UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HELEN GREENE JOHNSON, as Administrator of
the Estate of Khalil Islam, also known as Thomas
Johnson, Deceased,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

No. 24 Civ. 872 (DEH)

---

MUHAMMED A. AZIZ,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

No. 24 Civ. 874 (DEH)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
*Counsel for United States of America*
86 Chambers Street, 3rd Floor
New York, New York 10007

DANIELLE J. MARRYSHOW
ILAN STEIN
JEFFREY OESTREICHER
Assistant United States Attorneys
    – Of Counsel –

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.     Factual Background……..……………………………………………………..3

    B.     Procedural Background…………………………………..………………………..6

LEGAL STANDARD…………………………………………………………….……..7

ARGUMENT…………………………………………………………………..…..8

I.      PLAINTIFFS' NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL
      DISTRESS, AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
      CLAIMS ARE BARRED BY THE FTCA'S STATUTE OF LIMITATIONS…………………..8

    A. Plaintiffs Were Aware of the "Critical Facts" Concerning Their Injury And Its Alleged
      Cause No Later Than 2020................................................................. 8

    B. The Continuing Violation Doctrine Cannot Render Plaintiffs' Claims Timely…………..12

    C. Plaintiffs Are Not Entitled to Equitable Tolling…………………………………………14

II.     THE UNITED STATES HAS NOT WAIVED SOVERIGN IMMUNITY AS
      TO PLAINTIFFS' MALICIOUS PROSECUTION CLAIMS…………………………..14

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR MALICIOUS PROSECUTION………18

    A. The FBI Did Not Commence or Continue a Criminal Proceeding Against Plaintiffs….18

    B. There Was Probable Cause Supporting Plaintiffs' Indictments…………………………22

IV.    PLAINTIFFS' NEGLIGENCE CLAIMS FAIL UNDER RULE 12(B)(6) AND
      RULE 12(B)(1)…………………………………………………………….…………25

    A. Plaintiffs Fail to State Negligence Claims Because the FBI's Alleged
      Misconduct Was Intentional, Not Negligent…………………………………………..25

B.     No Private Analogue Exists Under New York Law for Negligence
        Under Similar Circumstances………………………………………………..27

C.     Plaintiffs' Negligent Supervision Claims Are Unavailable Under State
        Law Because the FBI Employees' Alleged Misconduct Occurred Within the
        Scope of Employment…………………………………………………………29

V. PLAINTIFFS FAIL TO STATE CLAIMS FOR INTENTIONAL INFLICTION
    OF EMOTIONAL DISTRESS……………...………………….……………………..30

VI. PLAINTIFFS FAIL TO STATE CLAIMS FOR NEGLIGENT INFILCTION
    OF EMOTIONAL DISTRESS…………………………………………………….....32

CONCLUSION…………………………………………………………………………..35

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.Q.C. ex rel. Castillo v. United States*,
  656 F.3d 135 (2d Cir. 2011) ................................................................ 8, 12, 14

*Ames v. United States*,
  600 F.2d 183 (8th Cir. 1979) ........................................................................ 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 7

*Barone v. United States*,
  No. 12 Civ. 4103 (LAK), 2014 WL 4467780 (S.D.N.Y. Sept. 10, 2014) ......... 14, 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................... 7

*Ben v. United States*,
  160 F. Supp. 3d 460 (N.D.N.Y. 2016) ...................................................... 28, 29

*Bender v. City of New York*,
  78 F.3d 787 (2d Cir. 1996) ......................................................................... 32

*Bernard v. United States*,
  25 F.3d 98 (2d Cir. 1994) ................................................................ 19, 28, 32

*Blanco v. Success Academy Charter Schools, Inc.*,
  No. 23 Civ. 1652 (LJL), 2024 WL 965001 (S.D.N.Y. Mar. 6, 2024) ................. 30

*Boose v. City of Rochester*,
  421 N.Y.S.2d 740 (4th Dep't 1979) ............................................................ 33

*Brady v. Maryland*,
  373 U.S. 83 (1963) ...................................................................................... 32

*Brewton v. City of New York*,
  550 F. Supp. 2d 355 (E.D.N.Y. 2008) ........................................................ 30

*Broughton v. State*,
  37 N.Y.2d 451 (N.Y. 1975) ........................................................................ 18

*Burt v. Aleman*,
   No. 05 Civ. 4493 (NGG), 2008 WL 1927371 (E.D.N.Y. Apr. 30, 2008) ........................ 21, 22

*Carney v. Boston Market*,
   No. 18 Civ. 713 (LGS), 2018 WL 6698444 (S.D.N.Y. Dec. 20, 2018) ................................. 34

*Chanko v. Am. Broad. Companies Inc.*,
   27 N.Y.3d 46 (N.Y. 2016) ........................................................................................... 31

*Chau v. Donovan*,
   357 F. Supp. 3d 276 (S.D.N.Y. 2019) ......................................................................... 33

*Cox v. Perfect Bldg. Maint. Corp.*,
   No. 16 Civ. 7474 (VEC), 2017 WL 3049547 (S.D.N.Y. July 18, 2017) ................................ 11

*David v. Weinstein Co.,*
   *LLP*, 431 F. Supp. 3d 290 (S.D.N.Y. 2019) .................................................................. 28

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010) ......................................................................................... 4

*Dillon v. City of New York*,
   704 N.Y.S.2d 1 (1st Dep't 1999) ................................................................................. 30

*Diminnie v. United States*,
   728 F.2d 301 (6th Cir. 1984) ................................................................................. 17, 18

*Dirienzo v. United States*,
   690 F. Supp. 1149 (D. Conn. 1988) ...................................................................... 19, 28

*Doe v. Guthrie Clinic, Ltd.*,
   22 N.Y.3d 480 (N.Y. 2014) ......................................................................................... 29

*Donahue v. United States*,
   634 F.3d 615 (1st Cir. 2011) ......................................................................................... 9

*Dupree v. Vill. of Hempstead*,
   401 F. Supp. 1398, 1400 (E.D.N.Y. 1975) ................................................................. 18

*Druschke v. Banana Republic, Inc.*,
   359 F. Supp. 2d 308, 315–16 (S.D.N.Y. 2005) .......................................................... 33

*EEOC v. Die Fliedermaus, L.L.C.*,
   77 F. Supp. 2d 460 (S.D.N.Y. 1999) ........................................................................... 30

*Forbes v. City of Rochester*,
 612 F. Supp. 3d 159 (W.D.N.Y. 2020) ................................................... 27

*Frederique v. Cnty. of Nassau*,
 168 F. Supp. 3d 455 (E.D.N.Y. 2016) .................................................... 27

*Freeman v. Rochester Psychiatric Ctr.*,
 No. 12 Civ. 6045, 2017 WL 4169336 (W.D.N.Y. Sept. 20, 2017) .......... 11

*Frigerio v. United States*,
 No. 10 Civ. 9086 (SAS), 2011 WL 3163330 (S.D.N.Y. July 22, 2011) .... 21

*Gaudet v. United States*,
 517 F.2d 1034 (5th Cir. 1975) ............................................................... 17

*Gilvar v. United States*,
 No. 09 Civ. 8941 (LTS), 2011 WL 2161866 (S.D.N.Y. May 26, 2011) ..... 9

*Gonzalez v. Nat'l Westminster Bank, Plc*,
 No. 11 Civ. 1435 (LAP), 2013 WL 6978874 (S.D.N.Y. Nov. 18, 2013) .... 13

*Hadid v. City of New York*,
 730 Fed. App'x 68 (2d Cir. 2018) ......................................................... 24

*Hazan v. City of New York*,
 No. 98 Civ. 1716 (LAP), 1999 WL 493352 (S.D.N.Y. July 12, 1999) ...... 33

*Henry v. Bank of Am.*,
 48 N.Y.S.3d 67 (1st Dep't 2017) ........................................................... 12

*Hernandez v. United States*,
 939 F.3d 191 (2d Cir. 2019) ...................................................... 7, 10, 27

*Howell v. New York Post Co.*,
 81 N.Y.2d 115 (N.Y. 1993) .................................................................... 31

*Jaegly v. Couch*,
 439 F.3d 149 (2d Cir. 2006) .................................................................. 22

*Jones v. City of New York*,
 988 F. Supp. 2d  305 (E.D.N.Y. 2013) ................................................... 32

*King v. United States*,
 No. 16-cv-2565 (LDH), 2020 WL 1234236 (E.D.N.Y. Mar. 13, 2020) ..... 28

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ........................................................................ 8

*Lamb v. Baker*,
    152 A.D.3d 1230 (4th Dep't 2017) ............................................................ 29

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ............................................................................. 16, 17

*Lassic v. United States*,
    No. 14 Civ. 9959 (KBF), 2015 WL 5472946 (S.D.N.Y. Sept. 16, 2015) ............................. 29

*Limone v. United States*,
    497 F. Supp. 2d 143 (D. Mass. 2007) ........................................................ 21

*Limone v. United States*,
    579 F.3d 79 (1st Cir. 2009) ...................................................................... 21

*Liuzzo v. U.S.*,
    508 F. Supp. 923 (E.D. Mich. 1981) ........................................................ 15

*Long Island Radio Co. v. NLRB*,
    841 F.2d 474 (2d Cir. 1988) ...................................................................... 7

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ...................................................................... 7

*Manganiello v. City of New York*,
    612 F.3d 149 (2d Cir. 2010) .................................................................... 19

*Margrabe v. Sexter & Warmflash, P.C.*,
    No. 07 Civ. 2798 (KMK), 2009 WL 361830 (S.D.N.Y. Feb. 11, 2009) ............................. 12

*McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*,
    682 N.Y.S.2d 167 (1st Dep't 1998) .......................................................... 30

*Mines-Jones v. Spiegel Brands, Inc.*,
    No. 19 Civ. 1024, 2019 WL 13472339 (E.D.N.Y. Apr. 16, 2019) ............................. 11

*Mix v. Delaware & Hudson Ry. Co.*,
    345 F.3d 82, 89 (2d Cir. 2003) ................................................................ 13

*Mortise v. United States*,
    102 F.3d 693 (2d Cir. 1996) ............................................................. 33, 34

*Ortiz v. City of New York*,
　No. 15 Civ. 2206 (DLC), 2016 WL 7009059 (S.D.N.Y. Nov. 30, 2016)................................ 26

*Pane v. Town of Greenburgh*,
　No. 07 Civ. 3216 (LMS), 2012 WL 12886971 (S.D.N.Y. Mar. 21, 2012)............................. 30

*Panos v. Universal Forest Prods., Inc.*,
　No. 18 Civ. 2066 (KMK), 2020 WL 416445 (S.D.N.Y. Jan. 27, 2020).................................. 13

*Pennington v. United States*,
　406 F. Supp. 850, 853 (E.D.N.Y. 1976) ................................................................................ 18

*Polselli v. IRS*,
　598 U.S. 432 (2023)................................................................................................................ 16

*Porrazzo v. Bumble Bee Foods, LLC*,
　822 F. Supp. 2d 406 (S.D.N.Y. 2011)..................................................................................... 10

*Quinoy v. Pena*,
　No. 13 Civ. 1945 (NSR), 2014 WL 1998239 (S.D.N.Y. May 14, 2014) .......................... 19, 23

*Ramiro Aviles v. S&P Glob., Inc.*,
　380 F. Supp. 3d 221 (S.D.N.Y. 2019)..................................................................................... 12

*Ramsaroop v. Dep't of Educ. of City of New York*,
　No. 20 Civ. 4947 (ER), 2022 WL 376029 (S.D.N.Y. Feb. 8, 2022) ...................................... 30

*Regan v. Sullivan*,
　557 F.2d 300 (2d Cir. 1977).................................................................................................... 17

*Rheingold v. Harrison Town Police Dep't*,
　568 F. Supp. 2d 384 (S.D.N.Y. 2008).................................................................................... 32

*Rivera v. City of New York*,
　392 F. Supp. 2d 644 (S.D.N.Y. 2005)..................................................................................... 30

*Roberts v. City of New York*,
　171 A.D.3d 139 (1st Dep't), *aff'd*, 34 N.Y.3d 991 (NY 2019) ................................................ 20

*Rohman v. N.Y.C. Transit Auth.*,
　215 F.3d 208 (2d Cir. 2000).................................................................................................... 19

*Rooney v. Wittich*,
　21 F. Supp. 2d 273 (S.D.N.Y. 1998)....................................................................................... 34

*Rothstein v. Carriere*,
    373 F.3d 282 (2d Cir. 2004) ................................................................................ 22

*Salamone v. United States*,
    618 F. Supp. 3d 146, 153 (S.D.N.Y. 2022) ........................................................ 29

*Savino v. City of New York*,
    331 F.3d 63 (2d Cir. 2003) ................................................................................. 22

*Seippel v. Jenkins & Gilchrist, P.C.*,
    341 F. Supp. 2d 363 (S.D.N.Y. 2004) ............................................................... 13

*Selkirk v. State*,
    671 N.Y.S.2d 824 (3d Dep't 1998) .................................................................... 13

*Selvam v. United States*,
    570 F. Supp. 3d 29 (E.D.N.Y. 2021) ..................................................... 22, 23, 24

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ........................................................................................... 16

*Spock v. U.S.*,
    464 F. Supp 510 (S.D.N.Y. 1978) ..................................................................... 18

*St. John v. Rein Teen Tours, Inc.*,
    No. 99 Civ. 2537 (MBM), 2000 WL 977685 (S.D.N.Y. July 17, 2000) .......... 33, 34

*Stuto v. Fleishman*,
    164 F.3d 820 (2d Cir. 1999) ............................................................................... 31

*Sulaiman v. Laram*,
    No. 16 Civ. 8182 (CM), 2017 WL 11659746 (S.D.N.Y. Apr. 4, 2017) ............. 12

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) ............................................................................... 31

*United Nat'l Ins. Co. v. Tunnel, Inc.*,
    988 F.2d 351 (2d Cir. 1993) ............................................................................... 26

*United States v. Kwai Fun Wong*,
    575 U.S. 402 (2015) ............................................................................................. 8

*United States v. Sherwood*,
    312 U.S. 584 (1941) ............................................................................................. 7

*United States v. Solomonyan*,
    452 F. Supp. 2d 334 (S.D.N.Y. 2006)........................................................... 23

*Watson v. United States*,
    865 F.3d 123 (2d Cir. 2017)........................................................................ 28

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007)........................................................................ 23

## Statutes

28 U.S.C. § 1346(b) ................................................................... 1, 16, 27, 29

28 U.S.C. § 2401(b) ............................................................................. 8, 16

28 U.S.C. § 2675(a) .................................................................................. 8

28 U.S.C. § 2680(h) ........................................................................... 15-18

## Rules

Fed. R. Civ. P. 12(b)(1).................................................................. 1, 7, 25, 28

Fed. R. Civ. P. 12(b)(6)................................................................... 1, 7, 25

Defendant the United States of America (the "Government"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion to dismiss Plaintiff Muhammed A. Aziz's Complaint (Dkt. No. 24 Civ. 874, ECF No. 1 ("Aziz Compl.")) and Plaintiff Helen Greene Johnson's Complaint (Dkt. No. 24 Civ. 872, ECF No. 1 ("Greene Johnson Compl.")), under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In this action filed pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* ("FTCA"), Plaintiffs seek to hold the Government liable for their since-vacated 1966 criminal convictions by the Manhattan District Attorney's Office for the murder of Malcolm X. Plaintiffs allege that the Federal Bureau of Investigation ("FBI") partnered with the New York City Police Department ("NYPD") in investigating Malcolm X's assassination, and that the FBI withheld exculpatory evidence and fabricated evidence against Plaintiffs resulting in their convictions. They bring claims against the Government sounding in negligence, malicious prosecution, negligent infliction of emotional distress ("NIED"), and intentional infliction of emotional distress ("IIED").

Plaintiffs' claims against the Government fail as a matter of law for multiple, independent reasons. As a threshold matter, Plaintiffs' negligence, NIED, and IIED claims are barred by the FTCA's two-year statute of limitations. These claims accrued decades ago, and Plaintiffs were (or should have been) aware of the critical facts concerning their injuries more than two years before they filed their claims. Indeed, in 2020 – more than two years before Plaintiffs submitted their administrative FTCA claims – Plaintiffs retained attorneys in connection with these matters and a

documentary series was released which purports to cast significant doubt on their convictions and the underlying investigation.

These causes of action also fail because Plaintiffs have not adequately stated a claim for relief. The negligence claims fail because they are premised on intentional conduct, not negligence, and because there is no private analogue under New York law for the conduct alleged in these actions. Nor are negligent supervision claims available under New York law where, as here, the alleged misconduct occurred within the scope of employment. Plaintiffs' IIED claims fail because they cannot be asserted against governmental entities under New York law as a matter of public policy. They also fail because the alleged misconduct is covered by a traditional tort remedy and because Plaintiffs have failed to allege sufficiently extreme or outrageous conduct. Plaintiffs' NIED claims fail for similar reasons: under New York law, Plaintiffs cannot recast a malicious prosecution claim as an NIED claim, and, in any event, Plaintiffs fail to allege the elements of a NIED claim, including breach of a specific duty owed to Plaintiffs, unreasonable endangerment of their physical safety, or sufficiently extreme or outrageous conduct.

Plaintiffs' malicious prosecution claims also fail as a matter of law. The Court lacks subject matter jurisdiction over the claims because they are based on pre-1974 alleged conduct, before Congress waived the Government's sovereign immunity. Also, because the FBI did not commence or continue a criminal proceeding against Plaintiffs, and there was probable cause supporting Plaintiffs' prosecutions, there is no basis for a malicious prosecution cause of action.

For these reasons, the Court should dismiss Plaintiffs' complaints in their entirety.

## BACKGROUND

### A. Factual Background

Malcolm X was assassinated on February 21, 1965, in the Audubon Ballroom in Manhattan.  *See* Aziz Compl. ¶¶ 22-24, Greene Johnson Compl. ¶¶ 23-25.  Plaintiffs allege that in the wake of the assassination, the FBI assisted the NYPD and the District Attorney in their investigation of the crime.  Aziz Compl. ¶ 38, Greene Johnson Compl. ¶ 34.  Specifically, over the course of the NYPD's investigation, Plaintiffs allege that the FBI (1) "orchestrated and supervised FBI informants' communications with the NYPD," *see* Aziz Compl. ¶ 41, Greene Johnson Compl. ¶ 37; (2) "invited the NYPD's collaboration on developing investigative leads outside of New York," Aziz Compl. ¶ 43, Greene Johnson Compl. ¶ 39; (3) shared with the NYPD "the identities of individuals its employees identified as having been present in the Audubon Ballroom at the time of the murder," Aziz Compl. ¶ 44, Greene Johnson Compl. ¶ 40; (4) delivered one of the murder weapons to the NYPD along with the witness who found it, Aziz Compl. ¶¶ 29, 42, Greene Johnson Compl. ¶¶ 30, 38; and (5) made its "crime laboratory available for the NYPD's use during the investigation and processed fingerprints recovered during the investigation," Aziz Compl. ¶ 45, Greene Johnson Compl. ¶ 41.

Plaintiffs further contend that both the FBI and the NYPD "amassed an immense volume of intelligence and investigative reports pointing away from [Plaintiffs] and demonstrating that the actual perpetrators came from New Jersey and were affiliated with the NOI [Nation of Islam] mosques in Newark and Paterson, New Jersey."  Aziz Compl. ¶ 46, Greene Johnson Compl. ¶ 42.  In particular, Plaintiffs aver that the FBI obtained detailed descriptions of two suspects, including the shotgun assassin.  Aziz Compl. ¶ 47, Greene Johnson Compl. ¶ 43.  But, Plaintiffs assert, the FBI did not share all it learned with the NYPD.  Aziz Compl. ¶ 56, Greene Johnson Compl. ¶ 52.

According to Plaintiffs, the FBI withheld certain exculpatory information that further demonstrated the actual perpetrators were from New Jersey, and that Plaintiffs therefore were not responsible for the crime, in an effort to "prevent[] disclosure of [the FBI's] investigative tactics and sources." *See* Aziz Compl. ¶¶ 46-59, Greene Johnson Compl. ¶¶ 42-55. Plaintiffs maintain that some of the information was withheld from the NYPD at the express instruction of J. Edgar Hoover. Aziz Compl. ¶ 50, Greene Johnson Compl. ¶ 46.

In late February and early March 1965, the NYPD arrested Plaintiffs for the murder of Malcolm X. *See* Aziz Compl. ¶ 60, Greene Johnson Compl. ¶ 56. Plaintiffs, along with another man, Mujahid Abdul Halim ("Halim") (who later admitted his involvement), were indicted on March 10, 1965, and tried in New York state court. *See* Aziz Compl. ¶¶ 61, 69-74, Greene Johnson Compl. ¶¶ 57, 64-69; Joint Motion to Vacate Judgments of Conviction and Dismiss Indictment, at 6 (November 18, 2021) ("2021 Motion"), https://www.courthousenews.com/wp-content/uploads/2021/11/aziz-islam-motion-to-vacate-convictions.pdf (last visited April 30, 2024).[1]

At trial, seven eyewitnesses identified Plaintiffs as having been involved in Malcolm X's assassination. 2021 Motion at 7. More specifically, several witnesses identified Aziz as the individual who created a diversion inside the Audubon Ballroom before Malcolm X was shot. *Id.* at 8. In addition, "[e]yewitnesses testified . . . that Islam fired a sawed-off shotgun at Malcolm X from the front of the Ballroom near the stage," *id.* at 9, and that "immediately after the shotgun blast, Aziz . . . ran toward the stage, firing repeatedly at the prostrate body of Malcolm X," *id.* at 10. Also, "several eyewitnesses identified Aziz and Islam as they fled from the scene," *id.*, and

---

[1] This document is properly considered on a motion to dismiss because it is incorporated by reference in the complaint. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Aziz Compl. ¶ 157, Greene Johnson Compl. ¶ 152.

had previously "picked [Plaintiffs] out of lineups or from photographs during the investigation," *id.* at 36. All three defendants, including Plaintiffs, were convicted of first-degree murder on March 11, 1966, and on April 14, 1966, they were each sentenced to life imprisonment. *See* Aziz Compl. ¶¶ 89-91, Greene Johnson Compl. ¶¶ 84-86; 2021 Motion at 17.

In December 1977, Plaintiffs moved to vacate their convictions based on (1) affidavits from Halim which identified his co-conspirators and provided additional detail about the assassination, (2) newly obtained FBI records, and (3) new information that an undercover detective had witnessed the assassination. *See* Aziz Compl. ¶¶ 93-94, Greene Johnson Compl. ¶¶ 88-89. The District Attorney opposed the motion. In his opposition, the District Attorney represented that the prosecution's case file contained no papers of any kind from the FBI. *See* Aziz Compl. ¶ 109; Greene Johnson Compl. ¶ 104. The District Attorney further reported that "any information in the FBI records obtained by the defense had no significance," and that the FBI had informed him that unredacted copies of the documents obtained by the defense were on file at FBI headquarters but, because of the volume of papers on file, it would take a considerable period of time to obtain them. Aziz Compl. ¶¶ 110-111, Greene Johnson Compl. ¶¶ 105-106. The motion to vacate was denied by the state court on November 1, 1978. Aziz Compl. ¶ 113, Greene Johnson Compl. ¶ 108. Plaintiffs were granted parole and released from prison in the mid-1980s. *See* Aziz Compl. ¶ 121, Greene Johnson Compl. ¶ 116.

The assassination of Malcolm X has been the subject of public scrutiny for decades, and much information has entered the public sphere in the years since. Notably, in 2011, the FBI publicly released thousands of pages of its records on Malcolm X, including information it gathered regarding his assassination, to its Freedom of Information Act Library, known as The Vault. *See* FBI Records: The Vault, *Civil Rights*, https://vault.fbi.gov/civil-rights (last visited

April 30, 2024).  And in February 2020, the documentary series, "Who Killed Malcolm X?" was released on Netflix, which specifically suggested that Plaintiffs were wrongly convicted of Malcolm X's assassination and that the FBI's records contained information regarding the true assailants.  *See* Meagan Flynn, *Malcolm X assassination may be reinvestigated as Netflix documentary, lawyers cast doubt on convictions*, The Washington Post (Feb. 10, 2020), https://www.washingtonpost.com/nation/2020/02/10/malcolmx-assassination-netflix.

Around the same time, in January 2020, counsel for Plaintiffs and the District Attorney's Conviction Integrity Program launched a joint reinvestigation of the case.  Aziz Compl. ¶ 122, Greene Johnson Compl. ¶ 117.  On November 18, 2021, at the conclusion of that reinvestigation, the District Attorney filed a joint motion to vacate Plaintiffs' convictions and to dismiss all charges against them.  Aziz Compl. ¶ 157, Greene Johnson Compl. ¶ 152; *see also* 2021 Motion.  The motion was granted.  Aziz Compl. ¶ 161, Greene Johnson Compl. ¶ 156.

Following the vacatur of their convictions, Plaintiffs filed lawsuits against the State of New York and the City of New York based on their wrongful convictions.  Together, the State and City settled those claims for $36 million.  *See* Associated Press, *Men exonerated in Malcolm X killing to receive $36 million*, Politico (Oct. 30, 2022), https://www.politico.com/news/2022/10/30/malcolm-x-killing-exonerated-settlement-00064156 (last visited April 30, 2024).

### B.  Procedural Background

Plaintiffs submitted their administrative claims to the FBI in March 2023.  Aziz Compl. ¶ 17, Greene Johnson Compl. ¶ 17.  On or about November 16, 2023, Plaintiffs filed the instant lawsuits in the United States District Court for the Eastern District of New York bringing claims for malicious prosecution, negligence, intentional infliction of emotional distress, and negligent

infliction of emotional distress.  *See Aziz* Dkt. No. 1, *Greene Johnson* Dkt. No. 1.  On or about February 6, 2024, those cases were transferred to the United States District Court for the Southern District of New York.  *See Aziz* Dkt. No. 16, *Greene Johnson* Dkt. No. 13.  On February 28, 2024, the two actions were deemed related.  *See Aziz* Minute Entry Dated February 28, 2024.

## LEGAL STANDARD

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "The United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  "Any waiver of the government's sovereign immunity is to be strictly construed in favor of the government." *Long Island Radio Co. v. NLRB*, 841 F.2d 474, 477 (2d Cir. 1988).  On a Rule 12(b)(1) motion, a district court "may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.  The plaintiff "has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Makarova*, 201 F.3d at 113.

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a court must accept as true the well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the non-movant, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019).  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

**ARGUMENT**

**I.    PLAINTIFFS' NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIMS ARE BARRED BY THE FTCA'S STATUTE OF LIMITATIONS**

Under the FTCA, before a plaintiff may bring "a claim against the United States for money damages for injury . . . or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government," the plaintiff must "have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a).  Moreover, an FTCA claim "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b).  The two-year statute of limitations is not jurisdictional and may be equitably tolled in rare circumstances.  *United States v. Kwai Fun Wong*, 575 U.S. 402, 413-14 (2015); *see also A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 139 (2d Cir. 2011).

Plaintiffs' negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress claims are barred by the FTCA's statute of limitations.  It cannot be seriously disputed that these claims accrued decades ago.  And even assuming the diligent discovery rule applies here, that does not render Plaintiffs' claims timely because they knew or should have known the critical facts concerning their injuries by February 2020 at the latest.  Finally, Plaintiffs have not alleged facts suggesting they are entitled to the extraordinary remedy of equitable tolling.

**A. Plaintiffs Were Aware of the "Critical Facts" Concerning Their Injury And Its Alleged Cause No Later Than 2020**

In general, an FTCA claim accrues at the time of the injury.  *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998).  However, under the diligence discovery rule, "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause."  *Id.* (internal quotation marks and citation omitted).  This is

not an "exacting requirement"; a plaintiff must have only "knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e. knowledge of the injury's existence and knowledge of its cause or the person or entity that inflicted it." *Id.* (internal quotation marks and citation omitted). In short, [i]t requires only that a plaintiff know or should know enough facts to seek legal advice." *Gilvar v. United States*, No. 09 Civ. 8941 (LTS), 2011 WL 2161866, at *3 (S.D.N.Y. May 26, 2011), *aff'd,* 468 F. App'x 31 (2d Cir. 2012). Further, when "the weight of the publicly available information" connects the government to the injury, plaintiffs "with reasonable diligence, should have discovered the critical facts of both [their] injury and its cause sufficient to file an administrative claim." *Gilvar*, 468 F. App'x at 33 (citation and internal quotation marks omitted). "[W]hether the plaintiffs *actually* knew the information is not the issue. What counts is that the body of work was generally available to them" more than two years before they filed their administrative claim. *Donahue v. United States*, 634 F.3d 615, 626 (1st Cir. 2011).

Over the past sixty years, the assassination of Malcolm X has been the subject of an extensive amount of public scrutiny and interest. Plaintiffs allege that the FBI withheld information "pointing away from [Plaintiffs] and demonstrating that the actual perpetrators came from New Jersey and were affiliated with the NOI mosques in Newark and Paterson, New Jersey." *See* Aziz Compl. ¶ 46, Greene Johnson Compl. ¶ 42. But this alleged information has been in the public domain since at least 2011, when the FBI publicly uploaded its records concerning Malcolm X to its FOIA Library, known as The Vault. *See* FBI Records: The Vault, *Civil Rights*, https://vault.fbi.gov/civil-rights       (last       visited       April       30,       2024); https://www.fbi.gov/news/stories/new-records-vault-comes-online       (FBI       uploaded       records

concerning Malcolm X to The Vault in April 2011).[2]  Indeed, the materials uploaded to The Vault in 2011, which have been publicly available for over thirteen years, contain records that provide the alleged critical facts for Plaintiffs' negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress claims.  For example, one FBI document dated March 25, 1965, noted that an individual who attended Malcolm X's funeral "chattered with former members of the Newark Nation of Islam (NOI) Temple," one of whom "was present when Malcolm X was shot."  FBI Records: The Vault, *Malcolm X Part 28 of 38*, at 45, https://vault.fbi.gov/Malcolm%20X/Malcolm%20X%20Part%2028%20of%2038/view  (last visited April 30, 2024).  Further, the publicly available information indicates that an  individual "identified" the person "who handled the shotgun as a lieutenant in the Newark Temple . . . . The man who started the distraction [in the Audubon Ballroom] . . . was believed to be a member of the Newark Temple."  *Id.* at 45-46.

Even the allegation that the FBI may not have shared all the information it gathered with the NYPD could have been raised based on the documents the FBI publicly disclosed over a decade ago.  For instance, an FBI report dated April 13, 1965, noted that witness statements "alleging that the individual who fired the shotgun at [Malcolm X] was supposedly a lieutenant from the Newark Temple of the Nation of Islam (NOI) . . . should not be furnished to the NYCPD without first receiving Bureau authority."  *Id.* at 62.[3]  In fact, Plaintiffs' allegation that the very description of

---

[2] This Court may consider these records because "it is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss."  *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011); *see also id.* at 12 (taking judicial notice of documents publicly available on the FDA website).

[3] To be sure, the same documents suggest that certain exculpatory information was shared with the NYPD.  The New York Office of the FBI "request[ed] Bureau authority to advise NYCPD" that it had information "that a Lieutenant from the Newark Temple of the Nation of Islam fired the shotgun when MALCOLM X was assassinated on 2/21/65."  FBI Records: The Vault, *Malcolm*

the "shotgun assassin later falsely identified as Mr. Islam" which "matched Bradley and was nothing like Mr. Islam" that they quote in their respective complaints has been publicly available for years. *Compare* Aziz Compl. ¶ 47, Greene Johnson Compl. ¶ 43, *with* FBI Records: The Vault, *Malcolm          X          Part          23          of          38*, at          99, https://vault.fbi.gov/Malcolm%20X/Malcolm%20X%20Part%2023%20of%2038/view          (last visited April 30, 2024).

In addition, the popular documentary series "Who Killed Malcolm X?" was released on Netflix in February 2020. *See* Meagan Flynn, *Malcolm X assassination may be reinvestigated as Netflix documentary, lawyers cast doubt on convictions*, The Washington Post (Feb. 10, 2020), https://www.washingtonpost.com/nation/2020/02/10/malcolmx-assassination-netflix/. The series "extensively reviewed evidence in support of [Plaintiffs'] innocence," *id.* and "point[ed] the finger at four members of a Nation of Islam mosque in Newark, N.J., depicting their involvement as an open secret in their city," John Leland, *Who Really Killed Malcolm X?*, The New York Times (Feb. 6, 2020), https://www.nytimes.com/2020/02/06/nyregion/malcolm-x-assassination-case-reopened.html. Indeed, Aziz, one of the Plaintiffs in this case, appeared in the documentary as an interviewee. *See* Flynn, *supra* p. 5-6.[4] The impact of the documentary series was so widespread

---

*Little (Malcolm X) HQ File 19 of 27*, at 190, https://vault.fbi.gov/malcolm-little-malcolm-x/malcolm-little-malcolm-x-hq-file-19-of-27/view (last visited April 30, 2024). Authority was granted to share this information with a redacted individual, and noted that "[a]vailable photographs . . . should also be furnished as soon as possible." *Id.* at 191.

[4] The documentary series remains available on Netflix, and the Court may take judicial notice of it. *See Cox v. Perfect Bldg. Maint. Corp.*, No. 16 Civ. 7474 (VEC), 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017) (noting that courts may take judicial notice of any facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Mines-Jones v. Spiegel Brands, Inc.*, No. 19 Civ. 1024 (LDH) (LB), 2019 WL 13472339, at *2 n.1 (E.D.N.Y. Apr. 16, 2019) (taking judicial notice of the 2013 animated film "Frozen"); *Freeman v. Rochester Psychiatric Ctr.*, No. 12 Civ. 6045 (MAT), 2017 WL 4169336, at *2 (W.D.N.Y. Sept. 20, 2017) (taking judicial notice of the television show "Dexter").

that Congress introduced a resolution seeking the reinvestigation of Malcolm X's assassination shortly after the series was released, specifically emphasizing that:

> the recently released Netflix docuseries titled "Who Killed Malcolm X?" serves as a serendipitous reminder of the injustices surrounding this case by demonstrating the gaps in prosecutorial and investigative processes . . . further compelling the need for the Department of Justice to assist the New York County District Attorney's Office, which has publicly committed to revisiting the case . . . .

H.R. Res. 863, 116th Cong. (2020).  And in fact, by January 2020, Plaintiffs had retained counsel to participate in the joint reinvestigation of the case with the Manhattan District Attorney's Conviction Integrity Program.  *See* Aziz Compl. ¶ 122, Greene Johnson Compl. ¶ 117.

In short, by 2020, there was an abundant amount of information in the public domain that would have put Plaintiffs on notice about the "critical facts" of their injury and its cause as a result of the FBI's inclusion of documents in the Vault in 2011, and the "Who Killed Malcolm X?" documentary in February 2020—a series in which Aziz appeared.  *A.Q.C*, 656 F.3d at 140. Because Plaintiffs did not file administrative claims until March 2023, *see* Aziz Compl. ¶ 17, Greene Johnson Compl. ¶ 17, their negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress claims are time-barred.

### B. The Continuing Violation Doctrine Cannot Render Plaintiffs' Claims Timely

The continuing violation doctrine also cannot render these claims timely.   The continuing violation doctrine is a "disfavored rule that is applied in rare circumstances."  *Sulaiman v. Laram*, No. 16 Civ. 8182 (CM), 2017 WL 11659746, at *8 (S.D.N.Y. Apr. 4, 2017).  Under that doctrine, "where there is a series of continuing wrongs," the statute of limitations may be tolled "to the date of the commission of the last wrongful act."  *Ramiro Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 289 (S.D.N.Y. 2019) (quoting *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 69 (1st Dep't 2017)). However, the continuing violation doctrine "may only be predicated on continuing unlawful

[wrongs] and not on the continuing effects of earlier [wrong]ful conduct." *Margrabe v. Sexter & Warmflash, P.C.*, No. 07 Civ. 2798 (KMK) (GAY), 2009 WL 361830, at *7 (S.D.N.Y. Feb. 11, 2009) (quoting *Selkirk v. State*, 671 N.Y.S.2d 824, 825 (3d Dep't 1998)) (alterations in original). In other words, for the statute of limitations to be tolled under this theory, Plaintiff must "allege that Defendants committed wrongs during the statutory period such that the continuing violation doctrine would apply." *Panos v. Universal Forest Prods., Inc.*, No. 18 Civ. 2066 (KMK), 2020 WL 416445, at *7 (S.D.N.Y. Jan. 27, 2020).

Here, Plaintiffs do not allege that the FBI committed any wrongdoing between March 2021 and March 2023, when they submitted their respective administrative claims. Instead, the last tortious act Plaintiffs allege the FBI took is its alleged refusal to disclose allegedly exculpatory information in support of Plaintiffs' 1977 motion to vacate their convictions, long before any act that could render these claims timely. *See* Aziz Compl. ¶¶ 108-111, Greene Johnson Compl. ¶¶ 103-106. Moreover, the law is clear that the mere failure to correct an alleged wrong does not extend the statute of limitations into perpetuity—the "law cannot permit a limitations period to depend on a continuing omission that can go on for decades." *Seippel v. Jenkins & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 376 (S.D.N.Y. 2004). Accordingly, because Plaintiffs merely "allege[s] a continuous omission" that "reflects [the] [d]efendant's . . . failure to fix a past wrong . . . as opposed to [the] [d]efendant's committing any new misdeeds," *Gonzalez v. Nat'l Westminster Bank, Plc*, No. 11 Civ. 1435 (LAP), 2013 WL 6978874, at *4 (S.D.N.Y. Nov. 18, 2013), they cannot take advantage of the continuing violation doctrine to save their untimely claims. *See Mix v. Delaware & Hudson Ry. Co.*, 345 F.3d 82, 89 (2d Cir. 2003) (noting in a Federal Employers' Liability Act action that "[o]nce the plaintiff is aware of his injury and its cause, the mere fact that the tortious

conduct—of which he is aware—is ongoing does not provide a basis for tolling or restarting the statute of limitations").

### C. Plaintiffs Are Not Entitled to Equitable Tolling

Plaintiffs likewise are not entitled to equitable tolling of the statute of limitations.  A litigant seeking equitable tolling bears the burden of establishing (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.  *A.Q.C.*, 656 F.3d at 144.  Equitable tolling is a "drastic remedy appliable only in rare and exceptional circumstances." *Id.* (citation, alteration, and internal quotation marks omitted).  Plaintiffs have not alleged in their complaints why, despite the vast amounts of information in the public domain, they did not pursue their claims until March 2023.  Nor do their complaints explain what, if any, extraordinary circumstances stood in the way of filing an administrative claim within the statute of limitations. As Plaintiffs "ha[ve] not alleged any basis for the application of equitable tolling," *Barone v. United States*, No. 12 Civ. 4103 (LAK), 2014 WL 4467780, at *13 n.12 (S.D.N.Y. Sept. 10, 2014), their negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress claims are time barred.

## II.    THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY AS TO PLAINTIFFS' MALICIOUS PROSECUTION CLAIMS

Plaintiffs' malicious prosecution claims should be dismissed because they seek to impose liability for conduct that took place before 1974, prior to Congress' waiver of the United States' sovereign immunity for any such acts.  Prior to 1974, the FTCA barred all claims for malicious prosecution.  However, on March 16, 1974, Congress amended 28 U.S.C. § 2680(h) to allow suits against the United States for acts or omissions by "investigative or law enforcement officers of the United States Government . . . arising, on or after the date of the enactment of this proviso, out of . . . malicious prosecution."  Because the acts and omissions on which Plaintiffs' malicious

14

prosecution claims are based occurred before 1974, the United States has not waived sovereign immunity for those acts.

It cannot genuinely be disputed that Plaintiffs' prosecutions and any alleged concealment of information by the FBI that led to Plaintiffs' convictions took place well before March 16, 1974; in fact, Plaintiffs were convicted on April 14, 1966.  Aziz Compl. ¶ 91, Greene Johnson Compl. ¶ 86.  Plaintiffs may argue, however, that their malicious prosecution claims did not *accrue* until their convictions were vacated in November 2021, *see* Aziz Compl. ¶¶ 157-164, Greene Johnson Compl. ¶¶ 152-159, and therefore their claims are timely.  But that would be mistaken because by its plain terms Section 2680(h) imposes only prospective liability—the statute waives sovereign immunity only for acts and omissions that took place "on or after the date of the enactment," regardless of when the cause of action accrued.

Beyond the plain language of Section 2680(h) (which is all the Court need look to), traditional tools of statutory interpretation also support this result.  As an initial matter, the legislative history of Section 2680(h) makes plain that the provision was intended to apply only to tortious acts committed after its enactment:

> The effect of this provision is to deprive the Federal Government of the defense of sovereign immunity in cases in which Federal law enforcement agents, acting within the scope of their employment, or under color of Federal law, commit any of the (enumerated) torts. . . .  Thus, after the date of enactment of this measure, innocent individuals . . . will have a cause of action against . . . the Federal Government.

S.Rep.No.93-588, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Adm. News 2789, 2791; *see also Liuzzo v. U.S.*, 508 F. Supp. 923, 928 (E.D. Mich. 1981) (quoting legislative history).

Moreover, the specific prospective language that Congress used in Section 2680(h) is significant.  When interpreting a statute, "[w]e assume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another

section of the same Act." *Polselli v. IRS*, 598 U.S. 432, 439 (2023) (citation and internal quotation marks omitted). In the FTCA, Congress stated that immunity was waived on or after March 16, 1974 "with regard to acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). In other words, Section 2680(h) directly links its effective date to the *acts* of government officers, making clear that what is relevant is when the government's allegedly tortious acts occurred, not when a plaintiff's claim accrues. If Congress intended for the waiver to apply to claims "accruing" after March 1974, it would have said so as it has done elsewhere in the FTCA. *See* 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity for certain claims "accruing on and after January 1, 1945"); 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing . . . within two years after such claim accrues."). Because "it is clear that Congress knew how to specify" the term accrued "when it wanted to," any contrary interpretation "runs afoul of the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (internal quotation marks omitted).

Moreover, construing Section 2680(h) to waive sovereign immunity only for future acts comports with the longstanding presumption against retroactive legislation. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 n.25 (1994) ("[W]e have applied the presumption [against retroactivity] in cases involving new monetary obligations that fell only on the government."); *id.* at 280 (statute operates retroactively if it "increase[s] a party's liability for past conduct"). That is especially here where retroactive application would create new liability, rather than merely increase it. *Id.* at 283. Indeed, the present case exemplifies where anti-retroactivity principles

come into play to prevent the imposition of liability well after the time when a defendant could adjust its primary conduct in conformity with the new law.

Furthermore, where Congress does want to enact retroactive legislation, it must make its intention to do so clear. *Landgraf*, 511 U.S. at 267-68, 270, 272. Here, Congress has not expressed any such intention. To the contrary, Section 2680(h) only applies to claims arising "on or after" March 16, 1974, which suggests liability that is exclusively prospective. Nor is it at all clear that Congress intended the term "arising" to be the same thing as "accruing" in the same statute. Because an ambiguous statute cannot provide the requisite congressional clarity, the statute must be construed to apply only prospectively. That conclusion is compelled even more in this instance because waivers of sovereign immunity must be construed narrowly in the government's favor. *Long Island Radio Co.*, 841 F.2d at 477.

In light of these principles, several courts of appeals have held that Section 2680(h) does not impose liability for acts or omissions occurring prior to the date of its enactment. *See Diminnie v. United States*, 728 F.2d 301, 303 (6th Cir. 1984) ("We agree . . . [that plaintiff's] malicious prosecution [claim was] barred by the doctrine of sovereign immunity [because] these claims all accrued at the time of the original arrest and indictment in 1973, and thus prior to the 1974 amendment to the FTCA which specifically waived sovereign immunity as to those types of claims."); *Ames v. United States*, 600 F.2d 183, 185 (8th Cir. 1979) (dismissing intentional tort claims because "the only acts and omissions alleged in plaintiff's complaint . . . occurred prior to March 16, 1974"); *Gaudet v. United States*, 517 F.2d 1034, 1035 (5th Cir. 1975) ("[T]he acts of which he complains occurred before March 16, 1974; therefore, suit is barred."); *see also Regan v. Sullivan*, 557 F.2d 300, 303 (2d Cir. 1977) (observing, in dicta, that even if plaintiff had asserted FTCA claims arising from his arrest in 1973, those claims would be barred because they

"arose prior to the effective date of the amendment" to Section 2680(h)); *Spock v. U.S.*, 464 F. Supp 510, 513 n.4 (S.D.N.Y. 1978); *Pennington v. United States*, 406 F. Supp. 850, 853 (E.D.N.Y. 1976); *Dupree v. Vill. of Hempstead*, 401 F. Supp. 1398, 1400 (E.D.N.Y. 1975) ("The complaint charges that the alleged wrongdoings occurred on July 17, 1973, which is prior to the amendment of 28 U.S.C. § 2680(h). It follows, therefore, that the United States of America is immune from suit.").

The Sixth Circuit's opinion in *Diminnie* is particularly instructive.  There, the court dismissed a malicious prosecution claim where the arrest and indictment occurred before 1974, but the criminal proceedings did not terminate in the plaintiff's favor until 1975.  728 F.2d at 303. Here, as in *Diminnie*, because the allegedly tortious conduct that supposedly led to Plaintiffs' indictment and subsequent convictions took place well before Congress waived the United States' sovereign immunity, this Court lacks subject matter jurisdiction over Plaintiffs' malicious prosecution claims.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR MALICIOUS PROSECUTION

Plaintiffs' malicious prosecution claims also should be dismissed for failure to state a claim.   In New York, a plaintiff alleging malicious prosecution must show: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, and (4) actual malice."  *Broughton v. State*, 37 N.Y.2d 451, 457 (N.Y. 1975).  Here, Plaintiffs have failed adequately to allege the first and third elements.

### A.  The FBI Did Not Commence or Continue a Criminal Proceeding Against Plaintiffs

With respect to the first element, under New York law, a defendant may be considered to have commenced or continued a criminal proceeding against the accused where "that defendant

played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (internal quotation marks omitted). Thus, for example, a "jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (internal quotation marks and alterations omitted). Generally, however, "there is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not [law enforcement] officers." *Barone*, 2014 WL 4467780, at *17. Accordingly, to premise a malicious prosecution claim on the conduct of a law enforcement officer, that officer "must do far more than simply aid in the investigation." *Quinoy v. Pena*, No. 13 Civ. 1945 (NSR), 2014 WL 1998239, at *10 (S.D.N.Y. May 14, 2014).

Moreover, control of the prosecution is deemed to have been passed from law enforcement to prosecutors when the grand jury issues an indictment. *See Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994) ("Once the grand jury indicted Bernard, control of the prosecution passed to the prosecutor and was no longer within the agent's authority."). Once the prosecutors take control of a case, a court cannot impose liability for malicious prosecution unless the defendant's "share in continuing the prosecution [is] active, as by insisting upon or urging further prosecution." *Dirienzo v. United States*, 690 F. Supp. 1149, 1158 (D. Conn. 1988) (quoting Restatement (Second) of Torts § 655 cmt. c (1977)).

Here, Plaintiffs do not allege that the FBI initiated or continued Plaintiffs' prosecutions. Rather, it is undisputed that this was a state prosecution, not a federal prosecution. Furthermore, although Plaintiffs aver that the FBI "assisted the NYPD's investigation of Malcolm X's murder," Aziz Compl. ¶ 258, Greene Johnson Compl. ¶ 253, their specific factual allegations assert that the

FBI's participation was limited to: (1) "orchestrat[ing] and supervis[ing] FBI informants' communications with the NYPD," Aziz Compl. ¶ 41, Greene Johnson Compl. ¶ 37; (2) "invit[ing] the NYPD's collaboration on developing investigative leads outside of New York," Aziz Compl. ¶ 43, Greene Johnson Compl. ¶ 39; (3) sharing with the NYPD "the identities of individuals its employees identified as having been present in the Audubon Ballroom at the time of the murder," Aziz Compl. ¶ 44, Greene Johnson Compl. ¶ 40; (4) "obtain[ing] detailed descriptions of two suspects . . . [and] bec[oming] aware of another informant who corroborated the previously obtained description of the shotgun assassin," Aziz Compl. ¶¶ 47-48, Greene Johnson Compl. ¶¶ 43-44; and (5) delivering one of the murder weapons to the NYPD along with the witness who found it, Aziz Compl. ¶¶ 29, 42, Greene Johnson Compl. ¶¶ 30, 38.[5]  In other words, the complaints suggest that the FBI aided in the investigation, but they do not allege that the FBI controlled the investigation or exerted control over the District Attorney's  decision to prosecute Plaintiffs.

---

[5] Plaintiffs further allege in conclusory fashion that the FBI "participated in the fabrication of evidence by causing witnesses to give false and materially misleading statements to prosecutors," Aziz Compl. ¶ 78, Greene Johnson Compl. ¶ 73, but they fail to identify those allegedly misleading statements, to what they pertained, or how they materially affected prosecutorial decisions.  *See Roberts v. City of New York,* 171 A.D.3d 139, 150 (1st Dep't), *aff'd*, 34 N.Y.3d 991 (NY 2019) ("It remains the law that a plaintiff's vague and conclusory assertions that the police fabricated evidence are insufficient to enable false arrest and malicious prosecution claims to survive a summary judgment motion" particularly where the plaintiff's claim of fabricated evidence "does not eliminate all questions as to probable cause.").  And while plaintiffs allege they would not have been prosecuted had "FBI employees divulged . . . evidence they possessed of [their] innocence and other individuals' guilt," Aziz Compl. ¶ 80, Greene Johnson Compl. ¶ 75, that allegation is entirely conclusory and does not establish that the FBI encouraged or importuned the District Attorney to act.  Also insufficient are Plaintiffs' allegations that "[n]umerous FBI employees . . . undertook a significant role in the investigation of Malcolm X's murder," working "cooperatively with the NYPD and the District Attorney in the investigation and prosecution of the criminal case." Aziz Compl. ¶ 38, Greene Johnson Compl. ¶ 34.  The Court also need not assume these conclusory statements are true on a motion to dismiss.

Indeed, Plaintiffs' allegations belie their claim that the FBI was somehow part of the prosecution team. For example, Plaintiffs acknowledge that the District Attorney's "case file contains no papers of any kind from the [FBI]." Aziz Compl. ¶ 109, Greene Johnson Compl. ¶ 104; 2021 Motion 20.[6] In addition, there are no well-pleaded allegations that the FBI pressured or even encouraged the District Attorney to act against the Plaintiffs. Nor are there allegations that the state trial was the functional equivalent of a federal prosecution or that the FBI provided testimony, before the grand jury or at trial, inculpating Plaintiffs. Rather, according to Plaintiffs, the FBI concealed allegedly exculpatory information from the District Attorney. Aziz Compl. ¶¶ 50-56, 59, Greene Johnson Compl. ¶¶ 46-52, 55. However, in the context of this state court prosecution, that is insufficient to allege that the FBI "exerted such control over the prosecution that the prosecutor ceased to exert his independent judgment." *Frigerio v. United States*, No. 10 Civ. 9086 (SAS), 2011 WL 3163330, at *10 (S.D.N.Y. July 22, 2011); *see also Limone v. United States*, 579 F.3d 79, 89-91 (1st Cir. 2009); *Burt v. Aleman*, No. 05 Civ. 4493 (NGG), 2008 WL 1927371, at *5 (E.D.N.Y. Apr. 30, 2008).

The *Limone* case cited in Plaintiffs' complaints, *see* Aziz Compl. ¶¶ 228-233, Greene Johnson Compl. ¶¶ 223-228, is instructive. There, despite the district court's findings of severe wrongdoing by the FBI (agents allegedly "suborned perjury," encouraged a witness "to testify despite knowing his testimony would likely be false," Aziz Compl. ¶ 231, Greene Johnson Compl. ¶ 226, and "fram[ed] . . . innocent men," Aziz Compl. ¶ 233, Greene Johnson Compl. ¶ 228 (quoting *Limone v. United States*, 497 F. Supp. 2d 143, 153 (D. Mass. 2007)), the First Circuit held that the malicious prosecution claims failed as a matter of law because the FBI had not

---

[6] Available at https://www.manhattanda.org/wp-content/uploads/2021/11/FINAL-Motion-to-Vacate-Convictions-11.16.2021.pdf (last visited April 30, 2024).

initiated or continued the state criminal proceedings against the plaintiffs. *Limone*, 579 F.3d at 89-91. The Court reasoned that, as here, the FBI "neither preferred charges against the scapegoats nor swore out a complaint against them"; "there is not a shred of evidence that the FBI induced the state to pursue the murder case"; the FBI did not control the state actors; and the "prosecution was [not] the functional equivalent of a federal prosecution." *Id. See also Frigerio*, 2011 WL 3163330, at *1, 10 (malicious prosecution claim dismissed where plaintiff failed to plead "facts demonstrating that the [FBI] agents exerted such control over the prosecution that the prosecutor ceased to exert his independent judgment").[7] For the same reason, the Court should dismiss Plaintiffs' malicious prosecution claims.

## B. There Was Probable Cause Supporting Plaintiffs' Indictments

Plaintiffs' malicious prosecution claims fail for the additional, independent reason that there was probable cause supporting their indictments. To survive a motion to dismiss, a plaintiff asserting malicious prosecution must allege facts tending to rebut the presumption of probable cause that arises from a grand jury indictment. *Rothstein v. Carriere*, 373 F.3d 275, 282-83, 285 (2d Cir. 2004); *Selvam v. United States*, 570 F. Supp. 3d 29, 36-37, 49 (E.D.N.Y. 2021), *aff'd*, No. 21-2513-CV, 2022 WL 6589550 (2d Cir. Oct. 11, 2022) (malicious prosecution claim failed where plaintiff "contended that certain assertions in [defendant's] warrant affidavit are false, but probable cause would persist even in the absence of those assertions"). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Savino v. City of New York*, 331 F.3d

---

[7] The United States also cannot be liable on a "continuation of the prosecution" theory after the grand jury indictment because the FBI was never in charge of the prosecution to begin with. In any event, there are no allegations that the FBI insisted or urged further action against Plaintiffs at any point during the prosecution. *See Burt*, 2008 WL 1927371, at *5 ("Once control of a prosecution has passed to a prosecuting attorney, a police officer may only be liable for 'continuing' the prosecution if he or she insists upon or urges further prosecution.") (internal quotation marks and alterations omitted).

63, 72 (2d Cir. 2003). Probable cause exists when officers "have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).

Probable cause is analyzed from an objective perspective, such that the arresting officer's subjective state of mind is irrelevant to the probable cause determination. *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006). "The law is clear that establishing probable cause does not require meeting a particularly demanding standard." *Quinoy*, 2014 WL 1998239, at *7 (citing *United States v. Solomonyan*, 452 F. Supp. 2d 334, 343 (S.D.N.Y. 2006)). "The existence or absence of probable cause becomes a question of law to be decided by the court . . . where there is no real dispute as to the facts." *Selvam*, 570 F. Supp. 3d at 49 (internal quotation marks omitted).

Here, the information allegedly in the possession of law enforcement when the prosecution was instituted was sufficient to establish probable cause. As an initial matter, because Plaintiffs were indicted on March 10, 1965, 2021 Motion at ¶ 22, the relevant allegations concern the FBI's conduct on or before that date. But Plaintiffs fail to advance well-pleaded factual allegations that support the inference that probable cause would have been lacking without the FBI's alleged misconduct before March 10, 1965. *See* Aziz Compl. ¶¶ 79, 88, 261, Greene Johnson Compl. ¶¶ 74, 83, 256.

To be sure, Plaintiffs allege that on or before March 10, 1965, the FBI concealed (1) a report describing two suspects and stating that the assassins were possibly imported to NYC and sat in the front of the Audubon Ballroom; (2) a report indicating that local FBI offices were instructed not to disclose the informant status of any witness; (3) a report containing information regarding someone believed to be Leon Davis; and (4) a police report describing the shooters as

men based in New Jersey who sat in the front row of the ballroom.  Aziz Compl. ¶ 85, Greene Johnson Compl. ¶ 80.  However, Plaintiffs fail to allege what information was presented to the grand jury, what evidence supported the finding of probable cause as of March 10, 1965, and what evidence was presented against the Plaintiffs at trial.  Without that, Plaintiffs do not provide any basis upon which to infer that they would not have been indicted but for the FBI's alleged pre-March 10 misconduct.  *See, e.g., Hadid v. City of New York*, 730 Fed. App'x 68, 72 (2d Cir. 2018) (the Second Circuit "ha[s] routinely affirmed dismissals of  malicious prosecution claims at the pleading stage where the plaintiff has failed to allege facts sufficient to rebut the presumption of probable cause flowing from a grand jury indictment**"**);  *Selvam*, 570 F. Supp. 3d at 49.

In fact, there was substantial evidence to support the finding of probable cause.  According to the District Attorney's 2021 Motion, seven eyewitnesses identified Plaintiffs at trial as having been involved in the assassination.  2021 Motion 7.  Two eyewitnesses testified that they saw Islam inside the Ballroom shortly before the murder.  *Id.* at 7-8.  Two eyewitnesses testified that they knew Islam from prior meetings.  *Id.* at 8.  Several witnesses identified Aziz as the person who created the diversion inside the Ballroom immediately before shots were fired.  *Id.*  "Jasper Davis testified that . . . a man he identified as Aziz sat down next to him and spoke with him for a few minutes" at the Ballroom before Malcolm X's speech.  *Id.*  "Eyewitnesses testified . . . that Islam fired a sawed-off shotgun at Malcolm X from the front of the Ballroom near the stage."  *Id.* at 9.  Carry Thomas and Fred Williams identified the man who shot Malcolm X with the sawed-off shotgun as Islam.  *Id.* at 9-10.  "Witnesses testified that, immediately after the shotgun blast, Aziz . . . ran toward the stage, firing repeatedly at the prostrate body of Malcolm X."  *Id.* at 10.  "[S]everal eyewitnesses identified Aziz and Islam as they fled from the scene."  *Id.*  These eyewitnesses had previously "picked [Plaintiffs] out of lineups or from photographs during the

investigation." *Id.* at 36.

In short, there was substantial evidence implicating Plaintiffs which supported the finding of probable cause, and Plaintiffs have failed to advance factual allegations evidencing that probable cause would have been vitiated but for the FBI's alleged misconduct.

## IV.   PLAINTIFFS' NEGLIGENCE CLAIMS FAIL UNDER RULE 12(B)(6) AND RULE 12(B)(1)

### A.   Plaintiffs Fail to State Negligence Claims Because the FBI's Alleged Misconduct Was Intentional, Not Negligent

Plaintiffs' negligence claims fail because they are premised on intentional conduct; none of the alleged acts are inadvertent, accidental, or anything but willful.  In introducing their complaints, Plaintiffs summarize their allegations against the Government as follows: "FBI employees, including Hoover, intentionally caused the presentation of false evidence against Mr. Aziz, concealed a trove of evidence of Mr. Aziz's innocence, and orchestrated fundamentally unfair legal proceedings against Mr. Aziz . . . ."  Aziz Compl. ¶ 3, Greene Johnson Compl. ¶ 3. According to Plaintiffs, FBI officials did so "despite knowing that their acts and omissions would violate Mr. Aziz's legal rights and cause him severe damage." *Id.*  Throughout the complaints, they repeatedly allege that FBI employees acted intentionally and knowingly.  For example. they allege that, "[f]rom 1965 to 2021, numerous FBI employees . . . intentionally conceal[ed]—and even den[ied] the existence of—information that would have exonerated Mr. Aziz [and Mr. Islam] . . . ."  Aziz Compl. ¶ 14, Greene Johnson Compl. ¶ 14.  They assert that FBI employees "deliberately concealed . . . information from the District Attorney, the court, Mr. Aziz, and Mr. Islam," and "knowingly and intentionally concealed exculpatory information even from the NYPD."  Aziz Compl. ¶ 56, Greene Johnson Compl. ¶ 52.  They contend the FBI did so to "protect[] and conceal[] the scope, nature, and activities of its domestic 'Counterintelligence

Program,' . . . and to divert blame from individuals whom certain FBI employees did not want to see prosecuted for their crimes."  Aziz Compl. ¶ 14, Greene Johnson Compl. ¶ 14.

According to Plaintiffs, the FBI "knowingly and intentionally facilitat[ed] the fabrication of evidence against Mr. Aziz [and Mr. Islam] and conceal[ed] evidence of [their] innocence," Aziz Compl. ¶ 81, Greene Johnson Compl. ¶ 76, and "intentionally hid [exculpatory] evidence from [other parties]," Aziz Compl. ¶ 86, Greene Johnson Compl. ¶ 81.  They allege that the "FBI documents themselves indicate that exculpatory information was 'deliberately withheld,' including from the District Attorney."  Aziz Compl. ¶ 126, Greene Johnson Compl. ¶ 121 (quoting 2021 Motion).

Similarly, the factual allegations relating to the conduct of FBI supervisors and FBI leadership all involve intentional conduct and deliberate decisions.  Aziz Compl. ¶ 50, Greene Johnson Compl. ¶ 46 ("Hoover expressly instructed the Bureau not to disclose to the NYPD the descriptions implicating Bradley."); Aziz Compl. ¶ 85(b), Greene Johnson Compl. ¶ 80(b) (at then-Director J. Edgar Hoover's behest, local FBI offices were instructed not to disclose to the NYPD the FBI informant status of any witness in the murder investigation").  None of the FBI supervisors' alleged conduct was borne out of laziness, incompetence, or neglect but instead was allegedly part of a coordinated, purposeful, and organized effort on the part of the agency.

A negligence claim, however, cannot flow from the type of intentional conduct alleged in the complaints. *See Ortiz v. City of New York*, No. 15 Civ. 2206 (DLC), 2016 WL 7009059, at *3 (S.D.N.Y. Nov. 30, 2016) (citing *United Nat'l Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993)) ("A claim of harm predicated solely on intentional acts may not give rise to a claim of negligence.").  For example, in *Fiedler v. Incandela*, plaintiff brought claims, including for negligence and malicious prosecution, against individual police officers and two counties in

connection with his arrest and prosecution for criminal possession of stolen property.  222 F. Supp. 3d 141, 151 (E.D.N.Y. 2016).  He alleged that the police had falsely accused him of moving stolen property.  *Id.* at 163.  The court dismissed the negligence claim because, according to plaintiff, defendants "acted intentionally at all relevant times, and Plaintiff fails to identify any inadvertent or accidental harmful conduct."  *Id.* at 167; *see also Forbes v. City of Rochester*, 612 F. Supp. 3d 159, 171 (W.D.N.Y. 2020) (dismissing negligence claim "premised on the same intentional conduct underlying his excessive force, assault, and battery claims"); *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 484 (E.D.N.Y. 2016) (same).  The same applies here.

## B.  No Private Analogue Exists Under New York Law for Negligence Under Similar Circumstances

Plaintiffs' negligence claims also fail because there is no private analogue for those claims under New York law.  The FTCA's waiver of sovereign immunity only applies "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Because Plaintiffs' negligence claims fail to meet that statutory requirement, the Court lacks subject matter jurisdiction.

Plaintiffs' negligence claims appear to rest on a constitutional due process violations—*i.e.*, the FBI's alleged fabrication of evidence and failure to turn over exculpatory information.  *See generally* Aziz Compl., Greene Johnson Compl.  Yet, as the Second Circuit has explained, "[t]he FTCA 'has not waived [the Government's] sovereign immunity with respect to claims that its employees have committed constitutional torts' under the federal constitution."  *Hernandez*, 939 F.3d at 205.  Nor can a plaintiff pursue a claim under the FTCA for violations of the New York Constitution.  *Id.* (collecting cases).

To the extent Plaintiffs' complaints can be construed to allege mere negligence—which,

as argued above, they cannot—the claims are foreclosed by the absence of a private-person analogue. "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Watson v. United States*, 865 F.3d 123, 134 (2d Cir. 2017) (quoting *Bernard*, 25 F.3d at 102). *See also King v. United States*, No. 16-cv-2565 (LDH) (RER), 2020 WL 1234236, at *2-3 (E.D.N.Y. Mar. 13, 2020) (law enforcement's alleged failure "to exercise due diligence in its investigation" and "to present exculpatory information" amounted to a claim of negligent investigation that is not cognizable under the FTCA); *Dirienzo*, 690 F. Supp. at 1155 ("The gravamen of plaintiff's claim is that the agents instituted and continued a criminal prosecution against him, an innocent person. However, neither New York nor the common law imposes liability upon even a *private* person for mere negligence in instituting or continuing a criminal prosecution for a crime which has actually occurred.").[8] Accordingly, Plaintiffs' negligence claims should be dismissed under Rule 12(b)(1).

---

[8] Perhaps recognizing that their claim for negligent investigation is foreclosed under New York law, Plaintiffs instead allege that "private individuals in the same or similar circumstances as Defendant's agents and employees would have had a duty to disclose the material exculpatory information in their possession," Aziz Compl. ¶ 284, Greene Johnson Compl. ¶ 279, to "avoid the [foreseeable] harm" to plaintiff, Aziz Compl. ¶ 282, Greene Johnson Compl. ¶ 277. But there is no standalone duty to prevent harm to third parties; that duty only arises in narrow circumstances, not alleged here, where there is a special, clearly defined relationship and where the alleged tortfeasor has custody or control over the plaintiff. *See, e.g.*, *Ben v. United States*, 160 F. Supp. 3d 460, 464-66, 469, 477-79, 482 (N.D.N.Y. 2016) (concluding that the U.S. Probation and Pretrial Services Office had the sort of special relationship that gives rise to a duty to prevent harm, where it "had sufficient authority and ability to control those aspects of [the releasee's] behavior upon which Plaintiffs are relying"). "Absent a special relationship, a defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter [the] defendant can exercise such control." *David v. Weinstein Co. LLP*, 431 F. Supp. 3d 290, 305 (S.D.N.Y. 2019) (internal quotation marks and alterations omitted).

**C. Plaintiffs' Negligent Supervision Claims Are Unavailable Under State Law Because the FBI Employees' Alleged Misconduct Occurred Within the Scope of Employment**

To maintain a claim against an employer for negligent supervision under New York law, a plaintiff must adequately allege that the employee's allegedly tortious conduct occurred outside the scope of employment. *See generally Doe v. Guthrie Clinic, Ltd.*, 22 N.Y.3d 480, 485 (N.Y. 2014). "[W]here a plaintiff is tortiously injured by an employee acting within the scope of his employment, courts routinely dismiss claims for negligent training and supervision as unnecessary, since the employer will be liable based on *respondeat superior* regardless of whether there was negligent training or supervision." *Ben*, 160 F. Supp. 3d at 476 (collecting cases); *Salamone v. United States*, 618 F. Supp. 3d 146, 153 (S.D.N.Y. 2022) ("New York law precludes a claim for negligent training or negligent supervision against an employer for acts taken within the scope of the employee's employment."); *see Lamb v. Baker*, 152 A.D.3d 1230, 1231 (4th Dep't 2017) (affirming dismissal of negligent supervision claim because plaintiff "failed to allege that [any of defendant's employees] committed an act of negligence outside the scope of his or her employment").

Here, Plaintiffs do not allege that any of the supposedly negligent supervisory acts were committed by FBI employees outside the scope of their employment. *See generally* Aziz Compl.; Greene Johnson Compl. Because the FTCA waives sovereign immunity only for claims that are cognizable in the state where the alleged negligence occurred, 28 U.S.C. § 1346(b)(1), this Court lacks subject matter jurisdiction over Plaintiffs' negligent supervision claims. *See Lassic v. United States*, No. 14 Civ. 9959 (KBF), 2015 WL 5472946, at *4 (S.D.N.Y. Sept. 16, 2015) ("this court does not have jurisdiction over an FTCA action based on a legal claim that is unavailable in the state where the act occurred").

## V.   PLAINTIFFS FAIL TO STATE CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs' IIED claims fail as a matter of law for several reasons.  As a threshold matter, under New York law, "'claims of intentional infliction of emotional distress against government[al] bodies are barred as a matter of public policy.'"  *Blanco v. Success Academy Charter Schools, Inc.*, No. 23 Civ. 1652 (LJL), 2024 WL 965001, at *15 (S.D.N.Y. Mar. 6, 2024) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 7 (1st Dep't 1999)); *accord Pane v. Town of Greenburgh*, No. 07 Civ. 3216 (LMS), 2012 WL 12886971, at *6 (S.D.N.Y. Mar. 21, 2012); *Rivera v. City of New York*, 392 F. Supp. 2d 644, 657 (S.D.N.Y. 2005).  Accordingly, Plaintiffs cannot pursue an IIED claim against the United States.  *Id.*; *see also, e.g.*, *Ramsaroop v. Dep't of Educ. of City of New York*, No. 20 Civ. 4947 (ER), 2022 WL 376029, at *9 (S.D.N.Y. Feb. 8, 2022) (dismissing IIED claim against NYC Department of Education).

In addition, because IIED "'is a theory of recovery that is to be invoked only as a last resort,'" it is "'precluded where the offending conduct is embraced by a traditional tort remedy.'"  *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999) (quoting *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 682 N.Y.S.2d 167, 169 (1st Dep't 1998)).  Here, according to Plaintiffs, the offending conduct allegedly falls within the ambit of malicious prosecution.  Aziz Compl. ¶¶ 1-267, Greene Johnson Compl. ¶¶ 1-262.  Therefore, Plaintiffs' IIED claims are precluded.  *See, e.g.*, *Aurrecchione v. Falco*, No. 22 Civ. 4538 (NSR), 2023 WL 6255529, at *15 (S.D.N.Y. Sept. 25, 2023) (dismissing IIED claim and observing: "state courts and federal courts applying New York law have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory"); *Brewton v. City of New York*, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008) (same).

Moreover, Plaintiffs have failed to allege the elements of an IIED claim, which are "rigorous, and difficult to satisfy." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993) (internal quotation marks omitted); *see also Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (IIED "remains a highly disfavored tort under New York law") (internal quotation marks and alterations omitted). IIED has four elements: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id*. (citations and internal quotation marks omitted). "Thus, it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id*. (internal quotation marks and alterations omitted).[9]

Plaintiffs' allegations that the FBI "caused the presentation of false evidence against [them], concealed a trove of evidence of [their] innocence, and orchestrated fundamentally unfair legal proceedings against [them]," Aziz Compl. ¶ 3, Greene Johnson Compl. ¶ 3, while undoubtedly quite serious, nonetheless do not meet this rigorous standard. *Stuto*, 164 F.3d at 827; *Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46, 56-57 (N.Y. 2016) (noting that "of the [IIED] claims considered by this Court, *every one* has failed because the alleged conduct was not

---

[9] Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the Court to determine in the first instance. *Stuto*, 164 F.3d at 827.

sufficiently outrageous") (internal quotation marks omitted; emphasis in original).  This is particularly so given that Plaintiffs' complaints are largely based on the FBI's alleged failure to turn over certain witness statements to the state prosecutor and alleged refusal to allow several witnesses to disclose that they were FBI informants, *see* Aziz Compl. ¶ 7, Greene Johnson Compl. ¶ 7, at a time (in and around 1966) when there was no established duty in caselaw requiring a federal law enforcement officer to unilaterally disclose such material for a state prosecution, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963) (ruling that "suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment") (emphasis added); *see also, e.g.*, *Jones v. City of New York*, 988 F. Supp. 2d 305, 309, 318 (E.D.N.Y. 2013) (allegation that prosecutor "failed to timely provide exculpatory DNA identification material pursuant to [*Brady*], thus prolonging [plaintiff's] incarceration," not sufficiently outrageous to state IIED claim); *cf. Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996) (noting in *dicta* that allegation that law enforcement officer "falsely claimed to have been bitten and wrongfully initiated an assault charge" may be sufficient to establish IIED claim).

## VI.  PLAINTIFFS FAIL TO STATE CLAIMS FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs' NIED claims fail for similar reasons.  As an initial matter, Plaintiffs' attempt to recast their malicious prosecution claims as ones sounding in negligence is unavailing.  The law is clear that a plaintiff may not, as here, "alleg[e] an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory."  *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008); *see also Bernard*, 25 F.3d at 102 ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution.") (citing

*Boose v. City of Rochester*, 421 N.Y.S.2d 740, 743 (4th Dep't 1979)); *Druschke v. Banana Republic, Inc.,* 359 F. Supp. 2d 308, 315–16 (S.D.N.Y. 2005) ("[T]he Court concludes that Druschke has alleged no facts that would allow her to maintain a separate claim for IIED or NIED 'where, as here, the conduct for the underlying claim may be redressed by way of traditional tort remedies such as battery, false arrest, and malicious prosecution"). Likewise, the fact that Plaintiffs allege intentional, not negligent, conduct on the FBI's part, *see* Aziz Compl. ¶¶ 3, 50-51, 56-59, 78, Greene Johnson Compl. ¶¶ 46-47, 52-55, 73, is fatal to the NIED claims. *See, e.g.*, *Chau v. Donovan*, 357 F. Supp. 3d 276, 290 (S.D.N.Y. 2019) (dismissing NIED claim premised on intentional conduct).

More broadly, Plaintiffs have not alleged (and cannot allege) the elements of an NIED claim. "'Under New York law, a plaintiff may establish [a claim for NIED] in one of two ways: (1) the 'bystander' theory'" – which Plaintiffs are not pursuing – "or (2) the 'direct duty theory.'" *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). Under the "direct duty" theory, a plaintiff may recover "if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." *Id.* The duty "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Id.* (citations omitted); *see also St. John v. Rein Teen Tours, Inc.*, No. 99 Civ. 2537 (MBM), 2000 WL 977685, at *2 (S.D.N.Y. July 17, 2000) (plaintiff must allege a "special duty" directed not to a class of people but rather "specific to the particular plaintiff").

Here, the complaints do not allege the FBI's breach of a "specific duty" owed directly to Plaintiffs. *Mortise*, 102 F.3d at 696. Instead, Plaintiffs allege only that the FBI breached a general duty to properly investigate, not conceal exculpatory evidence, and avoid the presentation of false evidence. Aziz Compl. ¶ 270, Greene Johnson Compl. ¶ 265. That is not sufficient. *See, e.g.*,

*Mortise*, 102 F.3d at 696; *Hazan v. City of New York*, No. 98 Civ. 1716 (LAP), 1999 WL 493352, at *5 (S.D.N.Y. July 12, 1999) ("Although the City has a general duty to prevent its police force from inflicting unreasonable harm on society at large, this duty was not a special one owed specifically to the plaintiff.").

Furthermore, while each Plaintiff alleges that "Defendant's agents and employees' acts and omissions endangered [his] physical safety and caused [Plaintiff] to fear for his physical safety," Aziz Compl. ¶ 272, Greene Johnson Compl. ¶ 267, there is nothing in the complaints to support that conclusory assertion. Rather, this element "involves an objective inquiry turning on whether a plaintiff's physical safety actually was endangered, not a subjective evaluation dependent on the plaintiff's state of mind." *Carney v. Boston Market*, No. 18 Civ. 713 (LGS), 2018 WL 6698444, at *3 (S.D.N.Y. Dec. 20, 2018) (quotation marks omitted); *see also St. John*, 2000 WL 977685, at *3 (same). As that is not the case here, Plaintiffs' NIED claims should be dismissed. *Id.*

Finally, just as for IIED, an NIED claim must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rooney v. Wittich*, 21 F. Supp. 2d 273, 282 (S.D.N.Y. 1998) (internal quotation marks omitted). As noted above, the complaints do not allege such conduct; therefore, the NIED causes of action fail for this reason as well.

**CONCLUSION**

For the reasons stated herein, the Government's motion to dismiss should be granted.


Dated: April 30, 2024
New York, New York

                                 Respectfully submitted,

                                 DAMIAN WILLIAMS
                                 United States Attorney for the
                                 Southern District of New York

By:     /s/ Ilan Stein
                                 ILAN STEIN
                                 DANIELLE MARRYSHOW
                                 JEFFREY S. OESTERICHER
                                 Assistant United States Attorney
                                 86 Chambers Street, Third Floor
                                 New York, New York 10007
                                 Telephone: (212) 637-2525/-2689/-2695
                                 E-mail: ilan.stein@usdoj.gov
                                         danielle.marryshow@usdoj.gov
                                         jeffrey.oestericher@usdoj.gov