UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HELEN GREENE JOHNSON, *as Administrator of the Estate of Khalil Islam, also known as Thomas Johnson, Deceased*, and MUHAMMAD A. AZIZ,

                    Plaintiffs,

   — against —

UNITED STATES OF AMERICA,

                    Defendant.

No. 24-CV-872 (DEH)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD............................................................................................................. 3

ARGUMENT ....................................................................................................................... 3

I.   Plaintiffs' Claims Are Timely.......................................................................................... 3

    A.   Plaintiffs' Claims Were *Heck*-Barred Until Their Exonerations in 2021 ........................ 3

    B.   Plaintiffs Are Entitled to Equitable Tolling ................................................................. 6

    C.   Plaintiffs Did Not Have All "Critical Facts" Related to Their Claims
        Until November of 2021 ............................................................................................7

    D.   The Continuing Violation Doctrine Renders Plaintiffs' Claims Timely ......................... 8

II.  The United States Has Waived Immunity as to the Malicious Prosecution Claims.............. 10

    A.   The Plain Language and Legislative History of the Federal Tort Claims Act
        Make Clear that "Arise" Refers to When a Claim Comes into Being ............................ 12

    B.   Malicious Prosecution Cannot "Arise" Without Favorable Termination ....................... 14

    C.   The Cases Cited by Defendant Are Inapposite ............................................................ 14

    D.   Plaintiffs Allege Unlawful Conduct After the Amendment's Enactment ....................... 15

III. Plaintiffs State Malicious Prosecution Claims.................................................................. 16

    A.   Plaintiffs Adequately Plead the Initiation of Criminal Proceedings............................... 16

    B.   Plaintiffs Adequately Plead the Absence of Probable Cause......................................... 19

IV. Plaintiffs Adequately Plead Negligence Claims ............................................................... 24

    A.   Plaintiffs Are Permitted to Allege Inconsistent Theories of Liability ............................ 24

    B.   Plaintiffs Plead a Sufficient Private Analogue............................................................. 27

    C.   Plaintiffs State Claims for Negligent Supervision ....................................................... 34

V.   Plaintiffs State Claims for Intentional Infliction of Emotional Distress................................ 36

    A.   New York State Public Policy Does Not Bar Plaintiffs' Claims ..................................... 36

B.  Plaintiffs' Intentional Infliction of Emotional Distress Claims Should Not Be
Dismissed as "Duplicative" ............................................................................... 37

C.  Plaintiffs Allege Sufficiently Extreme and Outrageous Conduct .................................... 41

VI. Plaintiffs State Claims for Negligent Infliction of Emotional Distress .................................. 44

CONCLUSION.................................................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*,
   721 F.3d 418 (7th Cir. 2013) ................................................................... 9

*Ames v. United States*,
   600 F.2d 183 (8th Cir. 1979) ................................................................. 15

*Anilao v. Spota*,
   774 F. Supp. 2d 457 (E.D.N.Y. 2011) ................................................... 21

*Arias v. City of Everett*,
   No. CV 19-10537-JGD, 2019 WL 6528894 (D. Mass. Dec. 4, 2019) ................... 43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 3

*Barnett v. Cabell Cty. Comm'n*,
   No. CV 3:22-0203, 2023 WL 2602509 (S.D. W. Va. Mar. 22, 2023) ..................... 43

*Barone v. United States*,
   No. 12-CV-4103 (LAK), 2016 WL 2658174 (S.D.N.Y. May 5, 2016) ....... 37, 38, 43

*Barone v. United States*,
   No. 12-cv-4103 (LAK)(MHD), 2015 WL 10791889 (S.D.N.Y. Oct. 29, 2015) ...................... 9

*Barrett v. United States*,
   689 F.2d 324 (2d Cir. 1982) ................................................................... 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................... 3

*Ben v. United States*,
   160 F. Supp. 3d 460 (N.D.N.Y. 2016) ................................................. 28

*Bender v. City of New York*,
   78 F.3d 787 (2d Cir. 1996) ................................................................... 39

*Bernard v. Andover*,
   188 N.Y.S.2d 879 (4th Dep't 1959) ...................................................... 30

*Biswas v. City of New York*,
   973 F. Supp. 2d 504 (S.D.N.Y. 2013) .............................................. 38, 43

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
   403 U.S. 388 (1971) ............................................................................. 13

*Boyd v. City of New York*,
    336 F.3d 72 (2d Cir. 2003) ........................................................................... 19

*Brady v. Maryland*,
    373 U.S. 83 (1963) ......................................................................................... 41

*Breton v. City of New York*,
    404 F. Supp. 3d 799 (S.D.N.Y. 2019) ........................................... 36, 38, 43

*Brown v. N.Y. Design Ctr., Inc.*,
    185 N.Y.S.3d 97 (1st Dep't 2023) ........................................................ 44, 45

*Buari v. City of New York*,
    530 F. Supp. 3d 356 (S.D.N.Y. 2021) .................................................. 16, 20

*Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*,
    318 B.R. 276 (Bankr. S.D.N.Y. 2004) ........................................................ 26

*Burt v. Aleman*,
    No. 05-CV-4493 (NGG), 2008 WL 1927371 (E.D.N.Y. Apr. 30, 2008) .......................... 18, 19

*Carney v. Boston Mkt.*,
    No. 18-CV-713 (LGS), 2018 WL 6698444 (S.D.N.Y. Dec. 20, 2018) ................................ 45

*Carney v. Buyea*,
    65 N.Y.S.2d 902 (4th Dep't 1946) ............................................................... 30

*Carroccia v. Anderson*,
    249 F. Supp. 2d 1016 (N.D. Ill. 2003) ........................................................ 43

*Cohen v. Cabrini Med. Ctr.*,
    94 N.Y.2d 639 (2000) ................................................................................... 33

*Colon v. City of New York*,
    60 N.Y.2d 78 (1983) ..................................................................................... 19

*Cox v. New York State*,
    No. 1:23-CV-0060 (MAD)(CFH), 2023 WL 2770368 (N.D.N.Y. Apr. 4, 2023) ..................... 4

*D.J.C.V. v. United States*,
    605 F. Supp. 3d 571 (S.D.N.Y. 2022) .................................................. 29, 37

*David v. Weinstein Co. LLC*,
    431 F. Supp. 3d 290 (S.D.N.Y. 2019) ........................................................ 28

*Davis v. S. Nassau Cmtys. Hosp.*,
    26 N.Y.3d 563 (2015) .............................................................................. 29, 32

*Del Col v. Rice,*
    No. 11 CV 5138 (MKB), 2012 WL 6589839 (E.D.N.Y. Dec. 18, 2012) ............................. 21

*Dettelis v. Sharbaugh,*
    919 F.3d 161 (2d Cir. 2019) ...................................................................... 14, 16

*Di Ponzio v. Riordan,*
    89 N.Y.2d 578 (1997) .................................................................................... 28

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104 (2d Cir. 2010) ............................................................................ 8

*Diminnie v. United States,*
    522 F. Supp. 1192 (E.D. Mich. 1981) ......................................................... 15

*Diminnie v. United States,*
    728 F.2d 301 (6th Cir. 1984) ....................................................................... 14

*Doe v. Langer,*
    171 N.Y.S.3d 594 (3d Dep't 2022) ............................................................. 44

*Dorking Genetics v. United States,*
    76 F.3d 1261 (2d Cir. 1996) ........................................................................ 27

*Dudek v. Nassau Cty. Sheriff's Dep't,*
    991 F. Supp. 2d 402 (E.D.N.Y. 2013) ........................................................ 10

*Dukes v. City of Albany,*
    289 F. Supp. 3d 387 (N.D.N.Y. 2018) ......................................................... 7

*Dupree v. Village of Hempstead,*
    401 F. Supp. 1398 (E.D.N.Y. 1975) ........................................................... 15

*EEOC v. Die Fliedermaus, L.L.C.,*
    77 F. Supp. 2d 460 (S.D.N.Y. 1999) .......................................................... 37

*Erlin v. United States,*
    364 F.3d 1127 (9th Cir. 2004) ....................................................................... 4

*Eskridge v. Diocese of Brooklyn,*
    180 N.Y.S.3d 179 (2d Dep't 2022) ............................................................. 39

*Espinal v. Melville Snow Contractors,*
    98 N.Y.2d 136 (2002) .................................................................................... 33

*Fahlund v. Nassau Cty. DA's Office,*
    265 F. Supp. 3d 247 (E.D.N.Y. 2017) ........................................................ 38

*Fischer v. Maloney*,
  43 N.Y.2d 553 (1978) ................................................................................................ 38

*Flores v. United States*,
  885 F.3d 119 (2d Cir. 2018) ........................................................................................ 9

*Fox v. Tomczak*,
  No. 04 C 7309, 2006 WL 1157466 (N.D. Ill. Apr. 26, 2006) .................................... 43

*Francis v. Kings Park Manor, Inc.*,
  992 F.3d 67 (2d Cir. 2021) .......................................................................................... 45

*Frigerio v. United States*,
  No. 10 Civ. 9086 (SAS), 2011 WL 3163330 (S.D.N.Y. July 22, 2011) ............. 18, 19

*Galgano v. County of Putnam*,
  No. 16-CV-3572 (KMK), 2020 WL 3618512 (S.D.N.Y. July 2, 2020) .................... 18

*Gallose v. Long Island R.R. Co.*,
  878 F.2d 80 (2d Cir. 1989) .......................................................................................... 35

*Gaudet v. United States*,
  517 F.2d 1034 (5th Cir. 1975) .................................................................................... 15

*Genen v. Metro-North Commuter R.R.*,
  690 N.Y.S.2d 213 (1st Dep't 1999) ............................................................................ 30

*Gisondi v. Harrison*,
  72 N.Y.2d 280 (1988) .................................................................................................. 22

*Gomez v. City of Norwalk*,
  No. 3:15-CV-1434 (MPS), 2018 WL 780213 (D. Conn. Feb. 8, 2018) .................... 24

*Gonzales v. Nat'l Westminster Bank PLC*,
  No. 11 Civ. 1435 (LAP), 2013 WL 6978874 (S.D.N.Y. Nov. 18, 2013) ................... 9

*Gonzalez v. Bratton*,
  48 F. App'x 363 (2d Cir. 2002), *aff'g*, 147 F. Supp. 2d 180 (S.D.N.Y. 2001) ........ 40

*Gonzalez v. Hasty*,
  802 F.3d 212 (2d Cir. 2015) .......................................................................................... 9

*Grega v. Pettengill*,
  123 F. Supp. 3d 517 (D. Vt. 2015) ............................................................................. 43

*Gregory v. Daly*,
  243 F.3d 687, 701 (2d Cir. 2001) ................................................................................. 3

*H. R. Moch Co. v. Rensselaer Water Co.*,
  247 N.Y. 160 (1928) ............................................................................. 33

*Heck v. Humphrey*,
  512 U.S. 477 (1994) ....................................................................... 1, 4, 5, 12

*Henry v. Daytop Vill.*,
  42 F.3d 89 (2d Cir. 1994) .................................................................... 24

*Hincapie v. City of New York*,
  434 F. Supp. 3d 61 (S.D.N.Y. 2020) ................................................... 20

*Hodge v. Village of Southampton*,
  838 F. Supp. 2d 67 (E.D.N.Y. 2012) ................................................... 25

*Idiakheua v. Morton*,
  No. 20-CV-4169 (NGG) (SJB), 2024 WL 417058 (E.D.N.Y. Feb. 5, 2024) ......................... 29

*In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*,
  482 F. Supp. 3d 1273 S.D. Fla. 2020) ............................................... 32, 33

*In re Mirena IUD Prods. Liabl. Litig.*,
  202 F. Supp. 3d 304 (S.D.N.Y. 2016), *aff'd*, 713 F. App'x 11 (2d Cir. 2017) ......................... 5

*Indian Towing v. United States*,
  350 U.S. 61 (1955) ............................................................................. 27

*Jaghory v. New York State Dep't of Educ.*,
  131 F.3d 326 (2d Cir. 1997) .................................................................. 3

*Jenkins v. Greene*,
  630 F.3d 298 (2d Cir. 2010) .................................................................. 6

*Jones v. City of New York*,
  988 F. Supp. 2d 305, 309 (E.D.N.Y. 2013) ....................................... 41, 42

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) .................................................................. 7

*Kruse v. Wells Fargo Home Mortg., Inc.*,
  383 F.3d 49 (2d Cir. 2004) .................................................................... 24

*Kwan v. Schlein*,
  246 F.R.D. 447 (S.D.N.Y. 2007) ........................................................... 24

*Lauer v. City of New York*,
  95 N.Y.2d 95 (2000) ............................................................................. 30

*Limone v. United States*,
    271 F. Supp. 2d 345 (D. Mass. 2003) ...................................................................... 18

*Limone v. United States*,
    336 F. Supp. 2d 18 (D. Mass. 2004) ............................................................... passim

*Limone v. United States*,
    497 F. Supp. 2d 143 (D. Mass. 2007), *aff'd*, 579 F.3d 79 (1st Cir. 2009) .................. 18, 29, 32

*Limone v. United States*,
    579 F.3d 79 (1st Cir. 2009) ...................................................................... 12, 18, 42

*Llerando-Phipps v. City of New York*,
    390 F. Supp. 2d 372 (S.D.N.Y. 2005) ............................................................ 38, 39, 43

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006) .......................................................................... 5

*Matthaus v. Hadjedj*,
    49 N.Y.S.3d 393 (1st Dep't 2017) ..................................................................... 39

*McDonough v. Smith*,
    588 U.S. 109 (2019) .......................................................................... 1, 6, 12, 14

*Miles v. City of Hartford*,
    719 F. Supp. 2d 207 (D. Conn. 2010), *aff'd*, 445 F. App'x 379 (2d Cir. 2011) ...................... 43

*Monk v. United States*,
    No. 3:22-cv-1503 (SRU), 2024 WL 1344712 (D. Conn. Mar. 29, 2024)............................ 9, 34

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165 (2d Cir. 1999) .......................................................................... 3

*Morel v. Reed*,
    No. 11-CV-1808 (DLI)(LB), 2015 WL 1506132 (E.D.N.Y. Mar. 31, 2015).......................... 23

*Murphy v. Am. Home Prods. Corp.*,
    58 N.Y.2d 293 (1983) ............................................................................. 41, 43

*Murphy v. Lynn*,
    118 F.3d 938 (2d Cir. 1997) .......................................................................... 16

*Newson v. City of New York*,
    No. 16-CV-6773 (ILG) (JO), 2019 WL 3997466 (E.D.N.Y. Aug. 22, 2019) ........................ 23

*Newton v. City of New York*,
    566 F. Supp. 2d 256 (S.D.N.Y. 2008) .................................................................. 20

*Palsgraf v. Long Island R.R. Co.*,
   248 N.Y. 339 (1928) ............................................................................ 29

*Parvi v. Kingston*,
   41 N.Y.2d 553 (1977) .......................................................................... 33

*Paul v. City of New York*,
   No. 16-CV-1952 (VSB), 2023 WL 3724152 (S.D.N.Y. May 30, 2023) ............... 25

*Pennington v. United States*,
   406 F. Supp. 850 (E.D.N.Y. 1976) ........................................................ 15

*Pitt v. District of Columbia*,
   491 F.3d 494 (D.C. Cir. 2007) .............................................................. 42

*Powell v. Quay*,
   No. 18-CV-5378 (ERK)(MMH), 2023 WL 1994873 (E.D.N.Y. Feb. 14, 2023) ...... 9

*Pursley v. City of Rockford*,
   No. 3:18-CV-50040, 2024 WL 1050242 (N.D. Ill. Mar. 11, 2024) .................. 43

*Ramchandani v. CitiGroup, Inc.*,
   No. 19 Civ. 9124 (VM), 2021 WL 930627 (S.D.N.Y. Mar. 11, 2021) ............... 17

*Rayonier v. United States*,
   352 U.S. 315 (1957) ............................................................................ 36

*Regan v. Sullivan*,
   417 F. Supp. 399 (E.D.N.Y. 1976) ........................................................ 15

*Regan v. Sullivan*,
   557 F.2d 300 (2d Cir. 1977) ................................................................. 15

*Remigio v. Kelly*,
   No. 04 Civ. 1877 (JGK)(MHD), 2005 WL 1950138 (S.D.N.Y. Aug. 12, 2005) ........ 9, 10

*Rentas v. Ruffin*,
   816 F.3d 214 (2d Cir. 2016) ............................................................. 38, 40

*Richards v. City of New York*,
   No. 97 Civ. 7990 (MBM), 2003 WL 21036365 (S.D.N.Y. May 6, 2003) ............. 22

*Riviello v. Waldron*,
   47 N.Y.2d 297 (1979) .......................................................................... 35

*Rizk v. City of New York*,
   462 F. Supp. 3d 203 (E.D.N.Y. 2020) ............................................... 25, 26

*Robinson v. United States*,
327 F. App'x 816 (11th Cir. 2007) ........................................ 9

*Rodriguez v. City of New York*,
590 F. Supp. 3d 518 (E.D.N.Y. 2022) ..................................... 18

*Roe v. United States*,
No. 18-CV-2644 (VSB), 2019 WL 1227940 (S.D.N.Y. Mar. 15, 2019)...................... 37

*Rohman v. N.Y.C. Transit Auth.*,
215 F.3d 208 (2d Cir. 2000)................................................ 16

*Scollar v. City of New York*,
74 N.Y.S.3d 173 (1st Dep't 2018) ......................................... 34

*Scott v. City of White Plains*,
No. 10 Civ. 1887 (KBF), 2012 WL 1267873 (S.D.N.Y. Apr. 10, 2012) .................... 5

*Seippel v. Jenkins & Gilchrist, P.C.*,
341 F. Supp. 2d 363 (S.D.N.Y. 2004) ..................................... 9

*Selmani v. City of New York*,
984 N.Y.S.2d 114 (2d Dep't 2014)......................................... 35

*Sharp v. Erie R.R. Co.*,
184 N.Y. 100 (1906)....................................................... 35

*Shepard v. Power*,
195 N.Y.S.3d 94 (2d Dep't 2023)........................................... 28

*Singleton v. New York*,
632 F.2d 185 (2d Cir. 1980)............................................... 13

*Slavin v. State*,
291 N.Y.S. 721 (3d Dep't 1936)............................................ 30

*Smith v. United States*,
508 U.S. 223 (1993)....................................................... 12

*Spock v. United States*,
464 F. Supp 510 (S.D.N.Y. 1978) ......................................... 15

*Stavitz v. New York*,
471 N.Y.S.2d 272 (1st Dep't 1984)......................................... 35

*Stephanie L. v. House of the Good Shepherd*,
129 N.Y.S.3d 570 (4th Dep't 2020)........................................ 44

*Strunk v. Zoltanski*,
    62 N.Y.2d 572 (1984) ................................................................ 30

*Sweet v. City of Hartford*,
    No. 3:15-CV-00553 (CSH), 2018 U.S. Dist. LEXIS 87221 (D. Conn. May 24, 2018) .......... 24

*Syms v. Olin Corp.*,
    408 F.3d 95 (2d Cir. 2005) .......................................................... 9

*Taber v. Maine*,
    67 F.3d 1029 (2d Cir. 1995) ......................................................... 37

*Taggart v. Costabile*,
    14 N.Y.S.3d 388 (2d Dep't 2015) ................................................... 44

*Torres-Estrada v. Cases*,
    88 F.4th 14 (1st Cir. 2023) ......................................................... 9

*Tropea v. Shell Oil Co.*,
    307 F.2d 757 (2d Cir. 1962) ......................................................... 30

*Tuttle v. United States*,
    No. 20-CV-6266-LJV, 2020 WL 351148 (W.D.N.Y. June 29, 2020) ....................... 4

*United States v. Olson*,
    546 U.S. 43 (2005) .............................................................. 27, 37

*Valdez v. United States*,
    518 F.3d 173 (2d Cir. 2008) .......................................................... 7

*Van Buren v. Lacerra*,
    57 N.Y.S.3d 203 (2d Dep't 2017) ................................................... 29

*Wallace v. Kato*,
    549 U.S. 384 (2007) ................................................................. 5

*Warner v. Druckier*,
    697 N.Y.S.2d 610 (1st Dep't 1999) ................................................. 39

*Warr v. Liberatore*,
    270 F. Supp. 3d 637 (W.D.N.Y. 2017) .............................................. 38

*Watson v. United States*,
    133 F. Supp. 3d 502 (E.D.N.Y. 2015) .............................................. 30

*Watson v. United States*,
    865 F.3d 123 (2d Cir. 2017) ......................................................... 27

*White v. Wellington*,
627 F.2d 582 (2d Cir. 1980) ............................................................................ 24

*Williams v. J. Luke Constr. Co., LLC*,
99 N.Y.S.3d 460 (3d Dep't 2019) .................................................................... 35

*Wilson v. Burge*,
667 F. Supp. 3d 785 (N.D. Ill. 2023) ............................................................... 43

*Worytko v. County of Suffolk*,
No. 03-CV-4767 (DRH) (ARL), 2007 WL 1876503 (E.D.N.Y. June 28, 2007) ................... 39

*Ying Li v. City of New York*,
246 F. Supp. 3d 578 (E.D.N.Y. 2017) ............................................................... 20

**Statutes**

28 U.S.C. § 2672 ..................................................................................... 34, 36

28 U.S.C. § 2674 ..................................................................................... 28, 36

28 U.S.C. § 2680 ....................................................................................... 11

28 U.S.C. § 1346 ..................................................................................... 34, 36

Act of Mar. 16, 1974, Pub. L. 93-253, § 2, 88 Stat. 50 ....................................... 11

**Other Authorities**

N.Y. Civil Pattern Jury Instrs. (3d ed. 2023) ................................................... 28

S. Rep. No. 93-588, 93d Cong., 2d Sess.,
reprinted in 1974 U.S. Code Cong. & Ad. News 2789 ......................................... 13

**Rules**

Fed. R. Civ. P. 8 ................................................................................... 3, 24

**Treatises**

Restatement (Second) of Torts § 321 (1965) ................................................. 30, 32

Restatement (Second) of Torts § 324A (1965) ............................................... 33, 34

Restatement (Second) of Torts § 46 ............................................................... 41

Plaintiffs Muhammad A. Aziz and Helen Greene Johnson[1] respectfully submit this memorandum of law in opposition to Defendant the United States of America's (the "Government" or "Defendant") motion (the "Motion") to dismiss their Complaints under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF Nos. 34-35.)

## PRELIMINARY STATEMENT

What is most striking about the Government's brief is the case it does *not* discuss: *Heck v. Humphrey*, 512 U.S. 477 (1994). The Supreme Court's decision in *Heck* is not only central to numerous issues raised in the Motion, but also one the Government has litigated in countless Federal Tort Claims Act (the "FTCA") cases. *Heck* dictates that, because habeas corpus is the exclusive remedy for an allegedly unlawful conviction, a civil action for damages is barred where a judgment for the plaintiff would "necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. Under *Heck*, not only is a civil suit precluded unless and until any related criminal conviction has been invalidated, but "[o]nly once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated . . . , will the statute of limitations begin to run." *McDonough v. Smith*, 588 U.S. 109, 119-20 (2019). The Government's assertion of a statute of limitations defense, while ignoring *Heck*, is baffling. The *Heck* line of cases likewise refutes the Government's argument that Plaintiffs' malicious prosecution claims are statutorily barred because they "arose" prior to 1974. To the contrary, *McDonough* instructs that a plaintiff does not have "a complete and present cause of action" for malicious prosecution until the favorable termination of a criminal case—an element of the claim. 588 U.S. at 119 (citation omitted).

---

1. Ms. Greene Johnson represents the estate of her deceased husband, Khalil Islam, who was also wrongfully convicted. We refer to Mr. Aziz and Mr. Islam as "Plaintiffs."

Following its primary and secondary arguments, both of which fail under *Heck* and *McDonough*, the Government offers a laundry list of legal arguments, insisting that it cannot be held accountable for the Federal Bureau of Investigation's (the "FBI") role in orchestrating Plaintiffs' wrongful convictions. The Government is wrong; it can be held accountable under the FTCA, and Plaintiffs have pled valid legal claims that should be allowed to proceed.

## BACKGROUND

The facts of the case are described in Plaintiffs' respective Complaints. Highly summarized, in 1965, Plaintiffs were falsely accused, charged, and prosecuted; wrongfully convicted; and unjustly imprisoned for decades for one of the most infamous murders in the twentieth century: the assassination of El-Hajj Malik El-Shabazz, better known as Malcolm X. The FBI played a central role in bringing about this injustice. The FBI itself acknowledged that it "played a very significant part in aiding local authorities in [Plaintiffs'] prosecution." G.J. Compl. ¶ 59.[2] Despite its partnership with local police and prosecutors, the FBI "concealed a trove of evidence of [Plaintiffs'] innocence, and orchestrated fundamentally unfair legal proceedings" against them, including by inducing FBI informants to testify falsely at Plaintiffs' criminal trial. *See, e.g.*, *id.* ¶¶ 3, 7, 14, 38, 72-73. In the late 1970s, more than a decade after Plaintiffs' wrongful convictions, one of the admitted assassins, Mujahid Abdul Halim, revealed the identities of his fellow gunmen and their cohorts who murdered Malcolm X. *Id.* ¶ 89. After Plaintiffs filed a motion to vacate their convictions based on this new information, the FBI shut down any reopening of the case by lying to prosecutors about the fact that its investigative files corroborated Mr.

---

2.  Because both Plaintiffs' Complaints contain substantially the same allegations, we cite only to Ms. Greene Johnson's Complaint, referenced herein as "G.J. Compl."

Halim's revelations. *Id.* ¶¶ 90-92. Plaintiffs were exonerated in 2021, after an extensive investigation that revealed some—but by no means all—of the FBI's misconduct. *Id.* ¶¶ 5-6.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"[T]he standards for reviewing dismissals granted under 12(b)(1) and 12(b)(6) are identical." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999) (citing *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). On a Rule 12(b) motion, a court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 572 (Stevens, J., dissenting) (citation omitted). Moreover, the plaintiff is at liberty to plead different theories, even if they are inconsistent with one another, and the court must accept each sufficiently pleaded theory at face value. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency."); *Gregory v. Daly*, 243 F.3d 687, 701 n.12 (2d Cir. 2001).

## ARGUMENT

### I.    Plaintiffs' Claims Are Timely

#### A.    Plaintiffs' Claims Were *Heck*-Barred Until Their Exonerations in 2021

Plaintiffs' FTCA claims are timely because, under *Heck*, Plaintiffs were barred from bringing any of their claims before their exonerations on November 18, 2021. These claims accordingly did not accrue until that date, and Plaintiffs timely submitted administrative claims in March of 2023 and filed suit on November 16, 2023, less than two years after their exonerations.

In *Heck*, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

512 U.S. at 486-87. In other words, a "claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." *Id*. at 487 (emphasis omitted). The inquiry for the district court is therefore "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id*.

District courts in this Circuit that have considered the issue have concluded that *Heck* applies to claims brought against the United States under the FTCA. *See, e.g.*, *Cox v. New York State*, No. 1:23-CV-0060 (MAD)(CFH), 2023 WL 2770368, at *8 (N.D.N.Y. Apr. 4, 2023) ("Any potential FTCA claim that calls into question [plaintiff's] arrest, prosecution, incarceration, or sentencing would be barred by *Heck* unless and until plaintiff is able to demonstrate favorable termination."); *Tuttle v. United States*, No. 20-CV-6266-LJV, 2020 WL 351148, at *3 (W.D.N.Y. June 29, 2020) (collecting cases and applying *Heck* to bar FTCA claims). Moreover, other Circuit Courts of Appeals have held that FTCA claims are indeed barred by *Heck* if they would impugn the validity of a conviction. *See Tuttle*, 2020 WL 351148, at *3 (collecting cases from the Third, Fifth, Ninth, and Tenth Circuits); *see also, e.g.*, *Erlin v. United States*, 364 F.3d 1127, 1132 (9th Cir. 2004) ("[T]he time of accrual of an FTCA claim is subject to the federal law set out in *Heck*. The interests the Supreme Court identified in *Heck* require us to impose the same restriction on

4

FTCA claims that *Heck* imposed on § 1983 actions.").  Unsurprisingly, the United States has also taken this position on numerous occasions.  *See, e.g.*, *Scott v. City of White Plains*, No. 10 Civ. 1887 (KBF), 2012 WL 1267873, at *4, *7-8 (S.D.N.Y. Apr. 10, 2012) (granting federal defendants' motion to dismiss FTCA claims on various grounds, including *Heck*); *see also* Mot. to Dismiss at 17, *Green v. Camarillo*, No. 22-cv-109 (S.D. Ga. filed May 15, 2023) (ECF No. 44) (U.S. Attorney collecting cases to argue that "[t]he *Heck* rule also applies to bar FTCA claims").[3]  We are unaware of any contrary authority.

Applying this rule to FTCA claims also makes sense and comports with the principles underlying *Heck*.  *Heck* holds that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments."  512 U.S. at 486.  *Heck* drew no distinction based on the type of claim a plaintiff pursues; rather, the focus was on whether the claim "challenged the legality of [a] conviction."  *Id.* at 490.  Those same principles apply equally to FTCA claims.  A contrary holding would have required Plaintiffs to bring their FTCA claims while their convictions remained in place.  But, of course, their claims all rest on their actual innocence and egregious government misconduct; as a result, any finding in their favor "would necessarily imply the invalidity of [their] conviction[s]."  *Id.* at 487.

Plaintiffs' claims did not accrue until their convictions were overturned on November 18, 2021.  Indeed, the Supreme Court has explicitly held that *Heck* "delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn."  *Wallace v. Kato*, 549 U.S. 384, 393 (2007); *see also*

---

3. "[D]ocket sheets are public records of which [a] court [can] take judicial notice." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  Courts can "take judicial notice" of evidence offered "to show positions . . . taken." *In re Mirena IUD Prods. Liabl. Litig.*, 202 F. Supp. 3d 304, 306 n.3 (S.D.N.Y. 2016), *aff'd*, 713 F. App'x 11 (2d Cir. 2017).

*McDonough*, 588 U.S. at 119-20 ("Only once the criminal proceeding has ended in the defendant's favor . . . will the statute of limitations begin to run.").

### B.   Plaintiffs Are Entitled to Equitable Tolling

Even absent *Heck*, Plaintiffs are entitled to equitable tolling of their negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress claims. "[R]ead into every federal statute of limitations is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982) (citation omitted). "A litigant seeking equitable tolling must show both that he 'diligently' pursued his rights and that 'some extraordinary circumstance . . . prevented timely filing.'" *Jenkins v. Greene*, 630 F.3d 298, 302 (2d Cir. 2010) (alteration in original). Plaintiffs have shown both elements.

*First*, Plaintiffs have diligently pursued their rights. As Defendant acknowledges, *see* Def.'s Br. at 12, Plaintiffs retained counsel by January of 2020, precisely the time at which Defendant claims they had sufficient knowledge to begin pursuing their claims. Plaintiffs actively participated in the joint reinvestigation that led to their exonerations in November of 2021, and, once the exonerations occurred, proceeded to file their administrative notices of claim with the FBI and U.S. Department of Justice (the "DOJ") and initiated the present litigation within two years of those exonerations. *Second*, two extraordinary circumstances prevented earlier filing: (1) *Heck*, which barred—or, at the very least, was reasonably understood to bar—Plaintiffs' claims until their underlying convictions were vacated; and (2) Defendant's ongoing concealment of crucial facts underlying Plaintiffs' claims until the joint motion for exoneration was made public in November of 2021, *see infra* Section I.C. Crucially, an "omission" by the government can serve

as a basis for equitable tolling even where it "does not rise to the level of fraud." *Valdez v. United States*, 518 F.3d 173, 183 (2d Cir. 2008). Thus, Defendant's ongoing concealment of relevant information is an "extraordinary" circumstance that prevented Plaintiffs from having crucial information necessary to bring their claims (including, for example, the identities of FBI employees who concealed information relating to the case and the extensive nature of that concealment).

*Dukes v. City of Albany*, 289 F. Supp. 3d 387 (N.D.N.Y. 2018), is instructive. There, the court found a plaintiff's § 1983 negligence claim arising from his vacated murder conviction timely "either because it was *Heck*-barred until the vacatur of his conviction or because equitable tolling applies." *Id.* at 395. The court reasoned that the plaintiff had "diligently pursued his rights by filing a direct appeal, pursuing that appeal to its conclusion, and later filing a federal habeas petition challenging his murder conviction" and observed that "[h]e was essentially barred from filing his negligence claim until new evidence finally invalidated his murder conviction and exposed the egregious nature of law enforcement's misconduct." *Id.* So too here: Plaintiffs diligently pursued their rights by pursuing exoneration of their convictions, and they were essentially barred from filing their claims until new evidence came to light during the reinvestigation and ultimate exoneration proceeding. Their claims are timely.

### C. Plaintiffs Did Not Have All "Critical Facts" Related to Their Claims Until November of 2021

The claims are also timely because Plaintiffs did not have all the critical facts giving rise to these claims until the end of the reinvestigation into their convictions in November of 2021. "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) (citations

omitted).  Even if Plaintiffs had a duty to inquire into the existence of a claim by early 2020—as Defendant argues, *see* Def.'s Br. at 8-12—they *did* inquire, with due diligence, by participating in the joint reinvestigation with the District Attorney's Office.

During this joint reinvestigation, Plaintiffs did not have access to all of the new documents and information the FBI provided to the District Attorney's Office.  Indeed, Plaintiffs *still* do not have access to all of the FBI documents, and their knowledge of those materials is limited to what the District Attorney's Office disclosed in the 2021 joint motion to vacate Plaintiffs' judgments of convictions (the "Joint Motion").[4]  Information that the District Attorney disclosed to Plaintiffs for the first time in that filing includes, for example, that: (1) the FBI met with and interviewed its informants who were present in the Audubon Ballroom where Malcolm X was assassinated, and at least some of those informants testified as prosecution witnesses at trial; (2) a New York City Police Department (the "NYPD") lieutenant reported to the FBI that, during an identification procedure, two unnamed witnesses failed to identify Mr. Islam as one of the perpetrators; and (3) FBI sources reviewed photographs of Mr. Islam and likewise failed to identify him.  These were critical facts underlying Plaintiffs' claims.  Accordingly, Plaintiffs did not have critical information regarding their claims until the joint motion was filed—and made public—on November 18, 2021.

### D.    The Continuing Violation Doctrine Renders Plaintiffs' Claims Timely

Plaintiffs' claims are also timely under the continuing violation doctrine.[5]  "The continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual

---

4.  The Joint Motion may be considered because it is incorporated by reference in the Complaints.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* G.J. Compl. ¶ 152.

5.  The Second Circuit has not expressly held that the continuing violation doctrine applies in the FTCA context.  *See Powell v. Quay*, No. 18-CV-5378 (ERK)(MMH), 2023 WL

date.'" *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (citation omitted). "It applies to claims 'composed of a series of separate acts that collectively constitute one unlawful [ ] practice.'" *Id.* (alteration in original) (citation omitted). "The continuing violation doctrine provides that '[w]hen a plaintiff experiences a continuous practice and policy [that violates his or her rights], . . . the commencement of the statute of limitations period may be delayed until the last [violation].'" *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (alterations in original) (citations omitted). While Defendant is correct that the mere failure to correct a past harm does not justify application of the continuing violation doctrine, *see* Def.'s Br. at 13,[6] its application is appropriate where, as here, the continuing nature of a plaintiff's injuries "occurred because of the defendants' daily failure to act." *Remigio v. Kelly*, No. 04 Civ. 1877 (JGK)(MHD), 2005 WL 1950138, at *10 (S.D.N.Y. Aug. 12, 2005).

---

1994873, at *5 (E.D.N.Y. Feb. 14, 2023) ("[T]he question of whether the continuing violation doctrine may apply to toll the FTCA statute of limitations, [is] an issue not yet decided in this Circuit." (citing *Syms v. Olin Corp.*, 408 F.3d 95, 108 (2d Cir. 2005))). The Circuit did address the continuing violation doctrine on the merits in the context of an FTCA claim in *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018), and district courts in this Circuit have applied the doctrine to claims brought under the FTCA. *See, e.g.*, *Monk v. United States*, No. 3:22-cv-1503 (SRU), 2024 WL 1344712, at *12 (D. Conn. Mar. 29, 2024); *Barone v. United States*, No. 12-cv-4103 (LAK)(MHD), 2015 WL 10791889, at *16 n.19 (S.D.N.Y. Oct. 29, 2015). Other Circuit Courts of Appeals have also applied the doctrine to FTCA claims. *See, e.g.*, *Torres-Estrada v. Cases*, 88 F.4th 14, 23-25 (1st Cir. 2023); *Alexander v. United States*, 721 F.3d 418, 425 (7th Cir. 2013); *Robinson v. United States*, 327 F. App'x 816, 818-19 (11th Cir. 2007).

6. The two cases Defendant relies on to make this point discuss a failure to correct false statements made in specific documents issued in connection with, respectively, tax advice, *Seippel v. Jenkins & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 376 (S.D.N.Y. 2004), and loan and investment statements, *Gonzales v. Nat'l Westminster Bank PLC*, No. 11 Civ. 1435 (LAP), 2013 WL 6978874, at *11 (S.D.N.Y. Nov. 18, 2013). In both cases, the plaintiffs' injuries arose solely from those discrete instances, although they did not realize the full extent of their damages until later. Not so here, where each additional day of Plaintiffs' incarceration constituted a new, discrete injury caused by Defendant's affirmative concealment of exculpatory evidence.

The continuing violation doctrine applies here because, at least until Plaintiffs' exonerations, each day that Defendant concealed the FBI's misconduct and the exculpatory information in its possession caused an injury to Plaintiffs. In *Remigio*, for instance, the plaintiff brought a procedural due process claim arising from the City's ongoing seizure and retention of his car without providing the required hearing. 2005 WL 1950138, at *11. Although the statute of limitations would have run had the plaintiff's claims accrued on the date of the seizure of his car, the court found that the continuing violation doctrine applied to delay accrual because "[e]ach day that the defendants failed to hold a hearing . . . was another instance of the defendants' continuing and incrementally increasing unlawful conduct." *Id.* at *10. Because "each day's due-process injury was similar to that of the day before and the day after, part of a continuous injury that was not simply a consequence of the initial seizure," the court found that "[i]t would be unreasonable to require [the plaintiff] to sue each day that a hearing was not held." *Id.* The same logic applies with equal force here: As in *Remigio*, Plaintiffs' "continuous injury . . . was not simply a consequence of [Defendant's] initial" presentation of false evidence and concealment of exculpatory evidence. *Id.* Instead, *each day* Defendant continued to affirmatively conceal exculpatory evidence prior to Plaintiffs' exoneration on November 18, 2021, constituted "another instance of the defendants' continuing" conduct. This justifies application of the continuing violation doctrine and renders Plaintiffs' claims timely. *See also Dudek v. Nassau Cty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 419-20 (E.D.N.Y. 2013) (citing *Remigio* and applying continuing violation doctrine to find timely claims regarding ongoing failure to provide required hearing for return of seized firearms).

## II.     The United States Has Waived Immunity as to the Malicious Prosecution Claims

Contrary to the Government's argument, Plaintiffs' malicious prosecution claims are covered by the Government's waiver of sovereign immunity. On March 16, 1974, Congress

amended the FTCA to add the "law enforcement proviso," carving out an exception to the preservation of the United States' sovereign immunity for certain intentional torts. *See* Act of Mar. 16, 1974, Pub. L. 93-253, § 2, 88 Stat. 50. The proviso extends the waiver of sovereign immunity to "any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" that are based on the "acts or omissions of investigative or law enforcement officers." 28 U.S.C. § 2680(h). Here, Plaintiffs' malicious prosecution claims did not arise until the prosecutions terminated in Plaintiffs' favor on November 18, 2021—*over 47 years* after the law enforcement proviso was enacted—and therefore fall within the waiver.

Defendant argues that Plaintiffs' malicious prosecution claims must be dismissed because Plaintiffs were prosecuted in 1966, before the 1974 amendment. Def.'s Br. at 14-15. In Defendant's view, "arising" as used in the law enforcement proviso refers to the date when the officer's conduct on which the claim is based occurred, as opposed to when the claim came into being. *See id.* at 15. As discussed below, Defendant's interpretation of the amendment is erroneous, as made clear by the plain language and legislative history of the law enforcement proviso, the unique nature of malicious prosecution claims, and case law interpreting the proviso.

Indeed, in *Limone v. United States*, 336 F. Supp. 2d 18 (D. Mass. 2004), a decision the Government described as "instructive," Def.'s Br. at 21, the court was presented with the same question. There, as here, the FBI's fabrication of evidence and concealment of exculpatory evidence caused innocent people to be wrongfully convicted; the misconduct began before 1974 but continued thereafter; and the malicious prosecution claims straddled the date of the amendment. Following a careful and thorough analysis, the court held that the plaintiffs' malicious prosecution claims did not "arise" until their criminal cases were favorably terminated. 336 F.

Supp. 2d at 37.[7]  So, too, should the Court here.[8]  Even the Government implicitly acknowledges this fact by omitting Plaintiffs' malicious prosecution claims from those it seeks to dismiss on statute of limitations grounds.  The malicious prosecution claims "arose" after 1974 for the same reason they are not time-barred: they did not *exist* until 2021.

A.      **The Plain Language and Legislative History of the Federal Tort Claims Act Make Clear that "Arise" Refers to When a Claim Comes into Being**

Where a statutory term is not defined, it is construed in accordance with "its ordinary or natural meaning."  *Smith v. United States*, 508 U.S. 223, 228 (1993) (citation omitted). The ordinary and natural meaning of "arise," as used in relation to a legal claim, is when the claim comes into being and can be enforced.  *See Limone*, 336 F. Supp. 23 at 31-32 (finding support in dictionary definitions and language of FTCA that "arise" and "accrue" both refer to "when legal rights may be enforced in court").

Both within and outside the malicious prosecution context, courts have routinely used "arise" to refer to the time when a claim comes into being, and/or used the terms "arise" and "accrue" interchangeably in this sense.  *Heck*, 512 U.S. at 489-90 ("Under our analysis the statute of limitations poses no difficulty while the state challenges are being pursued, since the § 1983 claim has not yet *arisen*.  Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the

7.  The First Circuit declined to answer this question on appeal, instead disposing of the claim on other grounds.  *Limone v. United States*, 579 F.3d 79, 88 (1st Cir. 2009).  Although the First Circuit described it as "a difficult question," its *Limone* decision pre-dated *McDonough*'s holding that "a complete and present cause of action" for malicious prosecution does not exist before the criminal conviction is invalidated.  588 U.S. at 119.

8.  Tellingly, nowhere in its discussion of the law enforcement proviso does Defendant even reference the *Limone* case, despite relying on the case elsewhere in its opening submission.

conviction or sentence has been invalidated." (emphasis added) (citation omitted)); *Singleton v. New York*, 632 F.2d 185, 189 (2d Cir. 1980) (noting that malicious prosecution claim "allegedly arose on December 16, 1976, when the prosecution . . . was terminated").

Had Congress intended to tie the date of the amendment's enactment to the underlying tortious *conduct* rather than the resulting legal *claim*, it could have easily drafted the statute to say so: *e.g.*, "acts or omissions of law enforcement officers occurring after" the given date rather than "claims arising on or after." *Limone*, 336 F. Supp. 2d at 32-33. It did not, and Defendant's attempt to reimagine statutory language is unavailing.

The legislative history of the amendment also supports Plaintiffs' position. Congress amended the FTCA in response to the abusive tactics of federal narcotics agents who engaged in illegal, unconstitutional "no-knock" raids. S. Rep. No. 93-588, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 2789, 2791. It found that recourse against individual officers under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), was insufficient given that the officers are often judgment-proof. S. Rep. No. 93-588, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 2789, 2791. The purpose of the 1974 amendment was therefore to correct the injustice of having "no effective legal remedy against the Federal Government for . . . physical damage, . . . pain, suffering and humiliation" resulting from intentional torts committed by individual federal officers. *Id.*

The Government cherry-picks language from the amendment's Senate Report to argue that the amendment applies only to conduct that occurred after its enactment, regardless of when the cause of action accrued. *See* Def.'s Br. at 15. Nothing in the quoted text suggests that the Senate Report was attempting to address the meaning of the term "arising" in the statute, let alone to define it as something other than "accruing." Instead, the text merely noted that the

amendment would address certain government misconduct for which no remedy had been provided in the past.

**B.      Malicious Prosecution Cannot "Arise" Without Favorable Termination**

For a malicious prosecution claim to exist, a later act must occur: the plaintiff's conviction must be terminated in his favor.  *Limone*, 336 F. Supp. 2d at 30 ("Unlike a plaintiff who claims that he or she was wrongly assaulted by an officer, who can proceed to court the moment after the punch lands, plaintiffs here had to wait thirty years before all elements of the claim were in place.").  The claim does not arise until this element is met.  *Dettelis v. Sharbaugh*, 919 F.3d 161, 163-64 (2d Cir. 2019).  Indeed, "one can argue that the favorable termination requirement is more than just an essential element of the legal claim; it is one of the acts comprising it."  *Limone*, 336 F. Supp. 2d at 37 n.25.  Accordingly, "[i]f the government believes that only acts are relevant to the determination of when a claim arises, then the acts comprising malicious prosecution continue until plaintiff is exonerated," *id.*—which, here, continued through November 18, 2021.[9] Similarly, *McDonough* holds that a plaintiff does not have "a complete and present cause of action" for malicious prosecution until the favorable termination of a criminal case.  588 U.S. at 119 (citation omitted).

**C.      The Cases Cited by Defendant Are Inapposite**

The cases Defendant cites in support of its reading of the law enforcement proviso do not withstand scrutiny.  In *Diminnie v. United States*, 728 F.2d 301 (6th Cir. 1984), there was no analysis of sovereign immunity or the favorable termination issue.  The plaintiff's malicious prosecution claim instead fell on its merits, the lower court having found on summary judgment

---

9.   Moreover, as the court observed in *Limone*, accepting Defendant's argument that Plaintiffs' claims arose before 1974 would ignore the holding and reasons set forth in *Heck*, in which the Supreme Court emphasized the significance of the favorable termination requirement to prevent collateral attacks on criminal convictions.  336 F. Supp. 2d at 37.

that the plaintiff had failed to prove all the necessary elements. *Diminnie v. United States*, 522 F. Supp. 1192, 1194-97 (E.D. Mich. 1981) ("Even though plaintiff's . . . trial occurred after March 16, 1974, defendant is insulated from any malicious prosecution claim arising out of this trial because [probable cause existed]."). In *Ames v. United States*, 600 F.2d 183 (8th Cir. 1979), while other claims were dismissed because they were not covered by the 1974 amendment, the malicious prosecution claim was disposed of in a separate analysis for failure to allege the initiation element. *Id.* at 184-85. In *Regan v. Sullivan*, 557 F.2d 300 (2d Cir. 1977), the court affirmed dismissal of the malicious prosecution claim because it "arose prior to the effective date of the amendment," *id.* at 303, but Defendant omits that, unlike here, the underlying criminal case terminated in 1973— *also* prior to the amendment's enactment, *see Regan v. Sullivan*, 417 F. Supp. 399, 401 (E.D.N.Y. 1976). *Gaudet v. United States*, 517 F.2d 1034 (5th Cir. 1975), was a two-page decision that gave scant attention to the law enforcement proviso and did not analyze when a malicious prosecution case "arises." The remaining cases—*Spock v. United States*, 464 F. Supp 510 (S.D.N.Y. 1978); *Pennington v. United States*, 406 F. Supp. 850 (E.D.N.Y. 1976); and *Dupree v. Village of Hempstead*, 401 F. Supp. 1398 (E.D.N.Y. 1975)—did not consider malicious prosecution claims.

### D. Plaintiffs Allege Unlawful Conduct After the Amendment's Enactment

Even if the Government's interpretation of the law enforcement proviso were correct, Plaintiffs' claims still survive because Plaintiffs have alleged wrongful conduct by the FBI that occurred after 1974. In addition to initiating the malicious prosecution of Plaintiffs, *see infra* Section III.A, the FBI continued the prosecution by continuing to conceal evidence of Plaintiffs' innocence and lying about the evidence it had. G.J. Compl. ¶¶ 87-116. It did so even during clear junctures when it could have prevented further harm by telling the truth: *e.g.*, when Plaintiffs appealed, filed petitions of writs of habeas corpus, and moved to vacate their convictions. In fact, the FBI's affirmative concealment of exculpatory evidence played a central role in both the District

Attorney's opposition to Plaintiffs' 1977 motion to vacate the convictions and the court's decision to deny the motion without a hearing. *Id.* ¶¶ 102-10. That conduct, which occurred after 1974, is clearly covered by the amendment to the FTCA. *See Limone*, 336 F. Supp. 2d at 31, 37-38.

### III. Plaintiffs State Malicious Prosecution Claims

To state a malicious prosecution claim under New York law, a plaintiff must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis*, 919 F.3d at 163-64 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). Defendant contests only the first and third elements. Def.'s Br. at 18. Contrary to Defendant's arguments, Plaintiffs adequately allege both.

### A. Plaintiffs Adequately Plead the Initiation of Criminal Proceedings

A defendant initiates a criminal proceeding by "play[ing] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (citation omitted). The initiation-or-continuation element is satisfied where a defendant withholds material information from a prosecutor or induces a witness to give false testimony that results in an arrest and grand jury indictment. *Buari v. City of New York*, 530 F. Supp. 3d 356, 383-85 (S.D.N.Y. 2021).

Here, Plaintiffs allege that the FBI concealed exculpatory information from the District Attorney. *See, e.g.*, G.J. Compl. ¶¶ 7, 47, 52, 121, 129, 147. They also allege that the FBI fabricated evidence by causing witnesses to falsely implicate Plaintiffs; that the FBI knew such evidence would be used to initiate the prosecution of Plaintiffs; and that the evidence was, in fact, so used after the FBI forwarded it to the District Attorney. *See, e.g.*, *id.* ¶¶ 3, 14, 72-74, 76, 244. The District Attorney itself acknowledged the FBI's significant role in the prosecution. *Id.* ¶ 59. *See Ramchandani v. CitiGroup, Inc.*, No. 19 Civ. 9124 (VM), 2021 WL 930627, at *6-7 (S.D.N.Y.

Mar. 11, 2021) (allowing malicious prosecution claim against banks for disclosing false information about plaintiff to DOJ where DOJ's sentencing memorandum indicated it "heavily relied on Citi's cooperation" and recognized "Citi's 'valuable assistance'"). The first malicious prosecution element is thus sufficiently pleaded.

The Government contends that "Plaintiffs' allegations belie their claim that the FBI was somehow part of the prosecution team," Def.'s Br. at 21, but none of the Government's examples negates the active role played by the FBI. For instance, the Government mischaracterizes and then places undue importance on Plaintiffs' allegation concerning the District Attorney's case file. *See* Def.'s Br. at 21. Plaintiffs do not, as Defendant claims, "acknowledge that the District Attorney's 'case file contains no papers of any kind from the [FBI].'" *Id.* Rather, the Complaints allege that, at the time of the *1970s* post-conviction proceedings, *the District Attorney* made this representation to the court. G.J. Compl. ¶ 104.

The Government next claims that "there are no well-pleaded allegations that the FBI pressured or even encouraged the District Attorney to act against the Plaintiffs." Def.'s Br. at 21. Not so. The Complaints adequately allege that the FBI withheld information exculpating Plaintiffs because the men were attractive targets; the FBI wanted to divert blame from William Bradley, with whom the FBI had an ongoing relationship; and the FBI wanted to conceal the nefarious activities of its domestic "Counterintelligence Program," also called "COINTELPRO." G.J. Compl. ¶¶ 14, 54; *see also id.* ¶¶ 136-41, 185-229; *Ramchandani*, 2021 WL 930627, at *7-8 (finding initiation element sufficiently pleaded where complaint alleged that defendant banks "had motive and opportunity to do more than merely cooperate with the [DOJ's] investigation, but rather to influence the outcome to serve [their] own interest in minimizing [their] role in the underlying [incident] and shifting blame to another").

The Government also argues without any basis that Plaintiffs' malicious prosecution claims fail because there are no allegations "that the state trial was the functional equivalent of a federal prosecution or that the FBI provided testimony, before the grand jury or at trial, inculpating Plaintiffs." Def.'s Br. at 21. There is no requirement under New York law that the prosecution be a federal prosecution or that the FBI's conduct "*constitute* 'the initiation or continuation' of such proceedings." *Galgano v. County of Putnam*, No. 16-CV-3572 (KMK), 2020 WL 3618512, at *10 (S.D.N.Y. July 2, 2020) (citations omitted). "On the contrary, [the FBI's] conduct need only *play an active role* in such 'initiation or continuation.'" *Id.* (citations omitted). Nor is there any requirement that the defendant himself provide testimony; initiation is satisfied where, as here, the defendant is alleged to have induced another witness to testify falsely. *Rodriguez v. City of New York*, 590 F. Supp. 3d 518, 535 (E.D.N.Y. 2022).

The Government's reliance on *Limone v. United States*, 579 F.3d 79 (1st Cir. 2009); *Frigerio v. United States*, No. 10 Civ. 9086 (SAS), 2011 WL 3163330 (S.D.N.Y. July 22, 2011); and *Burt v. Aleman*, No. 05-CV-4493 (NGG), 2008 WL 1927371 (E.D.N.Y. Apr. 30, 2008); is misplaced. The *Limone* case, while instructive on many issues presented in this case, *see, e.g.*, *supra* Section II, applied Massachusetts law, 579 F.3d at 89, but New York law applies here. Moreover, the First Circuit in *Limone* found the initiation element lacking, 579 F.3d at 91, only after a "lengthy" trial conducted by the district court that "took twenty-two days and involved hundreds of exhibits, thousands of pages," 497 F. Supp. 2d at 151, *aff'd on other grounds*, 579 F.3d 79 (1st Cir. 2009). The district court rejected that defense at the motion to dismiss stage. *Limone v. United States*, 271 F. Supp. 2d 345, 358 (D. Mass. 2003). In *Frigerio*, unlike here, there were no allegations that FBI agents withheld evidence from or forwarded fabricated evidence to prosecutors. The complaint alleged only that an FBI agent made misrepresentations to the *plaintiff*

and his lawyers. *See* 2011 WL 3163330, at *10. Finally, *Burt* was a case decided on summary judgment, not a motion to dismiss, where the court found that the record was "bereft of any *evidence*" showing that the officer insisted upon or urged further prosecution of the plaintiff after his arrest. 2008 WL 1927371, at *6 (emphasis added). Here, in contrast, the FBI contributed to the prosecution of Plaintiffs after their arrest through its ongoing fabrication of false testimony and concealment of exculpatory evidence.

### B. Plaintiffs Adequately Plead the Absence of Probable Cause

The Complaints plead a lack of probable cause. They allege that Plaintiffs had well-supported alibis, that the FBI amassed an immense amount of intelligence about the actual perpetrators immediately after Malcolm X's murder, and that the prosecution's case against Plaintiffs rested on fabricated eyewitness testimony. *See, e.g.*, G.J. Compl. ¶¶ 32-33, 42-51, 56, 72-80. Aside from these fabricated testimonies, there was *no* additional evidence implicating Plaintiffs—and, therefore, no probable cause.

Although the Government contends that the grand jury indictment created a presumption of probable cause, Def.'s Br. at 22-25, this presumption may be overcome with evidence "that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)); *see also id.* ("The presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts[,] have misrepresented or falsified evidence[,] or [have] otherwise acted in bad faith.'" (quoting *Colon*, 60 N.Y.2d at 82-83)). Here, the Complaints amply allege that the indictments were procured through FBI conduct "undertaken in bad faith"—namely, the FBI's fabrication of false evidence and concealment of exculpatory evidence, including detailed descriptions about the actual perpetrators. *See, e.g.*, G.J. Compl. ¶¶ 42-51, 56, 72-80.

Much of this evidence was in the FBI's hands long before Plaintiffs' indictments on March 10, 1965. *See, e.g., id.* ¶ 80(a)-(d), (f).

The Government does not dispute that concealment of exculpatory evidence and fabrication of evidence constitute bad faith conduct rebutting a presumption of probable cause. Nor can it. *See Buari*, 530 F. Supp. 3d at 383, 387 (finding presumption of probable cause rebutted where plaintiff alleged that detectives withheld exculpatory evidence; fabricated evidence by inducing witnesses to testify falsely; and knew that testimony was false, given lack of physical evidence corroborating false testimony and suspicion and tips about third-party suspects); *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 74 (S.D.N.Y. 2020) (finding that complaint "adequately pleads that the indictment was undoubtedly the product of fraud and bad faith conduct," where plaintiff alleged that detectives "suppressed evidence," "fabricated confessions," and "offered false testimony to the grand jury"); *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (deeming presumption of probable cause rebutted where plaintiff alleged that officers "failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, . . . and fabricated oral statements of witnesses"); *Newton v. City of New York*, 566 F. Supp. 2d 256, 275-77 (S.D.N.Y. 2008) (holding that allegations that defendants coerced eyewitnesses, withheld rape kit and other exculpatory evidence, and failed to investigate third-party suspect were sufficient to raise plausible inference of bad faith, and that such inference negated presumption of probable cause created by indictment).

Instead, while acknowledging Plaintiffs' allegations that the FBI withheld exculpatory information, *see* Def.'s Br. at 23-24, the Government argues that these allegations do not rebut the probable cause presumption because Plaintiffs do not indicate "what information was presented to the grand jury, what evidence supported the finding of probable cause as of March

10, 1965, and what evidence was presented against the Plaintiffs at trial." *Id*. at 24. Beyond the fact that the pleading standards do not require nearly that level of particularity, Defendant's argument fails for several reasons.

> ***First***, the Complaints adequately allege that the prosecution's case "rested entirely on eyewitness testimony," much of which the FBI procured, directed, and fabricated "by causing witnesses to give false and materially misleading statements." G.J. Compl. ¶¶ 72-73. The Government points to these same fabricated testimonies as "substantial evidence to support the finding of probable cause." Def.'s Br. at 24. But as courts have consistently held, "where a plaintiff alleges that the indictment was procured through false evidence, the complaint will not be dismissed at the motion to dismiss stage." *Del Col v. Rice*, No. 11 CV 5138 (MKB), 2012 WL 6589839, at *14 (E.D.N.Y. Dec. 18, 2012) (citing *Anilao v. Spota*, 774 F. Supp. 2d 457, 506 (E.D.N.Y. 2011) ("[A]t the motion to dismiss stage, the . . . defendants cannot hide behind the decision of the DA to prosecute and the subsequent indictment of plaintiffs when it was the . . . defendants who allegedly spurred the . . . defendants to act and fed them with false testimony in pursuit of that endeavour.")).

> That these testimonies were fabricated is apparent from the glaring inconsistencies and contradictions across the testimonies, including, *inter alia*, about where the shooters were seated in the Audubon Ballroom where the murder occurred. G.J. Compl. ¶¶ 101, 145. None of the prosecution witnesses placed the shooters in the front row. *Id.* ¶ 77. The only person who testified as such was Mr. Halim—the admitted assassin who was captured at the scene and confessed his guilt at trial. *Id.* Crucially, Mr. Halim's testimony was corroborated by two pieces of evidence concealed by the FBI: (1) the account of Eugene Roberts, an undercover investigator for the NYPD's Bureau of Special Services and Investigations, or "BOSSI", who knew at the time

and publicly confirmed years later that the shooters sat in the front row, and (2) an FBI report dated one day after the assassination, stating that the shooters were "two men, occupying the front seats, left side of [the] middle aisle." G.J. Compl. ¶ 145. The Government, while liberally citing the 2021 Joint Motion to vacate Plaintiffs' judgments of convictions, *see* Def.'s Br. at 4-5, 24-25, conspicuously omits the discussions in the Joint Motion about these inconsistencies and other weaknesses in the prosecution's case against Plaintiffs, *see, e.g.*, Joint Mot. at 9 & n.12, 11, 15-16, 36 (discussing inconsistencies in eyewitness statements and grand jury and trial testimonies). The Government nowhere mentions Mr. Halim's testimony when he retook the stand at trial, recanted his previous testimony, confessed his guilt, and affirmed Plaintiffs' innocence, G.J. Compl. ¶¶ 64-69—testimony that the District Attorney itself described as "[t]he most important weakness in the People's case," Joint Mot. at 36. Nor does the Government acknowledge the inconsistencies discussed in the Joint Motion between the eyewitnesses' grand jury and trial testimonies. *See, e.g.*, Joint Mot. at 6, 44-45.

***Second***, the Government focuses solely on what evidence was presented to the grand jury and at trial and ignores what evidence was *withheld*. The Complaints allege in detail the trove of evidence of Plaintiffs' innocence that the FBI concealed from the prosecution and, in turn, the grand jury. *See, e.g.*, G.J. Compl. ¶¶ 42-52. Given the patently exculpatory value of this evidence, had it been revealed to the grand jury, the prosecution's entire case against Plaintiffs would have been undermined, and no indictment would have been issued. *Id.* ¶¶ 256-57. *See Richards v. City of New York*, No. 97 Civ. 7990 (MBM), 2003 WL 21036365, at *16 (S.D.N.Y. May 6, 2003) ("[T]he police may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause." (citation omitted)); *Gisondi v. Harrison*, 72 N.Y.2d 280, 285 (1988) (noting that police may be liable for withholding evidence where

"discrepancies are so substantive that failure to disclose them would be comparable to fraud or perjury").

**Third**, as stated above and alleged in the Complaints, there was never any probable cause to begin with. *See, e.g.*, G.J. Compl. ¶¶ 251-55. The mountain of evidence concealed by the FBI that exculpated Plaintiffs and that inculpated Malcolm X's actual murderers makes that all the more obvious. The Government's suggestion that Plaintiffs must adopt the opposite stance and allege what evidence *did* support a probable cause finding is unsupported and illogical.

**Finally**, even if probable cause had existed, it was vitiated by the FBI's fabrication of evidence and concealment of exculpatory evidence. *See Newson v. City of New York*, No. 16-CV-6773 (ILG) (JO), 2019 WL 3997466, at *6 (E.D.N.Y. Aug. 22, 2019) (finding plaintiff was "entitled to the inference" that probable cause supporting initial arrest was negated when officers learned of ballistics match and cellphone incriminating third-party suspect, and that officers' delay in furnishing such evidence to prosecutors made prosecutors less inclined to dismiss charges against plaintiff); *Morel v. Reed*, No. 11-CV-1808 (DLI)(LB), 2015 WL 1506132, at *5 (E.D.N.Y. Mar. 31, 2015) ("[O]n a malicious prosecution claim, if it can be proved that a law-enforcement officer fabricated material evidence against a suspect and forwarded it to prosecutors, . . . then not only is the presumption of probable cause overcome, but the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator." (citation omitted)).

In sum, the Complaints more than adequately allege that there was no probable cause to commence the criminal proceedings against Plaintiffs and that the FBI's misconduct negates any presumption of probable cause caused by the indictment.

## IV.     Plaintiffs Adequately Plead Negligence Claims

### A.     Plaintiffs Are Permitted to Allege Inconsistent Theories of Liability

Defendant first argues that Plaintiffs' negligence claims "fail because they are premised on intentional conduct." Def.'s Br. at 25. That argument does not withstand scrutiny because the Federal Rules of Civil Procedure permit plaintiffs to allege claims in the alternative, and Plaintiffs allege conduct that is consistent with negligent, rather than intentional, acts.

Federal Rule of Civil Procedure 8 provides that a plaintiff "may state as many separate claims . . . as it has, *regardless of consistency*." Fed. R. Civ. P. 8(d)(3) (emphasis added); *see also Henry v. Daytop Vill.*, 42 F.3d 89, 91 (2d Cir. 1994) (observing that "Federal Rules of Civil Procedure explicitly authorize pleading in the alternative" and holding that inconsistent "second claim may not be construed as an admission against [the plaintiff's] first claim"). Indeed, "[i]n federal courts, . . . alternative, inconsistent claims and defenses may be alleged in a pleading." *White v. Wellington*, 627 F.2d 582, 587 (2d Cir. 1980); *see also Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 n.3 (2d Cir. 2004) (observing that, "even if the theories are inconsistent, [the Federal Rules of Civil Procedure] permit[] pleading inconsistent theories in the alternative"). Accordingly, a "Plaintiff may pursue claims sounding in both negligence and intentional torts at the same time, and in the alternative." *Sweet v. City of Hartford*, No. 3:15-CV-00553 (CSH), 2018 U.S. Dist. LEXIS 87221, at *38 (D. Conn. May 24, 2018) (citing Fed. R. Civ. P. 8(d)(3)) (collecting cases); *Gomez v. City of Norwalk*, No. 3:15-CV-1434 (MPS), 2018 WL 780213, at *8 (D. Conn. Feb. 8, 2018) (allowing both a "negligence claim and a claim of intentional conduct based on the same incident"). The Government does not acknowledge this rule, much less address it.

Second, an alternative, inconsistent claim may be dismissed only where the facts alleged do not support it. *Kwan v. Schlein*, 246 F.R.D. 447, 451 (S.D.N.Y. 2007) (observing that

"each alternative theory must itself be sufficient to state a claim" and dismissing claim that lacked adequate factual allegations). Thus, negligence claims are inappropriately dismissed unless "a plaintiff's factual allegations are *only* consistent with a theory of intentional, or perhaps reckless, conduct." *Rizk v. City of New York*, 462 F. Supp. 3d 203, 229 (E.D.N.Y. 2020) (emphasis added) (citations omitted); *see also Paul v. City of New York*, No. 16-CV-1952 (VSB), 2023 WL 3724152, at *12 (S.D.N.Y. May 30, 2023) (observing that "[i]t is specifically accepted in this District that claims of excessive force [*i.e.*, an intentional tort] and negligence may be pled in the alternative, so long as a reasonable jury could find that the complained of actions were either intentional or negligent," and collecting cases); *Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 88 n.14 (E.D.N.Y. 2012) ("Although plaintiff alleges that defendant Hunsucker intentionally (rather than negligently) caused the injury to his leg, he is permitted to plead a negligence claim in the alternative against Hunsucker.").

Here, the Government points to facts Plaintiffs allege that involve intentional conduct. Def.'s Br. at 25-26. However, Plaintiffs make other allegations supporting their negligence claims. For example, as discussed below in Section IV.C, *infra*, Plaintiffs allege a theory of liability based on the negligent *supervision* of the wrongdoers at the FBI. That theory of liability is necessarily predicated on negligent, rather than intentional, conduct. Indeed, as discussed below, Defendant's argument about Plaintiffs' negligent supervision claims turns on issues related to scope of employment, not on any contention that the alleged failure to supervise was intentional. Def.'s Br. at 29. Even if Defendant means to make that argument, the Complaints contain specific factual allegations that are of the sort routinely alleged for negligent supervision claims premised on the failure to supervise, discipline, and train tortfeasors—allegations that are entirely consistent with negligent, rather than intentional, wrongdoing. *E.g.*, G.J. Compl.

¶¶ 180-84, 281-88. Even if, *arguendo*, some allegations could be construed as an intentional failure to supervise, the Complaints adequately allege specific conduct that is consistent with, and plausibly states, a claim for negligence. *See, e.g.*, *Rizk*, 462 F. Supp. 3d at 229.

As another example, the Complaints allege that, in connection with Plaintiffs' 1977 motion to vacate their convictions, the District Attorney relied on representations by then-FBI Special Agent Steven Edwards and other FBI employees in asserting that FBI files contained no documents that corroborated the account Mr. Halim provided regarding Plaintiffs' innocence. G.J. Compl. ¶¶ 103-06. Regarding FBI employees' conduct, the Complaints allege that "FBI employees continued to conceal substantial evidence in their possession of [Plaintiffs'] innocence, eliminating any chance for [them] to have a fair shot at clearing [their] name[s]." *Id.* ¶ 115. Nothing in those allegations explicitly states, or necessarily implies, that that conduct was intentional. Indeed, discovery in this case may well reveal that then-FBI Special Agent Edwards and other FBI employees were negligent in their review of the relevant FBI files, resulting in the false misrepresentations made to the District Attorney and the court. *See id.* ¶ 107. In other words, the FBI employees' *continued* concealment of substantial evidence in their possession, *see id.* ¶ 115, could have been the result of negligent, rather than intentional, conduct—*i.e.*, that their review of the relevant FBI files was inadequate and inconsistent with the standard of care a similarly situated reasonably prudent person would have exercised. Only discovery can reveal the answer to that question.

The fact that the Complaints describe certain conduct as being intentional, *e.g.*, G.J. Compl. ¶ 120, is of no moment. As explained above, "a factual allegation in one claim should not be construed as an admission against another alternative or inconsistent claim." *Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*, 318 B.R. 276, 288 (Bankr. S.D.N.Y. 2004) (citing

*Henry*, 42 F.3d at 95).  In short, Plaintiffs are permitted to allege alternative, inconsistent theories (and facts that support those inconsistent theories), and the Complaints adequately allege facts that are consistent with negligence, not just intentional conduct.

###### B. Plaintiffs Plead a Sufficient Private Analogue

The Government next argues that Plaintiffs' negligence claims fail because "there is no private analogue for those claims under New York law."  Def.'s Br. at 27.  That argument turns on a mischaracterization of Plaintiffs' claims as alternatively being predicated on constitutional violations, *id.*, or a failure by law enforcement "to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution," *id.* at 28 (quoting *Watson v. United States*, 865 F.3d 123, 134 (2d Cir. 2017)).  In a footnote, the Government also argues that the Complaints allege no sort of "special relationship" that would give rise to a duty of care—and that "there is no standalone duty to prevent harm to third parties."  *Id.* 28 n.8.

At the outset, Plaintiffs acknowledge that the FBI's employees performed governmental functions.  That is not fatal to Plaintiffs' negligence claims.  *See Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir. 1996) ("The government is not limited to the liability assigned to municipal corporations under common law, nor is it insulated from FTCA liability simply because the negligence was committed in the performance of a uniquely governmental function." (citing *Indian Towing v. United States*, 350 U.S. 61, 65-69 (1955))).  "[T]he words 'like circumstances' [in the FTCA] do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield."  *United States v. Olson*, 546 U.S. 43, 46 (2005).

Against that backdrop, the Government's argument is misguided for a number of reasons.  *First*, Plaintiffs' negligence theories do not rest on any constitutional violation.  The Complaints make clear that: (1) Plaintiffs do not allege a constitutional tort, and (2) the presence

of constitutional violations demonstrates that the Defendant's employees' conduct was not an exercise of a discretionary function. G.J. Compl. ¶ 247. Similarly, Plaintiffs' negligence claims are not premised on a negligent investigation theory. Nothing in the Complaints purports to advance such a theory. *Id.* ¶¶ 272-88. Indeed, the inquiry the FTCA demands is whether "a *private individual* under like circumstances" would be liable. 28 U.S.C. § 2674 (emphasis added).

**Second**, the Government's contention that "there is no standalone duty to prevent harm to third parties," Def.'s Br. at 28 n.8, is off base. This is not a case involving the conduct of third parties. The Government relies on *Ben v. United States*, 160 F. Supp. 3d 460 (N.D.N.Y. 2016), but that case involved a claim against the United States for crimes committed by someone on probation, on the theory that the U.S. Probation and Pretrial Services Office was negligent in its supervision of the probationer. *Id.* at 464-65. Defendant similarly cites to *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 305 (S.D.N.Y. 2019), another case involving the conduct of a third person. But, again, Plaintiffs are not trying to hold the United States accountable for the actions of third persons; Plaintiffs are trying to hold the United States accountable for the actions *of its own employees* that caused Plaintiffs harm. Third-party conduct is not at issue.

Contrary to the Government's assertion, there *is* a "freestanding" duty to prevent harm caused by a party's *own* actions; that is the basic precept that underlies negligence. "[C]onduct is considered negligent when it tends to subject another to an unreasonable risk of harm arising from one or more particular foreseeable hazards." *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 584 (1997). "There is negligence if a reasonably prudent person could foresee injury as a result of his or her conduct, and acted unreasonably in the light of what could be foreseen." N.Y. Civil Pattern Jury Instrs. 2:12 (3d ed. 2023); *see also Shepard v. Power*, 195 N.Y.S.3d 94, 96-97 (2d Dep't 2023) ("The general duty of care in a negligence action requires an individual to use that

degree of care that a reasonably prudent person would have used under the same circumstances." (citations omitted)); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 601-02 (S.D.N.Y. 2022) (allowing negligence claim to proceed where plaintiffs "alleged that Government agents violated their duty to act with ordinary care towards them by separating parent and child and preventing them from communicating"). "A critical consideration in determining whether a duty exists is whether the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Davis v. S. Nassau Cmtys. Hosp.*, 26 N.Y.3d 563, 572 (2015) (citation omitted).

Here, Defendant's employees violated their duty to act with ordinary care. A duty arose for at least two reasons. **First**, Defendant's employees' conduct created a risk of harm to Plaintiffs. *See, e.g.*, *Idiakheua v. Morton*, No. 20-CV-4169 (NGG) (SJB), 2024 WL 417058, at *28 (E.D.N.Y. Feb. 5, 2024) (finding that defendant's "affirmative actions in increasing the risk of harm to Plaintiff created a duty to exercise reasonable care" to prevent harm); *Van Buren v. Lacerra*, 57 N.Y.S.3d 203, 205 (2d Dep't 2017) (finding triable issue of fact as to whether party "breached a duty by creating an unreasonable risk of harm"); *see also Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344 (1928) (holding that duty arises when risk of harm is reasonably foreseeable). "The Restatement (Second) of Torts § 321(1) (1965) provides that 'if the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.'" *Limone*, 497 F. Supp. 2d at 230 (quoting Restatement (Second) of Torts

§ 321 (1965)) (finding that FBI agents had duty to take affirmative steps to prevent FBI informant's perjury).[10]

New York law imposes negligence liability where a tortfeasor creates a dangerous condition with an attendant, foreseeable risk of harm—just as Defendant's employees did here by assisting in Plaintiffs' prosecutions, but simultaneously fabricating evidence and concealing evidence of their innocence—and then fails to take reasonable steps to prevent the resulting foreseeable harm. *See, e.g.*, *Strunk v. Zoltanski*, 62 N.Y.2d 572, 575 (1984) ("The present is a situation in which the landlord, by leasing the premises to the owner of the dog, could be found affirmatively to have created the very risk which was reasonably foreseeable and which operated to injure plaintiff." (citation omitted)); *Hewitt v. Palmer Veterinary Clinic, PC*, 35 N.Y.3d 541, 550 (2020) (Wilson, J., concurring) ("Animal owners presumptively had a duty to control their animals, but others might also have such a duty when they 'created the very risk . . . which operated to injure [the] plaintiff.'" (quoting *Strunk*, 62 N.Y.2d at 575)); *Genen v. Metro-North Commuter R.R.*, 690 N.Y.S.2d 213, 216 (1st Dep't 1999) ("Hunter's duty to exercise reasonable care . . . [arose] by its own affirmative acts that created a risk of injury to members of the public using that Metro-North station."); *Carney v. Buyea*, 65 N.Y.S.2d 902, 908-09 (4th Dep't 1946).[11]

---

10. New York courts have cited Section 321 of the Restatement of Torts (1934), which embodies a similar rule, with approval. *E.g.*, *Bernard v. Andover*, 188 N.Y.S.2d 879, 884 (4th Dep't 1959); *Slavin v. State*, 291 N.Y.S. 721, 724 (3d Dep't 1936); *cf. Lauer v. City of New York*, 95 N.Y.2d 95, 112 (2000) (Smith, J., dissenting) ("[U]pon realizing that he created an unreasonable danger to plaintiff, a targeted suspect of the investigation, Dr. Lilavois had a duty to exercise reasonable care to prevent the harm." (citing, *inter alia*, Section 321)).

11. *See also, e.g.*, *Tropea v. Shell Oil Co.*, 307 F.2d 757, 766 (2d Cir. 1962) ("[T]he plaintiff and his injury were within the scope of Tonri's duty not to create a foreseeable risk of danger."); *Watson v. United States*, 133 F. Supp. 3d 502, 526 (E.D.N.Y. 2015) (observing that "New York law recognizes 'failure to act' negligence claims" and concluding that "[i]f the USCIS [United States Citizen and Immigration Service] were a private entity and had

Here, Defendant's employees created a foreseeable risk of harm by assisting in Plaintiffs' prosecution and the initiation of criminal proceedings against them, but then concealing significant evidence (on a continuing basis) demonstrating Plaintiffs' innocence and the identities of Malcolm X's actual assassins, and by fabricating evidence. *E.g.*, G.J. Compl. ¶¶ 2-3, 14, 73-74, 78-80, 82-84, 251-53. As a result of Plaintiffs' convictions, Plaintiffs were, at a minimum, exposed to a risk of harm. Plaintiffs "served [their] sentence[s] in various maximum-security prisons throughout New York State, including Attica, Sing Sing, and Clinton Correctional Facilities." *Id.* ¶ 232. Their "imprisonment spanned from the 1960s through the 1980s, a time period that included the Attica Uprising and well-documented inhumane treatment of prisoners." *Id.* ¶ 233. A person put into those circumstances faced a grave risk of serious physical harm. *See, e.g.*, New York State Archives, *Timeline of Events of the Attica Prison Uprising of 1971 and Subsequent Legal Actions*, https://www.archives.nysed.gov/research/topic-attica-timeline (last visited May 14, 2024) (noting that 29 inmates were killed during Attica Uprising and "near-indiscriminate barrage of almost 2,000 rounds [was] fired by State Police and Corrections officers"). Particularly in light of the "well-documented inhumane treatment of prisoners" in the 1960s through the 1980s, G.J. Compl. ¶ 233, the risk of harm to Plaintiffs was foreseeable. Creating that foreseeable risk of harm imposed a duty on Defendant's employees to take reasonable steps to avoid that harm form coming to fruition. Because the information that would have prevented Plaintiffs' wrongful convictions was in FBI employees' possession, FBI employees assisted with the initiation of criminal proceedings against Plaintiffs, and FBI employees fabricated

---

knowledge of a condition which it could eliminate and which would foreseeably cause harm to a specific individual, then its failure to avoid the harm by reasonable means would be actionable negligence").

evidence, Defendant's employees were "in the best position to protect against the risk of harm." *Davis*, 26 N.Y.3d at 572 (citation omitted).

On that score, this case is similar to *Limone*, where the district court found that the Government owed a duty of care to the plaintiffs "to take affirmative steps to prevent" a cooperating witness's perjury. 497 F. Supp. 2d at 230. The duty arose because, as mentioned above, "if [an] actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." *Id.* (quoting Restatement (Second) of Torts § 321(1) (1965)). And, in that case, FBI agents had "used machinations and offers of compensation to turn [the person] into a cooperating witness and to push him to testify," despite knowing he was likely to perjure himself. *Id.* at 230-31. Thus, the FBI agents created a dangerous situation through this conduct, imposing on them the duty described above. To the extent the decision in *Limone* is distinguishable in this regard, it is because the cooperating witness "was not an agent or employee per se of the FBI," though the FBI's "actions and relationship with him as a cooperating witness created a duty." *Id.* at 230. Here, it was the FBI employees' *own* conduct that created the substantial risk of physical harm to Plaintiffs—by fabricating evidence, by concealing exculpatory evidence, and by lying during post-conviction proceedings about the evidence in the FBI's possession—making the existence of a duty even clearer here than it was in *Limone*.[12]

---

12. *In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273 S.D. Fla. 2020), is also instructive. There, the district court found a duty on a "zone of risk" theory under Florida law, which, like New York law, imposes a duty on "defendants whose own affirmative conduct created an unreasonable risk of harm." *Id.* at 1302. The court found a duty because the FBI had taken affirmative steps that "eliminat[ed] concerned citizens' . . . ability to directly contact their local FBI field office concerning threats to human life." *Id.* at 1302-03.

**Second**, Defendant's employees voluntarily assumed a duty once they voluntarily undertook to assist with the investigation into Malcolm X's murder. "The case law is clear that, even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care." *Parvi v. Kingston*, 41 N.Y.2d 553, 559 (1977); *see also H. R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167 (1928) ("It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all. . . . The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all." (citation omitted)). "Courts analyzing FTCA cases routinely find cognizable duties arising in a wide variety of undertakings by the federal government, following the Second Restatement approach." *In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d at 1289-90, 1300-02 (citing Restatement (Second) of Torts § 324A (1965)) (denying motion to dismiss FTCA negligence claim premised on FBI conduct based on voluntary undertaking and "zone of risk" theories and collecting cases).[13]

Here, Defendant's employees were not required to assist the NYPD with its investigation into Malcolm X's murder and Plaintiffs' resulting prosecutions and wrongful convictions. However, once those employees voluntarily participated in those investigations and prosecutions, they assumed a duty to exercise reasonable care to prevent increasing the risk of

---

13. The New York Court of Appeals has adopted the approach articulated in Section 324A of the Restatement (Second) of Torts (1965). *E.g.*, *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 141-42 (2002); *Cohen v. Cabrini Med. Ctr.*, 94 N.Y.2d 639, 643 (2000). That section provides: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm . . . ." Restatement (Second) of Torts § 324A (1965).

harm to Plaintiffs described above. *See* Restatement (Second) of Torts § 324A. They did not and instead increased the risk of harm by, *inter alia*, fabricating evidence.

Defendant's employees acted in a way that created a foreseeable risk of harm to Plaintiffs and voluntarily undertook to assist with Plaintiffs' prosecutions. Under those circumstances, New York law imposed a duty to take reasonable steps to prevent the foreseeable harm their actions and voluntary undertaking engendered—namely, Plaintiffs' wrongful convictions, decades spent in dangerous prison conditions that threatened their physical safety, and the other harms detailed in the Complaints. *E.g.*, G.J. Compl. ¶¶ 230-40. At the pleading stage, Plaintiffs' allegations are more than sufficient to state a negligence claim.

## C. Plaintiffs State Claims for Negligent Supervision

Defendant's entire argument as to Plaintiffs' negligent supervision claims turns on the fact that, under New York law, an employee's conduct must be outside the scope of their employment for such liability to attach. Def.'s Br. at 29. Defendant's argument fails because there are factual questions that cannot be resolved at the pleading stage. Plaintiffs' negligent supervision claims are an alternative theory of liability—*see supra* Section IV.A—that applies to the extent that the facts ultimately support a finding that certain offending FBI employees' conduct fell *outside* the scope of their employment, G.J. Compl. ¶ 280, in which case that conduct itself would not give rise to FTCA liability, *see* 28 U.S.C. §§ 1346(b)(1), 2672.

"The United States is liable for negligent supervision FTCA claims if a private employer would be liable under state law." *Monk v. United States*, No. 3:22-CV-1503 (SRU), 2024 WL 1344712, at *11 (D. Conn. Mar. 29, 2024). Under New York law, "an employer may be liable for the acts of an employee outside the scope of his or her employment" on a negligent supervision theory. *Scollar v. City of New York*, 74 N.Y.S.3d 173, 179 (1st Dep't 2018). "An

employee's actions fall within the scope of employment where the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business." *Selmani v. City of New York*, 984 N.Y.S.2d 114, 115-16 (2d Dep't 2014) (citations omitted); *see also Stavitz v. New York*, 471 N.Y.S.2d 272, 274 (1st Dep't 1984) (same).

Here, the Complaints allege that FBI employees, including former-Director J. Edgar Hoover, violated federal law and internal FBI directives and operating procedures. *E.g.*, G.J. Compl. ¶¶ 160-84. It is plausible that the conduct that constituted those violations did not "further the [FBI's] interest," and that the employees who committed those violations were not "carry[ing] out duties incumbent upon [them] in furthering the [FBI's] business." *See Selmani*, 984 N.Y.S.2d at 115-16. Whether that conduct was within the scope of their employment is a question of fact that cannot be resolved at this stage. *Williams v. J. Luke Constr. Co., LLC*, 99 N.Y.S.3d 460, 465 (3d Dep't 2019) ("Whether an employee was acting within the scope of employment generally presents a question of fact for [the factfinder] to decide."); *see also, e.g.*, *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979); *Sharp v. Erie R.R. Co.*, 184 N.Y. 100, 104-05 (1906); *accord Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 84 (2d Cir. 1989).

Defendant correctly recites New York law, but its only analysis of the issue is its conclusory assertion that Plaintiffs make no allegations "that any of the supposedly negligent supervisory acts were committed by FBI employees outside the scope of their employment." Def.'s Br. at 29. Defendant is correct insofar that the Complaints do not contain a boilerplate recitation of the words "outside the scope of their employment." But, as explained above, the Complaints allege specific facts that permit the plausible inference that those employees acted outside the scope of their employment. If that is the case, then those employees' conduct cannot

itself be the basis for FTCA liability, *see* 28 U.S.C. §§ 1346(b)(1), 2672, but their supervisors' negligent supervision of those employees—including the person(s) responsible for supervising former-Director Hoover—does provide a basis for FTCA liability. Which alternative theory of liability the facts ultimately prove to be the correct one is a question for the factfinder to resolve—and that is true irrespective of the allegations that the relevant federal officers were acting within the scope of their employment. G.J. Compl. ¶ 22. *See, e.g.*, *Breton v. City of New York*, 404 F. Supp. 3d 799, 809-10 (S.D.N.Y. 2019) (holding that "whether the defendants acted within the scope of their employment is a question that cannot be resolved" on motion for judgment on the pleadings, even where complaint specifically alleged employees were acting within scope of their employment); *see also supra* Section IV.A.

## V. Plaintiffs State Claims for Intentional Infliction of Emotional Distress

### A. New York State Public Policy Does Not Bar Plaintiffs' Claims

The Government first argues that Plaintiffs' claims for intentional infliction of emotional distress ("IIED") are foreclosed by the New York public policy bar on IIED claims against governmental entities. Def.'s Br. at 30. That argument fails, because the United States is liable "to the same extent as *a private individual* under like circumstances." 28 U.S.C. § 2674 (emphasis added); *see also* 28 U.S.C. § 2672 (providing for liability "under circumstances where the United States, *if a private person, would be liable* to the claimant in accordance with the law of the place where the act or omission occurred" (emphasis added)); 28 U.S.C. § 1346(b)(1) (same). Permitting the United States to avail itself of a defense available only to *governmental entities* under New York law, not to *private persons*, would be directly at odds with the plain statutory language of the FTCA and controlling precedent. *See Rayonier v. United States*, 352 U.S. 315, 319 (1957) ("We expressly decided in *Indian Towing* [*v. United States*, 350 U.S. 61 (1955)] that the United States' *liability is not restricted to the liability of a municipal corporation*

*or other public body . . . .*" (emphasis added)); *see also Olson*, 546 U.S. at 45-46 ("The Act says that it waives sovereign immunity 'under circumstances where the United States, if a private person,' not 'the United States, if a state or municipal entity,' would be liable." (emphasis omitted)); *Taber v. Maine*, 67 F.3d 1029, 1048 (2d Cir. 1995) ("Pursuant to the FTCA, courts merely determine whether analogous behavior by a *private-sector employee* would give rise to some form of fault-based vicarious liability on the part of a *private-sector employer*." (emphasis added)).

In brief, the United States' liability is co-extensive with that of a private person, not with that of a governmental agency. It is unsurprising, therefore, that Defendant cites no FTCA cases in support of its argument. Def.'s Br. at 30. It is equally unsurprising that courts, applying New York law, routinely allow IIED claims against the United States to proceed in FTCA cases. *See, e.g.*, *D.J.C.V.*, 605 F. Supp. 3d at 601; *Roe v. United States*, No. 18-CV-2644 (VSB), 2019 WL 1227940, at *5-6 (S.D.N.Y. Mar. 15, 2019); *Barone v. United States*, No. 12-CV-4103 (LAK), 2016 WL 2658174, at *2-5 (S.D.N.Y. May 5, 2016). Moreover, the Government cites no authority for the proposition that *New York State's* common law public policy bar applies to the *federal* government, and we are aware of none.

### B.    Plaintiffs' Intentional Infliction of Emotional Distress Claims Should Not Be Dismissed as "Duplicative"

The Government next argues that Plaintiffs' IIED claims fail because "the offending conduct is embraced by a traditional tort remedy." Def.'s Br. at 30 (quoting *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999)). Citing no binding authority, Defendant asserts that "the offending conduct allegedly falls within the ambit of malicious prosecution." *Id.* Defendant's argument fails because it rests on a faulty premise, and because Plaintiffs' IIED claims are not duplicative of their malicious prosecution claims.

***First***, Plaintiffs dispute that an IIED claim cannot survive a motion to dismiss where other, traditional torts *may* provide a remedy. "In *Fischer v. Maloney*, 43 N.Y.2d 553, 557-58 (1978), the New York Court of Appeals suggested that 'it may be questioned whether . . . [IIED] should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability.' But the Court of Appeals did not hold that liability for IIED is never appropriate when the underlying conduct may overlap with other torts." *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016) (emphasis omitted) (affirming denial of motion pursuant to Federal Rule of Civil Procedure 50 where plaintiff brought both malicious prosecution and IIED claims). The observation in *Rentas* is consistent with Federal Rule of Civil Procedure 8, which permits a plaintiff to plead alternative and inconsistent theories of liability, as discussed in Section IV.A, *supra*. It is no surprise, therefore, that courts often permit IIED claims to proceed in tandem with "traditional tort" claims, including malicious prosecution. *E.g.*, *Rentas*, 816 F.3d at 220-22, 227 (IIED and malicious prosecution); *Breton*, 404 F. Supp. 3d at 809, 814 (IIED and malicious prosecution); *Fahlund v. Nassau Cty. DA's Office*, 265 F. Supp. 3d 247, 259-60 (E.D.N.Y. 2017) (IIED and false arrest); *Barone*, 2016 WL 2658174, at *1-5 (IIED and malicious prosecution); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 529, 536 (S.D.N.Y. 2013) (IIED and malicious prosecution); *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 385 (S.D.N.Y. 2005) (IIED and malicious prosecution).

***Second***, even if IIED claims were always disallowed in situations where traditional tort remedies are available, that would be because the IIED claims are duplicative—which is not the case here. *See, e.g.*, *Warr v. Liberatore*, 270 F. Supp. 3d 637, 655 (W.D.N.Y. 2017) (dismissing an IIED claim where the claim was duplicative and would not have provided anything "in addition to what [was] recoverable under the traditional torts alleged"); *Matthaus v. Hadjedj*,

49 N.Y.S.3d 393, 394 (1st Dep't 2017) ("Supreme Court properly granted defendant's motion to dismiss plaintiff's claim for intentional infliction of emotional distress as duplicative of her defamation cause of action."). Dismissal is inappropriate where an IIED claim is not duplicative of other causes of action. *See, e.g.*, *Bender v. City of New York*, 78 F.3d 787, 792 (2d Cir. 1996) (observing that "the initiation of a false charge . . . could be found to involve additional elements not necessarily comprehended by the torts of false arrest or malicious prosecution"); *Eskridge v. Diocese of Brooklyn*, 180 N.Y.S.3d 179, 181 (2d Dep't 2022) (reversing dismissal of IIED claim where "cause of action [was] not duplicative" of other causes of action); *Warner v. Druckier*, 697 N.Y.S.2d 610, 611 (1st Dep't 1999) (affirming denial of motion to dismiss IIED claim and rejecting "defendants' contention that plaintiff's cause for intentional infliction of emotional distress is duplicative").

Here, Plaintiffs' malicious prosecution claims and IIED claims seek relief for different conduct and therefore are not duplicative. Plaintiffs' IIED claims seek relief for conduct that goes beyond just the initiation of a prosecution without probable cause; those claims seek relief for the initiation of prosecutions in the face of troves of evidence that demonstrated Plaintiffs' innocence and pointed towards Malcolm X's actual assassins, never disclosed to Plaintiffs, and FBI employees' fabrication of evidence—conduct that goes beyond a mere malicious prosecution claim. *See Worytko v. County of Suffolk*, No. 03-CV-4767 (DRH) (ARL), 2007 WL 1876503, at *6 (E.D.N.Y. June 28, 2007) (declining to dismiss IIED claim "to the extent [the] claim is premised upon other conduct, such as threats or [other] acts . . . outside of the arrests"); *Llerando-Phipps*, 390 F. Supp. 2d at 381 (allowing IIED claim based on false arrest and imprisonment that "resulted in [the plaintiff's] employment termination" and "deteriorated health" because defendants "failed to demonstrate that there is overlap between [the plaintiff's] claims and

remedies that are available under traditional tort law"); *see also Gonzalez v. Bratton*, 48 F. App'x

363, 365 (2d Cir. 2002) (summary order) (assuming that, even if "duplicative claims are barred,"

plaintiff's IIED claim survived because challenged conduct went beyond her false imprisonment

claim, including "forcing her to undergo unnecessary and humiliating examinations" (quoting 147

F. Supp. 2d at 195)), *aff'g*, 147 F. Supp. 2d 180 (S.D.N.Y. 2001).

More significantly, Plaintiffs' IIED claims seek relief for conduct and injuries that

continued past Plaintiffs' prosecutions and continue to this day. *See Rentas*, 816 F.3d at 226

("Under New York law, the statute of limitations on an IIED claim involving a continuous injury

does not begin to run until the conduct ceases."). Plaintiffs allege that, even after they were

released from custody, they continued to be injured by Defendant's employees' continued

concealment of significant exculpatory evidence. *E.g.*, G.J. Compl. ¶¶ 230, 236-38 (*inter alia*,

describing Plaintiffs' convictions as making them "infamous not only by the news media, but also

in the recorded history of this country—a stain, and threat, that followed [them] and [their]

famil[ies] for decades"). Moreover, Defendant's employees concealed significant exculpatory

evidence throughout the course of Plaintiffs' post-conviction proceedings, lying about what the

evidence in the FBI's possession did or did not show—extreme and outrageous conduct that is also

not part of Plaintiffs' malicious prosecution claims. *E.g.*, G.J. Compl. ¶¶ 103-07.

In short, Plaintiffs' IIED claims are not duplicative of their malicious prosecution

claims. The IIED claims seek relief for conduct that the malicious prosecution claims do not

encompass. Thus, even assuming, *arguendo*, that duplicative claims must be dismissed, Plaintiffs'

IIED claims survive Defendant's Motion.

### C.    Plaintiffs Allege Sufficiently Extreme and Outrageous Conduct

The Government finally argues that Plaintiffs have failed to allege conduct sufficiently extreme and outrageous that could support an IIED claim.  Def.'s Br. at 31-32.  The only real analysis Defendant provides turns on its assertion that, in 1965, the FBI had no affirmative duty to disclose exculpatory information and its misreading of an inapposite district court decision.  *Id.* (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Jones v. City of New York*, 988 F. Supp. 2d 305, 309, 318 (E.D.N.Y. 2013)).

*First*, assuming, *arguendo*, that, in 1965, the FBI had no constitutionally mandated obligation to disclose the troves of exculpatory information in its possession, that does not answer the question of whether FBI employees' "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (quoting Restatement (Second) of Torts § 46 cmt. d)).  All it means is that a portion of the FBI employees' wrongful conduct in 1965 may or may not have violated constitutionally minimum thresholds.

On that score, the Government's argument regarding *Brady* completely glosses over the fact that Plaintiffs' IIED claims are not premised merely on FBI employees' withholding of exculpatory information in 1965.  Defendants' employees possessed information indicative of Plaintiffs' innocence and the identities of Malcolm X's actual murderers.  *E.g.*, G.J. Compl. ¶ 56.  They nevertheless assisted the NYPD and District Attorney with Plaintiffs' prosecutions, concealing the troves of exculpatory information they possessed.  *E.g.*, *id.* ¶¶ 58-59, 80.  They also fabricated evidence that was used to obtain Plaintiffs' convictions.  *Id.* ¶¶ 14, 73-74, 76.  They sat back and did nothing while Plaintiffs languished in squalid, dangerous prison conditions for

decades—not just declining to speak up, but also actively lying about what information FBI files contained. *E.g.*, *id.* ¶¶ 104-07, 115. Indeed, as discussed above in Section V.B, *supra*, Plaintiffs' IIED claims are premised, in part, on the FBI's continued concealment of evidence well past 1965, including but not limited to Plaintiffs' 1977 attempts to vacate their convictions. To this day, the FBI has yet to fully disclose the exculpatory evidence in its possession. *E.g.*, *id.* ¶¶ 136, 151.

**Second**, in *Jones*, the court held that the plaintiff's IIED claims could not proceed against the City of New York because of the state's policy bar on IIED claims against government entities. 988 F. Supp. 2d at 318. As against the individual defendants, the court highlighted the fact that "[t]he complaints of the apparent victims provided sufficient basis to hold plaintiff for trial," implying that the withholding of exculpatory evidence was not extreme and outrageous in a context where there was sufficient evidence to justify the defendant's detention—in other words, that the defendants' conduct did not actually prolong the plaintiff's detention. *Id.* at 309, 318. Moreover, in that case, the DNA report at issue did "not exonerate," "would not have been admissible at trial," and "would not have extirpated probable cause." *Id.* at 311. Those facts are far from analogous to the facts of this case, if only because the information the FBI possessed was, in fact, used to exonerate Plaintiffs.

**Finally**, although the facts of this case are *sui generis*, ample case law establishes that Defendant's employees' conduct was sufficiently extreme and outrageous to support IIED claims. *E.g.*, *Limone*, 579 F.3d at 94 (finding sufficiently extreme and outrageous conduct where "the FBI had participated willingly in framing the scapegoats, and then scrambled to cover up the frame job by obstructing the scapegoats' efforts to clear their names"); *Pitt v. District of Columbia*, 491 F.3d 494, 506 (D.C. Cir. 2007) (holding that evidence that "officers' affidavit contained several glaring omissions and at least one false statement," along with evidence that "at least one

officer tampered with evidence in an attempt to link [the plaintiff] to the scene of the crime," was sufficient to sustain IIED claim); *Barone*, 2016 WL 2658174, at *3 (allowing IIED claim to proceed where plaintiff alleged "that the defendants, among other things, deliberately and maliciously arrested and prosecuted him for serious felonies despite knowing his innocence"); *Grega v. Pettengill*, 123 F. Supp. 3d 517, 550 (D. Vt. 2015) ("[A] police officer's fabrication of evidence in order to inculpate a criminal suspect may constitute the extreme and outrageous behavior sufficient to support a claim of IIED."); *Miles v. City of Hartford*, 719 F. Supp. 2d 207, 217-18 (D. Conn. 2010) (holding that police officers' fabrication of evidence could support jury finding of extreme and outrageous conduct), *aff'd*, 445 F. App'x 379 (2d Cir. 2011).[14]  Indeed, courts have sustained IIED claims on less egregious facts that did not result in wrongful convictions for murdering a prominent civil rights leader that took over 55 years to vacate.  *E.g.*, *Breton*, 404 F. Supp. 3d at 808-09; *Biswas*, 973 F. Supp. 2d at 535-36; *Llerando-Phipps*, 390 F. Supp. 2d at 381.

The Complaints amply detail the ways in which Defendant's employees' actions are "utterly intolerable in a civilized community."  *See Murphy*, 58 N.Y.2d at 303.  The Government's attempt to minimize the egregiousness of the conduct is sophistic.

---

14. *See also, e.g.*, *Pursley v. City of Rockford*, No. 3:18-CV-50040, 2024 WL 1050242, at *16 (N.D. Ill. Mar. 11, 2024) (fabricating evidence); *Wilson v. Burge*, 667 F. Supp. 3d 785, 873 (N.D. Ill. 2023) (speaking with "key witness before" trial and withholding "critical exculpatory information"); *Barnett v. Cabell Cty. Comm'n*, No. CV 3:22-0203, 2023 WL 2602509, at *12-13 (S.D. W. Va. Mar. 22, 2023) (fabricating evidence, coercing false statements and presenting them to prosecutors, and "withholding exculpatory evidence"); *Arias v. City of Everett*, No. CV 19-10537-JGD, 2019 WL 6528894, at *14 (D. Mass. Dec. 4, 2019) (fabricating evidence, causing plaintiff's arrest and detention without probable cause, and withholding exculpatory evidence); *Fox v. Tomczak*, No. 04 C 7309, 2006 WL 1157466, at *6 (N.D. Ill. Apr. 26, 2006) (fabricating "false or misleading evidence" or "conceal[ing] exculpatory evidence"); *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) (fabricating "false or misleading evidence" of guilt or concealing "exculpatory information from prosecutors").

## VI. Plaintiffs State Claims for Negligent Infliction of Emotional Distress

The Government presents a number of arguments about why Plaintiffs' negligent infliction of emotional distress ("NIED") claims should be dismissed, most of which repeat the arguments made against Plaintiffs' negligence claims—namely, the alleged absence of a duty of care, and the misguided assertion that Plaintiffs' claims rest entirely on intentional conduct that precludes a negligence claim. Def.'s Br. at 32-34.[15] Those arguments—regarding intentional versus negligent conduct and the presence of a direct duty of care owed to Plaintiffs personally—are addressed above in Sections IV.A and IV.B, *supra*, respectively. The Government also argues that Plaintiffs' allegations that Defendant's employees' conduct caused Plaintiffs to fear for their physical safety is "conclusory" and turns on an objective, rather than subjective inquiry. Def.'s Br. at 34. Finally, the Government asserts that Plaintiffs' NIED claims fail because Plaintiffs do not allege sufficiently extreme and outrageous conduct. *Id.*

Taking those latter two arguments in reverse order: *First*, extreme and outrageous conduct is not an element of an NIED claim under New York law. *Brown v. N.Y. Design Ctr., Inc.*, 185 N.Y.S.3d 97, 102 (1st Dep't 2023); *Doe v. Langer*, 171 N.Y.S.3d 594, 599-600 (3d Dep't 2022); *Stephanie L. v. House of the Good Shepherd*, 129 N.Y.S.3d 570, 577 (4th Dep't 2020); *Taggart v. Costabile*, 14 N.Y.S.3d 388, 396-97 (2d Dep't 2015). *Second*, Plaintiffs discuss the extreme and outrageous conduct issue in Section V.C, *supra*.

*Third*, the Government argues that Plaintiffs' NIED claims depend on whether their "physical safety actually was endangered, not a subjective evaluation dependent on the plaintiff's

---

15. The Government does not make this clear, but appears to argue additionally that Plaintiffs' NIED claims are foreclosed for the same reason that Plaintiffs' IIED claims are foreclosed—namely, because traditional tort remedies are available. *See* Def.'s Br. at 32-33. To the extent that Defendant intends to make that argument, it is addressed above in Section V.B, *supra*, in connection with Plaintiffs' IIED claims.

state of mind." Def.'s Br. at 34 (quoting *Carney v. Boston Mkt.*, No. 18-CV-713 (LGS), 2018 WL 6698444, at *3 (S.D.N.Y. Dec. 20, 2018)). The Government's argument thus turns on its apparent contention that being falsely convicted of murdering a renowned civil rights leader would not, as an objective matter, cause a person to fear for their physical safety. Assuming, *arguendo*, that New York law imposes such a requirement—and it does not[16]—that contention defies common sense. Plaintiffs specifically allege that their convictions created a threat that followed them for decades. G.J. Compl. ¶ 238. Their convictions "placed [them] among the most hated and notorious murderers." *Id*. Plaintiffs "served [their] sentence[s] in various maximum-security prisons throughout New York State, including Attica, Sing Sing, and Clinton Correctional Facilities." *Id.* ¶ 232. Their "imprisonment spanned from the 1960s through the 1980s, a time period that included the Attica Uprising and well-documented inhumane treatment of prisoners." *Id.* ¶ 233. Any person in those circumstances would, as an objective matter, fear for their physical safety. The Government offers no serious argument to the contrary and merely relies on its misguided and unsupported assertion that "there is nothing in the complaints" to support Plaintiffs' allegation that they feared for their physical safety. Def.'s Br. at 34.

Plaintiffs plausibly allege claims for NIED. The Government's arguments to the contrary counter both common sense and controlling case law, and fail for the reasons stated above.

---

16. *E.g.*, *Brown*, 185 N.Y.S.3d at 103 (NIED case involving hidden camera and no threat of physical harm). Rather, the elements of an NIED claim under New York law are "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (en banc).

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety, and allow this case to move forward.

SHANIES LAW OFFICE LLC

By: _____

Dated: June 7, 2024
      New York, New York

David B. Shanies
Deborah I. Francois
Tristan M. Ellis
Eleanor C. Davis
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
tristan@shanieslaw.com
eleanor@shanieslaw.com

*Attorneys for Plaintiffs Helen Greene Johnson and Muhammad A. Aziz*