UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HELEN GREENE JOHNSON, *as administrator of the Estate of Khalil Islam, also known as Thomas Johnson, Deceased*,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

24 Civ. 872 (DEH)

**OPINION
AND ORDER**

---

MUHAMMAD A. AZIZ,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

24 Civ. 874 (DEH)

**OPINION
AND ORDER**

---

DALE E. HO, United States District Judge:

In 1966, Muhammad A. Aziz and Khalil Islam were wrongfully convicted of the 1965 assassination of Malcolm X.  Compl. ¶¶ 2, 86; Aziz Compl. ¶¶ 2, 91.[1]  They each spent the next two decades in prison.  *Id.*  Mr. Aziz, who was 26 years old at the time of his arrest, was granted parole and released 20 years later, in 1985.  Aziz Compl. ¶¶ 4, 121.  He is now 86 years old.  *See*

---

[1] Unless otherwise noted, the facts are taken primarily from the Complaint in *Greene Johnson v. United States*, No. 24 Civ. 872, ECF No. 1 ("Compl.").  Where necessary, facts are occasionally taken from the Complaint in the companion case, *Aziz v. United States*, No. 24 Civ. 874, ECF No. 1 ("Aziz Compl."), which largely mirrors the *Greene Johnson* Complaint in substance and form.

*id.* at 19.  Mr. Islam, who was 30 at the time of his arrest, spent 22 years in prison until he was paroled in 1987.  Compl. ¶¶ 4, 116.  He died in 2009, at the age of 74.  *Id.* ¶ 116.  Mr. Aziz and Mr. Islam were exonerated in 2021, and their convictions were vacated, after a reinvestigation revealed that Federal Bureau of Investigation ("FBI") and New York City Police Department ("NYPD") employees had concealed evidence of their innocence.  *Id.* ¶¶ 5, 7.  The reinvestigation led the New York County District Attorney (the "District Attorney") to "apologize for what were serious, unacceptable violations of law and the public trust."  *Id.* ¶ 8.

Mr. Aziz and Helen Greene Johnson, Mr. Islam's widow and the administrator of his estate (collectively, "Plaintiffs"[2]), bring these actions under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, seeking damages for alleged misconduct by FBI officials during and after the 1965 investigation and prosecution.  Compl. ¶ 1.  They allege four causes of action under New York state law: intentional infliction of emotional distress ("IIED"), *id.* ¶¶ 241-48, malicious prosecution, *id.* ¶¶ 249-62, negligent infliction of emotional distress ("NIED"), *id.* ¶¶ 263-71, and negligence, *id.* ¶¶ 272-88.

Before the Court is Defendant the United States of America's (the "Government's") Motion to Dismiss the Complaints, ECF No. 35.  For the reasons that follow, the motion is **GRANTED in part** and **DENIED in part**.  Specifically, the Court **GRANTS** the motion as to Plaintiffs' negligence and NIED claims and **DENIES** the motion as to their malicious prosecution and IIED claims.

---

[2] Although the Plaintiffs are technically Mr. Aziz and Ms. Greene Johnson, the Court will also use the term "Plaintiffs" to refer to Mr. Aziz and Mr. Islam, collectively.

**BACKGROUND**

The following facts are taken primarily from the two Complaints in this case and are assumed to be true for purposes of this motion.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp.*, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).

**A.  The Assassination of Malcolm X**

On February 21, 1965, at approximately 3 p.m., Malcolm X was introduced to speak at the Audubon Ballroom (the "Ballroom") in Manhattan.  Compl. ¶ 23.  As he began his remarks, a group of men in the audience caused a commotion.  *Id.* ¶ 24.  During the ensuing confusion, three men shot at Malcolm X, fatally wounding him.  *Id.* ¶ 25.  First, William Bradley,[3] a former Lieutenant in the Nation of Islam ("NOI") Mosque No. 25 in Newark, New Jersey, shot Malcolm X with a sawed-off 12-gauge shotgun.  *Id.* ¶ 26.  Then two former members of NOI Mosque No. 76 in Paterson, New Jersey—Mujahid Abdul Halim[4] and Leon Davis—shot Malcolm X with a .45-caliber semiautomatic pistol and a 9mm semiautomatic pistol, respectively.  *Id.* ¶ 27.  All three men fled, but Halim was caught by a group of attendees and detained by the NYPD.  *Id.* ¶ 28.  The three murder weapons were left inside the Audubon Ballroom.  *Id.*  Two co-conspirators—Benjamin Thomas, a former Assistant Secretary of Mosque No. 76, and Wilbur Kinly, a former member of Mosque No. 25—were also present.  *Id.* ¶ 29.  One or both of them created the commotion in the audience to divert attention from the shooters, and Kinly threw an improvised smoke bomb made by Halim.  *Id.*

Neither Mr. Islam nor Mr. Aziz had anything to do with the attack on Malcolm X.  Compl. ¶ 32; Aziz Compl. ¶ 31.  At the time of the incident at the Audubon Ballroom, Mr. Islam

---

[3] William Bradley was later known as Al-Mustafa Shabazz.  *Id.* ¶ 26 n.2.

[4] Mujahid Abdul Halim was alternatively known as Talmadge Hayer, Thomas Hayer, Thomas Hagan, and Thomas Hagen.  *Id.* ¶ 27 n.3.

was at home with his family in the Bronx.  Compl. ¶¶ 32-33.  He was visited there by his

neighbor, who came to Mr. Islam's apartment moments after hearing the news of Malcolm X's

assassination on the radio.  *Id.* ¶ 33.  The neighbor found Mr. Islam at home in his pajamas.  *Id.*

The neighbor's wife visited the apartment later that afternoon and confirmed her husband's

account.  *Id.*

Meanwhile, Mr. Aziz was at his own home in the Bronx.  Aziz Compl. ¶ 31.  He had

spent most of the day tending to his legs, which had been injured in a police beating a month

earlier.  *Id.* ¶ 32.  At the time of the shooting, he was unable to walk or run without limping and

substantial pain.  *Id.* ¶ 33.  That morning, he had gone to Jacobi Hospital for pain in his right leg

and been treated in the emergency room.  *Id.* ¶ 34.  The attending physician wrapped the

wounded leg, prescribed medication, and instructed Mr. Aziz to elevate and rest his leg.  *Id.* ¶ 34.

Mr. Aziz returned home sometime before 1 p.m. and stayed there for the rest of the day, resting

his leg as instructed.  *Id.* ¶ 35.  While at home with his family that afternoon, Mr. Aziz had a

series of phone calls around 3 p.m. about the news of the shooting, including calls from two

friends of his then-wife.  *Id.* ¶ 36.  Both friends spoke with him and confirmed that he was at

home in the Bronx at the time of the attack.  *Id.*  Mr. Aziz also exchanged calls with Mosque No.

7 in Manhattan shortly after hearing news of the shooting.  *Id.* ¶ 37.  A former member of

Mosque No. 7 called Mr. Aziz at his home and spoke with him, confirming that Mr. Aziz was at

his home in the Bronx at the time.  *Id.*

## B.  The FBI's Role in the Investigation

Numerous FBI employees immediately played a significant role in the investigation of

Malcolm X's murder, working cooperatively with the NYPD and the District Attorney in the

investigation and prosecution of the case.  Compl. ¶ 34.  The FBI and NYPD established a

liaison system for higher-ranking officers to exchange information.  *Id.* ¶ 39.  Early on, the FBI

invited the NYPD's collaboration in developing investigative leads outside of New York.  *Id.*
Both the FBI and the NYPD, at each other's requests, conducted research and shared information
about persons of interest, including at least three of the five known co-conspirators (Bradley,
Davis, and Halim).  *Id.* ¶ 40.  FBI employees also made the Bureau's crime lab available for
NYPD use and processed fingerprints recovered during the investigation.  *Id.* ¶ 41.

Although the two agencies extensively shared information and resources, the FBI
withheld crucial evidence about the actual killers.  *Id.* ¶¶ 36, 52.  In fact, an FBI report dated
February 22, 1965—the day after the assassination—contained detailed information about the
true culprits, including a physical description of one of them and the location of the three
shooters in the Audubon Ballroom.  *Id.* ¶ 56.  FBI intelligence eventually included the names of
all three shooters and one co-conspirator, the physical descriptions of the shooters, and their
location in the front row of the Audubon Ballroom at the time of the attack.  *Id.* ¶ 48.  At least
nineteen FBI employees involved in the investigation and later prosecution were aware of the
exculpatory value of the evidence they had amassed, but they deliberately concealed this
evidence from the defendants; their counsel; the court; in many cases, the prosecutor; and in
some cases, even the NYPD.  *Id.* ¶¶ 81, 149.

The FBI's sources identified the culprit who wielded the shotgun, falsely identified as
Mr. Islam, as "six feet two inches, two hundred pounds, heavy build, dark complexion"—a
description that was nothing like Mr. Islam but was a match for Bradley.  *Id.* ¶ 43.  Shortly
thereafter, a Boston-based FBI informant corroborated that intelligence, providing the FBI with a
physical description of the man with the shotgun, his connection to the NOI mosque in Newark,
and the fact that he appeared to be an "expert" in handling a shotgun.  *Id.* ¶ 44.  FBI employees
had prepared an extensive file on Bradley between 1963 and 1965, and they knew him to be
dark-skinned, heavy-set, a former lieutenant in the Newark mosque, and experienced with

firearms.  *Id.* ¶¶ 45, 129-30.  But then-FBI Director J. Edgar Hoover expressly instructed his employees not to disclose to the NYPD the descriptions implicating Bradley.  *Id.* ¶ 46. Accordingly, the FBI employees involved in the investigation concealed that information from the NYPD and the District Attorney, leaving the NYPD with "no information about Bradley." *Id.* ¶¶ 47, 135.

FBI employees also withheld information about Leon Davis, who fired the 9mm pistol. *Id.* ¶ 142.  Eleven days after the murder, NYPD officials asked for the FBI's help finding Halim's associate, who was known as "Turk" and who was with Halim three weeks before Malcolm X's death.  *Id.* ¶ 143.  The FBI knew that Davis was known as "Turk" but concealed this information, along with a description of Davis as "a short, dark skinned Black man with bushy hair and a mustache," "who started the distraction by claiming someone's hand was in his pocket."  *Id.* ¶¶ 143-44.

The FBI also concealed multiple reports from Eugene Roberts, who was posing at the time as a security guard for Malcolm X while working as an undercover officer for the NYPD's intelligence unit, the Bureau of Special Services and Investigations ("BOSSI").  *Id.* ¶ 49.  As a member of the rostrum security team on the day of the attack, Roberts saw two of the shooters in the front row of the Ballroom and saw three shooters run in the same direction, toward the back of the room.  *Id.* ¶ 50.  Two of the shooters ran past Roberts, and Roberts physically engaged the third, Halim.  *Id.*  Significantly, Roberts's account of the shooters' location in the front row of the Ballroom would have corroborated testimony later heard at trial that tended to exculpate Plaintiffs, and it would have undermined the testimony of every prosecution witnesses.  *Id.* ¶ 80; *see infra* pp. 8-10.  Roberts reported his observations to BOSSI, but none of the BOSSI investigators disclosed that information to the prosecution or even to members of the NYPD beyond BOSSI.  Compl. ¶ 146.  An FBI Special Agent who was detailed to BOSSI was aware of

Roberts' account and its conflict with the account of prosecution witnesses, but he, too, concealed the information from prosecutors and from non-BOSSI NYPD employees.  *Id.* ¶ 147.

Mr. Aziz and Mr. Islam were attractive targets to certain FBI and NYPD employees because both were Black men associated with the NOI and both were at home at the time of the assassination, rather than at the crowded Mosque No. 7 where they would have had many more alibi witnesses.  *Id.* ¶ 54.  The FBI preferred the prosecution of Mr. Islam and Mr. Aziz to that of Bradley, who had an ongoing relationship with the Bureau.  *Id.*  As a result, Mr. Aziz and Mr. Islam were prosecuted and convicted for a crime they never committed.  *Id.* ¶ 83; Aziz Compl. ¶ 88.

### C.  The Arrest, Trial, and Conviction

The NYPD arrested Mr. Aziz and Mr. Islam within 10 days of the assassination.  *Id.* ¶ 56; Aziz Compl. ¶ 60.

Mr. Aziz and Mr. Islam were tried, together with Halim, the gunman who had been detained by the crowd after the shooting, in the Criminal Term of the Supreme Court of the State of New York, County of New York.  Compl. ¶¶ 57, 62, 64; Aziz Compl. ¶¶ 61, 69.  The FBI and NYPD cooperated with each other to provide evidence for the prosecution at trial.  Compl. ¶ 58. The District Attorney praised the FBI for its "cooperation from the beginning of [the] case," calling it "a perfect example of real effective cooperation."  *Id.* ¶ 59.  The trial prosecutor thanked the FBI's New York Field Office "for its assistance during the State's investigation of the case."  *Id.*  The FBI, for its part, noted that "Bureau Agents have played a very significant part in aiding local authorities in the prosecution of the defendants in this case."  *Id.*

At trial, Mr. Aziz and Mr. Islam each testified in his own defense, affirming that he was at home with family and friends at the time of the crime, that he was not at the Audubon Ballroom on February 21, 1965, and that he was in no way involved in the assassination.  Compl.

¶ 60; Aziz Compl. ¶ 64.  Mr. Aziz further testified that he had never seen Halim before his arrest.
Aziz Compl. ¶ 64.  He presented testimony from his wife and from friends who either saw or
called him at home around the time of the murder, and from the physician who treated his injured
leg at the emergency room that morning.  *Id.* ¶¶ 65-66.  He also presented the testimony of a
man who witnessed the shooting and reported that the shotgun assassin was "stout and very dark
and had a very deep beard"—an accurate description of Bradley, but not of Mr. Aziz or Mr.
Islam.  Compl. ¶ 62.  Indeed, the description was so unlike Mr. Islam that the trial prosecutor,
apparently implying that the testimony was contrived, later commented: "Stout and very dark
and had a very deep beard.  Well, I guess that's about the best description you could get and keep
it away from the defendant."  *Id.* ¶ 63.

Halim also testified at trial.  *Id.* ¶ 64.  At first, he denied his guilt, but he later retook the
stand and recanted his prior testimony.  *Id.*  He said he was speaking of his own free will,
explaining: "I just want to tell the truth, that's all."  *Id.*  He testified that he did not know Mr.
Aziz or Mr. Islam before they became co-defendants and that neither of them had any
involvement in the murder of Malcolm X.  *Id.* ¶ 65.  He confessed his own guilt, admitting that
he shot Malcolm X with a .45-caliber handgun.  *Id.* ¶ 66.  And he testified that four other men
were involved in the murder, all of whom he knew—but he refused to identify them.  *Id.* ¶ 67.
He said he and one other man were seated in the front row, armed with pistols, while a third man
sat a few rows back "with the shotgun," and another man further back started a commotion by
pretending his pocket was being picked.  *Id.* ¶ 68.  Halim described the man with the shotgun as
"husky" with "dark skin" and a beard, but he refused to describe his other co-conspirators.  *Id.*
¶ 69.

There was never any physical or forensic evidence linking Mr. Aziz or Mr. Islam to the
shooting, nor was there evidence of any prior connection to Halim.  Compl. ¶ 71.  The

prosecution's case against them rested entirely on eyewitness testimony, many relevant portions of which FBI employees were involved in procuring and directing. *Id.* ¶ 72. FBI employees helped fabricate evidence by causing witnesses to give false and misleading statements to prosecutors in their sworn testimony. *Id.* ¶ 73. And FBI employees concealed evidence that would have pointed to Mr. Aziz and Mr. Islam's innocence. *Id.* ¶¶ 81, 83. For example, various witnesses prepared by the FBI placed the three shooters in different parts of the Audubon Ballroom, but none of them testified that the shooters sat in the front row, as Halim testified—even though the FBI had information that would have corroborated Halim's account. *Id.* ¶¶ 77-78.

Specific reports that the FBI possessed but concealed at the time of trial include:

- An FBI report dated February 22, 1965, stating that "the killers of Malcolm X were possibly imported to NYC" and that the shooters sat in the front of the Ballroom, along with detailed descriptions of two suspects;

- An FBI report dated February 25, 1965, indicating that, at the request of then-director J. Edgar Hoover, local FBI offices were instructed not to disclose to the NYPD the FBI informant status of any witnesses;

- FBI reports dated March 3 and 4, 1965, stating that two witnesses failed to identify Mr. Islam as one of the perpetrators and that FBI "sources" had reviewed photographs of Mr. Islam and failed to place him in the Audubon Ballroom that day;

- An FBI report dated March 4, 1965, containing information about an associate of Halim's nicknamed "Turk," and noting that "Turk" was believed to be Leon Davis—now known to have been the shooter with the 9mm semiautomatic handgun;

- A police report dated March 8, 1965, detailing an eyewitness's description of the shooters as men from the NOI based in New Jersey who sat in the front row on the left-hand side, with "Benjamin from Paterson or Newark" two seats behind them;

- An FBI report dated March 25, 1965, summarizing intelligence that one of the shooters came from Newark, New Jersey;

- An FBI dossier on William Bradley, containing information collected between 1963 and 1965 that clearly linked him to Malcolm X's murder;

- An April 13, 1965 memorandum from Hoover to the head of the New York Field Office, instructing that FBI intelligence implicating "a lieutenant from the Newark Temple of the Nation of Islam"—apparently referring to Bradley—must "not be furnished to the [NYPD] without first receiving Bureau authority"; and

- Multiple reports from Eugene Roberts, the undercover officer working for NYPD's BOSSI, that corroborated Halim's account and undermined the testimony of every prosecution witness, including his reports that the shooters sat in the front row of the Ballroom.

*Id.* ¶ 80.

None of this information was heard at trial. *Id.* ¶ 78. FBI employees hid this evidence from the defendants; their counsel; the court; in many cases, the prosecutor; and in some cases, even the NYPD. *Id.* ¶ 81. As a result, Mr. Aziz and Mr. Islam were prosecuted for a crime they never committed. *Id.* ¶ 83. And at the end of trial, they were both convicted of first-degree murder and sentenced to life in prison. *Id.* ¶¶ 84-86; Aziz Compl. ¶¶ 89-91.

### D. The Post-Conviction Proceedings

After unsuccessful direct appeals, Mr. Aziz and Mr. Islam moved in December 1977 to vacate their convictions, based primarily on newly discovered evidence under Section 440.10(1)(g) of the New York Criminal Procedure Law (the "1977 440 Motions"). Compl. ¶ 88; Aziz Compl. ¶ 93. Among other things, the 1977 440 Motions were predicated on: (1) affidavits from Halim identifying his true co-conspirators and providing additional information about the murder; (2) redacted FBI records that the FBI had concealed at the time of trial but that Mr. Aziz and Mr. Islam had since obtained; and (3) the revelation that undercover detective Eugene Roberts had witnessed Malcolm X's assassination. Compl. ¶ 89.

In his affidavits, Halim identified his co-conspirators as Benjamin Thomas, Leon Davis, "William X" (later identified as William Bradley), and "Wilbur or Kinly." *Id.* ¶ 93. Halim stated that all four men were NOI members from New Jersey; that Thomas and Davis lived in Paterson and were associated with the Paterson Mosque; and that Bradley and "Wilbur" both lived in Newark and were associated with the Newark Mosque. *Id.* ¶ 94. He described in detail the murder plot, his recruitment to it, the planning of the murder, and each assassin's role. *Id.*

¶ 95.  He explained that he and Davis sat in the front row of the Ballroom, while Bradley and Thomas sat close behind them, and Kinly sat in the rear.  *Id.*

Eugene Roberts's identity as an undercover NYPD officer—and the fact that he witnessed Malcolm X's assassination—was first publicly revealed during his testimony in an unrelated criminal case in 1970.  *Id.* ¶ 97.  In that other case, he testified that he was working undercover as a member of Malcolm X's security team and was relieved from his post just before Malcolm took the stage.  *Id.* ¶ 98.  He testified that "two individuals near the front of the auditorium jumped up" to create a distraction, and that gunfire erupted as he "started down the aisle" toward them.  *Id.* ¶ 99.  Roberts said he came face to face with Halim, who shot at him but missed, and that he knocked Halim over with a chair.  *Id.*  But in an affidavit submitted by the District Attorney in response to Plaintiffs' 1977 440 Motions, Roberts averred that he did "not have any information" or reason to believe Mr. Aziz and Mr. Islam were innocent.  *Id.* ¶ 100.

In opposition to the 1977 440 Motions, the District Attorney represented that his office's case file contained nothing to support Plaintiffs' contentions, and that there was "no mention or indication of, or reference to, any of the persons identified by [Halim] in his affidavits as having been his accomplices in the murder of Malcolm X."  *Id.* ¶ 103.  The District Attorney further explained that its case file contained "no papers of any kind from the Federal Bureau of Investigation."  *Id.* ¶ 104.  The District Attorney stated that he had spoken with an FBI agent to obtain unredacted copies of the FBI documents submitted by defense counsel in support of their motion but was only partially successful.  *Id.* ¶¶ 104-05.  With respect to the documents he was able to obtain in their unredacted form, he stated:

> There is nothing in any of these unredacted FBI documents which in any way supports any of the defendants' contentions or allegations.  Specifically, *there is no mention or indication of the name of, or reference to, any of the persons identified by* [*Halim*] *in his affidavits as having been his accomplices in the murder of Malcolm X.*

*Id.* ¶ 105.  He then explained that there were other unredacted documents that the FBI agent had

not provided him because they were "not on file in the New York Office of the FBI" but were

instead on file at the FBI's headquarters in Washington, D.C., and that given their volume, "it

would take a considerable period of time to obtain them." *Id.* ¶ 106.  Nevertheless, as to those

documents in redacted form, he stated:

> *There appears to be nothing in any of these redacted documents which*
> *corroborates the allegations in* [*Halim's*] *affidavits, or which is otherwise*
> *supportive of the instant motion.*  Many of these redacted documents are, [the FBI
> Agent] informs me, internal FBI memoranda which merely summarize and
> chronicle the [NYPD's] investigation into the murder, *and which contain no*
> *original information developed by the FBI.*  Others of these documents contain
> information developed by the FBI which paralleled information obtained by the
> [NYPD].

*Id.* ¶ 106.  It was later revealed that the representations made by the FBI agent to the District

Attorney were false: the FBI's file, in fact, contained multiple reports that supported Halim's

account.  *Id.* ¶ 107.

On November 1, 1978, the court denied the 1977 440 motions, explaining that it "must

question the reliability of any identification which comes thirteen years after the events in

question to inculpate persons who apparently were never the object of suspicion despite the

thorough efforts of local, state, and federal law enforcement officials." *Id.* ¶¶ 108-09.  The court

also rejected Plaintiffs' request for an order directing the District Attorney to investigate further,

explaining: "Were there reliable evidence which tended to support the conclusions that

petitioners suggest, this court is confident that the district attorney would undertake to ensure

that no miscarriage of justice had occurred." *Id.* ¶ 110.

Plaintiffs' petitions for leave to appeal to the Appellate Division were denied.  *Id.* ¶ 111.

Following that denial, Plaintiffs each filed a petition for writ of habeas corpus in this District.  *Id.*

¶ 112.  Plaintiffs' habeas petitions included additional details from Halim about his co-

conspirators' physical descriptions and the last name of "William X" Bradley, whom Halim said

was "known as a stick-up man." *Id.* ¶ 113.  In December 1980, those petitions, too, were denied.

*Id.* ¶ 114.  Mr. Aziz and Mr. Islam were released on parole in 1985 and 1987, respectively, after

more than 20 years in prison.  *Id.* ¶ 116; Aziz Compl. ¶ 121.  Mr. Islam died in 2009.  Compl.

¶ 116.

### E.  The Reinvestigation and Exoneration

In early 2020, a documentary series was released on Netflix suggesting that Plaintiffs

were wrongly convicted of Malcolm X's murder and that the FBI had been aware of the true

culprits all along.  *See* Meagan Flynn, *Malcolm X Assassination May Be Reinvestigated as*

*Netflix Documentary, Lawyers Cast Doubt on Convictions*, The Washington Post (Feb. 10,

2020), https://www.washingtonpost.com/nation/2020/02/10/malcolmx-assassination-netflix.

Around the same time, counsel for Plaintiffs began a joint reinvestigation of the case with the

District Attorney's Conviction Integrity Program.  Compl. ¶ 117.

On November 18, 2021, Plaintiffs and the District Attorney filed a joint motion to vacate

their convictions, under Section 440.10 of the New York Criminal Procedure Law, on the

grounds of newly discovered evidence and failure to disclose exculpatory evidence.  Compl.

¶ 152.  At a hearing on the Motion, the District Attorney at the time explained:

> [W]hat we have obtained in this reinvestigation now are new materials that our
> office tragically did not have in 1965 and, thus, did not turn over to the defense.
> Most critically, we have obtained dozens and dozens of reports from the FBI and
> the NYPD Bureau of Special Services Investigations.
>
> These records include FBI reports of witnesses who failed to identify Mr. Islam
> and implicated other subjects and suspects, and significantly, we now have reports
> that the late FBI Director J. Edgar Hoover, himself, and the FBI, ordered multiple
> witnesses not to tell police or prosecutors that they were, in fact, FBI informants.
> Many of those documents were exculpatory. None of them were disclosed to the
> defense.

*Id.* ¶ 154.  He stated that "there is only one ultimate conclusion; Mr. Aziz and Mr. Islam were wrongfully convicted of this crime."  *Id.* ¶ 155.

The trial court granted the 440 motion, vacating Plaintiffs' convictions and dismissing the indictment against them.  *Id.* ¶ 159.  The court observed that "there can be no question that this is a case that cries out for fundamental justice."  *Id.* ¶ 157.  The court continued, "I regret that this Court cannot fully undo the serious miscarriages of justice in this case and give you back the many years that were lost.  Dismissal of the indictment is the full extent of this Court's authority."  *Id.* ¶ 158.

### F.  Procedural History of this Action

Pursuant to 28 U.S.C. §§2401(b) and 2672, Plaintiffs filed administrative claims with the Federal Tort Claims Act Section of the Department of Justice ("DOJ"), and with the FBI directly, in March 2023.  Compl. ¶ 17.  On June 14, 2023, the DOJ confirmed that it had received the claims.  Since that time, the DOJ has not tried to resolve the claims.  *Id.*

Plaintiffs filed their claims in federal court on November 16, 2023.  Compl.  The Government's Motion to Dismiss followed on April 30, 2024.  ECF No. 34.

### LEGAL STANDARDS

The Government brings this Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[5]  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving such a motion, "the court must take all facts alleged in the complaint as true and draw

---

[5] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing the complaint, the court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. But the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## DISCUSSION

The Government moves to dismiss each of Plaintiffs' Federal Tort Claims Act claims. On the malicious prosecution claims, the Government argues that the FTCA does not waive the United States's sovereign immunity for claims based on conduct that occurred before 1974, and that, in any event, Plaintiffs have failed to state a claim. *See* Gov't Mem. in Supp. of Mot. to Dismiss ("Gov't Mem.") 14-22, ECF No. 35. On the negligence, IIED, and NIED claims, the Government argues that the FTCA's two-year statute of limitations bars suit, and that Plaintiffs either fail to state or are otherwise precluded under state law from bringing their claims. *See* Gov't Mem. 8-14, 22-34.

### A. Plaintiffs' Malicious Prosecution Claims

The Government raises two challenges to Plaintiffs' malicious prosecution claims. First, the Government argues that they are barred by sovereign immunity. Second, the Government contends that Plaintiffs have not adequately pleaded the tort of malicious prosecution. As

explained below, however, the Court concludes that: (1) Plaintiffs' malicious prosecution claims are not barred because, under the FTCA's law enforcement proviso of 1974, the FTCA waives sovereign immunity for certain claims "arising" after the proviso's effective date—and this waiver applies to Plaintiff's malicious prosecution claims, which only "arose" after Plaintiffs were exonerated in 2021; and (2) Plaintiffs have adequately stated a claim for malicious prosecution.

### 1. Sovereign Immunity

Under the doctrine of sovereign immunity, the United States is immune from suit except where it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Before 1946, those injured by the tortious acts of federal employees could not sue the United States for damages; their only redress was a private bill in Congress. *Molzof v. United States*, 502 U.S. 301, 304 (1992). The FTCA replaced that system by waiving the sovereign immunity of the United States in suits for money damages based on torts committed by federal employees. FTCA, ch. 753, §§ 401-424, 60 Stat. 812, 842-47 (1946) (codified as amended at 28 U.S.C. §§ 1346(b), 2671-2680). Specifically, the FTCA waives sovereign immunity where a claimant's injuries were "caused by the negligent or wrongful act or omission of any employee of the Government," acting within the scope of employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

When Congress first enacted the FTCA, it exempted certain intentional torts—including malicious prosecution—from that waiver. *See* § 421(h), 60 Stat. at 845-46. But in 1974, Congress amended the FTCA "in response to abuses committed by federal law enforcement officers in connection with 'no-knock' drug raids in Collinsville, Illinois." *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012). The amendment, known as the "law enforcement

16

proviso," extends the waiver of sovereign immunity to six intentional torts by law enforcement officers, including malicious prosecution. *See* Act of Mar. 16, 1974, Pub. L. 93-253, § 2, 88 Stat. 50 (1974).  The relevant language now reads:

> The provisions of [the FTCA] shall not apply to . . . [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of [the FTCA] shall apply to *any claim arising, on or after the date of the enactment of this proviso* [i.e., March 16, 1974], out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

28 U.S.C. § 2680(h) (emphasis added).  Accordingly, claims against the United States for malicious prosecution are barred by sovereign immunity if they arose before March 16, 1974, but not barred if they arose on or after that date.

This case presents what appears to be a question of first impression in this Circuit: when does a malicious prosecution claim "arise" for purposes of the FTCA's law enforcement proviso?  Or perhaps more precisely: does the FTCA's waiver of sovereign immunity for claims "arising" after its effective date of March 16, 1974 apply to malicious prosecution claims where the prosecution occurred before that date, but the plaintiffs were not exonerated until after it?

To state a claim for malicious prosecution under New York law, a plaintiff must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163-64 (2d Cir. 2019) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).  The Government argues that Plaintiffs' malicious prosecution claims "arose" in 1965, when the prosecution against them was initiated—so the claims are barred by sovereign immunity.  *See* Gov't Mem. 14-18.  Plaintiffs counter that their claims could not "arise" until after their

exonerations in 2021, because without the second element of the tort—favorable termination of proceedings—they had no cause of action.  *See* Pls.' Mem. in Opp'n to Mot. to Dismiss ("Pls. Mem.") 10-15, ECF No. 49.[6]

After considering the plain language of the statute, traditional canons of statutory interpretation, and the few judicial decisions on the subject, the Court concludes that a malicious prosecution claim "arises" under the FTCA when *all* of its elements come into being, including the requirement that criminal proceedings have terminated in the plaintiff's favor.  Accordingly, Plaintiffs' malicious prosecution claims arose after the effective date of the law enforcement proviso and are not barred by sovereign immunity.

### a.  The Plain Language of the Statute

"Statutory interpretation always begins with the plain language of the statute."  *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 427 (2d Cir. 2009).  In interpreting that language, the Court must consider "not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme."  *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013) (quotation marks omitted).  "It is one of the most basic interpretive canons that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Id.* (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).  Above all, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this

---

[6] Plaintiffs suggest that their malicious prosecution claims encompass FBI conduct that extends beyond March 1974, *see* Pls.' Mem.15-16, even though the allegations under the malicious prosecution cause of action in their Complaint focus primarily on 1965 and 1966.  At oral argument, counsel clarified that this was an "alternative argument."  Tr. Hr'g Mot. to Dismiss ("Tr.") 46, ECF No. 73.  Because the Court agrees with Plaintiffs that their claims as originally pleaded may proceed, it does not reach their alternative argument that they can recover on a malicious prosecution theory for post-1974 conduct.

first canon is also the last: judicial inquiry is complete." *Id.* (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

Beginning with the plain language of the statute, the law enforcement proviso states:

[W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of [the FTCA] shall apply to any *claim arising, on or after the date of the enactment* of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

§ 2680(h) (emphasis added).  What first stands out about this formulation is the placement of the

phrase "on or after the date of the enactment of this proviso."  *Id.*  The Government argues that

the proviso "directly links its effective date to the *acts* of government officers, making clear that

what is relevant is when the government's allegedly tortious acts occurred."  Gov't Mem. 16.

But the proviso's syntax does precisely the opposite: by placing the "on or after" phrase

immediately after "any claim arising," it unambiguously ties the proviso's effective date to the

arising of a claim, not to the acts and omissions underlying the claim.  The relevant question,

then, is when a "claim" "arises" within the meaning of the FTCA.

Around the time of enactment of the proviso, legal dictionaries[7] defined "claim" as "[a]

demand for money or property; the assertion of a demand, or the challenge of something, as a

matter of right."  *Claim*, Ballentine's Law Dictionary (3d ed. 1969); *see also Claim*, Black's Law

Dictionary (4th ed. 1968) ("a pretense; a right or title," "a challenge of something as right," "a

cause of suit or cause of action").[8]  "As used in a statute concerning claims against the state and

---

[7] Where Congress borrows a legal term of art, it "presumably knows and adopts" the widely accepted common-law meaning.  *Molzof*, 502 U.S. at 307 (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)).  "This rule carries particular force in interpreting the FTCA." *Id.*  Because the terms "claim" and "arise" appear in conjunction with a list of common-law torts—assault, battery, false imprisonment, and so on, 28 U.S.C. § 2680(h)—Congress presumably intended the words to have their widely accepted legal meaning.

[8] Other definitions in Black's include "a call," "an action on account," "an assertion," "both the principal of judgment and interest thereon," a "challenge of property or ownership of a

providing for their enforcement by suit, the term is equivalent to 'cause of action.'"  *Claim*,

Ballentine's, *supra*.  The Court thus concludes that the word "claim," as used in the law

enforcement proviso, means a cause of action.

Legal dictionaries at the time defined "arise" as "[t]o come into being or notice, as a

cause of action arising at a particular time and place."  *Arise*, Ballentine's, *supra*; *see also Arise*,

Black's, *supra* ("[t]o spring up, originate, to come into being or notice, to become operative,

sensible, visible, or audible; to present itself"); *accord Jones v. R.R. Donnelley & Sons Co.*, 541

U.S. 369, 382 (2004) (describing "the common usage of the word 'arise' to mean 'come into

being; originate' or 'spring up'").  A cause of action therefore "arises" when it comes into being.

That leaves the question of when a cause of action for malicious prosecution comes into

being.  For most intentional torts, the elements of the claim all come into existence around the

same time that the tortious conduct occurs.  A claim for battery, for example, is available as soon

as there is an intent to cause a harmful or offensive contact and that contact actually results.  *See*

Restatement (Second) of Torts §§ 13, 18; *accord* § 21 (assault), § 35 (false imprisonment), § 118

(privilege to arrest), § 682 (abuse of process).  But malicious prosecution is unusual in that one

of its elements is a future event extraneous to the tortious conduct of the defendants—namely,

favorable termination of the underlying criminal proceedings.  *See Heck v. Humphrey*, 512 U.S.

477, 484 (1994) ("One element that must be alleged and proved in a malicious prosecution action

is termination of the prior criminal proceeding in favor of the accused.").  Critically, a claim for

malicious prosecution is not legally cognizable until the proceedings have terminated in the

plaintiff's favor.  For that reason, the statute of limitations "for claims based in malicious

---

thing which is wrongfully withheld," a "judgment," a "legal capability to require a positive or
negative act of another person," and the "means by or through which claimant obtains possession
or enjoyment of privilege or thing."  *Id.*

prosecution . . . starts to run only when the underlying criminal action is conclusively terminated." *Murphy*, 53 F.3d at 548. Because a plaintiff cannot state a claim for malicious prosecution until favorable termination of proceedings, the claim cannot be said to come into being, originate, or *arise* until that time. New York courts have consistently agreed. *See, e.g.*, *O'Dell v. Cnty. of Livingston*, 103 N.Y.S.3d 730, 732 (App. Div. 2019) (malicious prosecution claim "arises upon favorable termination of a criminal proceeding"); *see also, e.g.*, *Gill v. City of New York*, 45 N.Y.S.3d 570, 572 (App. Div. 2017) ("cause of action to recover damages for malicious prosecution arises only after, among other things, the plaintiff has been acquitted of the subject charges"); *Stampf v. Metro. Transp. Auth.*, 868 N.Y.S.2d 641, 643 (App. Div. 2008) (malicious prosecution claim "did not arise until there was a favorable termination of the criminal charges"); *Vitale v. Hagan*, 517 N.Y.S.2d 725, 726-27 (App. Div. 1987) ("A cause of action for malicious prosecution arises on the date that the criminal charges against the defendant are dismissed on the merits or a verdict is entered in defendant's favor."), *aff'd as modified*, 524 N.E.2d 144 (1988).

The Supreme Court's decision in *Heck v. Humphrey* supports this conclusion. *Heck* held that a § 1983 claim for damages must be dismissed if a favorable judgment would necessarily imply the invalidity of a criminal conviction, relying heavily on an analogy between the § 1983 claim at issue in that case and the common-law tort of malicious prosecution. In explaining its holding, the Court emphasized that it was not imposing a new exhaustion requirement but rather "*deny[ing] the existence* of a cause of action." *Heck*, 512 U.S. at 489 (emphasis added). That is because, the Court explained, "the § 1983 claim *has not yet arisen*" if it is *Heck*-barred due to an outstanding criminal conviction. *Id.* (emphasis added). "Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction

21

or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* (citations omitted). *Heck* confirms what the plain language suggests: that a malicious prosecution claim does not "arise" until favorable termination of proceedings.

### b. Canons of Construction

The Government, relying on various canons of statutory construction, urges the Court to adopt a contrary reading of the text, tying the effective date of the proviso to when the acts or omissions underlying the claim occurred rather than when the cause of action came into being. *See* Gov't Mem. 16-17. But those interpretive tools cannot override the statute's plain language. *See Hedges*, 724 F.3d at 189 ("When the words of a statute are unambiguous, [the] first canon is also the last: judicial inquiry is complete." (citation omitted)).

First, the Government argues that because the FTCA elsewhere uses the word "accruing" to set the statute's effective date, "arising" in the proviso must mean something different. *See* § 1346(b)(1) (establishing federal district court jurisdiction "of civil actions on claims against the United States, for money damages, *accruing* on and after January 1, 1945" (emphasis added)); Gov't Mem. 15-16. The Court disagrees. Around the time of enactment of the proviso, legal dictionaries explained that, "[a]s a general proposition, a cause of action *accrues* the moment it *comes into existence*." *Accrual of cause of action*, Ballentine's, supra (emphasis added); *see also Accrue*, Black's, *supra* ("A cause of action 'accrues' when a suit may be maintained thereon."). Those definitions of "accrue" are consistent with the meaning of the word "arise."[9] Because

---

[9] The Government cites *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), for the proposition that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." Gov't Mem. 16 (quoting *Sosa*, 542 U.S. at 712 n.9 (quoting 2A N. Singer, Statutes and Statutory Construction § 46:06, 194 (6th ed. 2000))). If anything, *Sosa* supports the conclusion that the proviso's effective date is tied to when a claim arises, not when the acts or omissions occurred. There, the Supreme Court drew a contrast between the FTCA's exception to the waiver of sovereign immunity for claims "arising in a foreign country," § 2680(k), on the one hand, and its

"arise" and "accrue" are largely synonymous, there is no reason to assume—at least in this context—that when Congress chose one word in 1946 and another in 1974, it intended them to have distinct meanings.

Next, the Government argues that construing the proviso to apply to Plaintiffs' malicious prosecution claims would violate the general presumption against statutory retroactivity. *See Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994). That presumption only applies, however, when Congress has not made its intent clear. *Id.* at 270. The statute at issue in *Landgraf* did not specify what claims it would apply to—those based on conduct that occurred after enactment, those arising after enactment, or otherwise. *See id.* at 258. In the absence of a clear directive from Congress, the Supreme Court applied the "default rule" against retroactivity. *Id.* at 272. But the Court also noted that, if "Congress has expressly prescribed the statute's proper reach," then, "of course, there is no need to resort to judicial default rules." *Id.* at 280.

Here, the statutory text is unambiguous: Congress could easily have placed the "on or after" phrase elsewhere in the proviso if it had wanted to pin the effective date to when the acts or omissions occurred. For example, it could have stated that, "with regard to acts or omissions of investigative or law enforcement officers *occurring on or after the date of the enactment of*

_____

exceptions for claims "based upon an act or omission of an employee of the Government . . . in the execution of a statute or regulation," § 2680(a), or "arising out of an act or omission of any employee of the Government in administering [a certain federal law]," § 2680, on the other. *Sosa*, 542 U.S. at 699, 711 n.9. The government had argued that when an injury in a foreign country could be traced to the acts and omissions of government employees at headquarters in the United States, such a claim could be said to "arise in" the United States. *Id.* at 711-12. The Supreme Court disagreed, explaining that "a claim arises where the harm occurs"—and that "Congress knew how to specify 'act or omission' when it wanted to." *Id.* at 711 n.9. Similarly here, in the law enforcement proviso, Congress referenced the "acts or omissions" of law enforcement officers, but it chose *not* to tie the effective date of the proviso to those acts or omissions. *See* § 2680(h). If it had wanted to do so, it knew how.

*this proviso*," the waiver of sovereign immunity would apply to certain intentional tort claims.[10] But Congress expressly tied the effective date to the moment *a claim* arises.  There is therefore no need for a judicial default rule to resolve statutory ambiguity.

The Government also argues that the proviso should apply only to acts or omissions (not claims arising) after its effective date because of the principle that "waiver[s] of the government's sovereign immunity [are] to be strictly construed in favor of the government," *Long Island Radio Co. v. NLRB*, 841 F.2d 474, 477 (2d Cir. 1988).  That principle, too, applies only in the face of statutory ambiguity, which is not present here.  *See F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012).  But even if the effective date language were ambiguous, it is not clear that once Congress has made an unequivocal waiver of sovereign immunity, subsequent questions about "temporal prerequisites to suit" need also be strictly construed.  *See Boos v. Runyon*, 201 F.3d 178, 183 (2d Cir. 2000).  To the contrary, the Supreme Court has "warned against reading the waiver of sovereign immunity too restrictively," *id.*, when it comes to questions about equitable tolling, for example.  *See Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95 (1990) ("Once Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver.").

As the Government suggests, Congress may well have imagined that the proviso would apply primarily to tortious conduct that had not yet taken place.  Nevertheless, the statutory

---

[10] For that matter, Congress could have drafted the proviso to apply to "any claim arising out of assault, battery, etc., on or after the date of the enactment of this proviso"—which would have been ambiguous.  Depending whether one read the "on or after" phrase to modify "claim" or "assault, battery, etc.," one could conclude either that the *claim* needed to *arise* after the date of enactment or that the tortious *conduct* needed to *occur* after that date.  By contrast, the syntax Congress actually chose permits only one reading—the effectiveness depends on when a *claim* arises.

language it chose waived sovereign immunity in a manner that permits claims based on a

defendant's past acts or omissions in very limited circumstances like those presented here: where

the plaintiff's legal claim does not arise until an event occurring after the waiver's effective date.

The Court cannot say that this outcome—which follows from the plain meaning of the statutory

language—is at odds with congressional intent.  In enacting the law enforcement proviso,

Congress stated that it wanted to rectify the "injustice" of the FTCA's exclusion of intentional

torts from the waiver of sovereign immunity and create a remedy for "innocent individuals who

are subjected to raids of the type conducted in Collinsville, Illinois."  S. Rep. No. 93-588, 93d

Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Adm. News 2789, 2791.  The committee

responsible for drafting the amendment explained that while the "whole matter was brought to

[its] attention . . . in the context of . . . Fourth Amendment constitutional torts," the amendment

"should not be viewed as limited to constitutional tort situations."  *Id.*  Clearly, the tort of

malicious prosecution was not the driving force behind congressional action, and its peculiar

features—with elements that may occur months, years, or even decades apart from each other—

do not appear to have been discussed in the legislative history.  But Congress's overarching

purpose of "providing a remedy against the Federal Government for innocent victims of Federal

law enforcement abuses," *id.*, is consistent with the Court's conclusion that malicious

prosecution claims that only became available after 1974 are included in the waiver of sovereign

immunity.

      Nor would the Court's interpretation open the floodgates to claims based in part on pre-

1974 conduct.  If malicious prosecution is unusual among intentional torts, then *this* malicious

prosecution claim—spanning over half a century from initiation to termination of proceedings—

is almost sui generis.  The Court is unaware of any FTCA case since a 2004 decision in the

District of Massachusetts, *Limone v. United States*, 336 F. Supp. 2d 18 (D. Mass. 2004),

presenting the issue of a prosecution that was initiated before 1974 but only decades later revealed to have been a sham.  That scenario, "given the passage of time," is "unlikely to recur." *Limone v. United States*, 579 F.3d 79, 88 (1st Cir. 2009).

### c.  Caselaw

Perhaps because of the narrow circumstances under which the question might present itself, few courts have addressed whether the FTCA's law enforcement proviso waives sovereign immunity for malicious prosecution claims whose elements straddle the effective date of March 16, 1974.  But the only court to have analyzed this precise question in any depth reached the same conclusion as this Court.  *See Limone*, 336 F. Supp. 2d at 32-33.

In *Limone*, four men alleged that they had been framed by state and federal law enforcement officers for the murder of Edward "Teddy" Deegan on March 12, 1965.  *Id.* at 23.  All four men were convicted of murder in 1968; one was sentenced to life imprisonment and three were sentenced to death, although their sentences were later vacated and replaced with life imprisonment.  *Id.* at 27.  In 2000, after two of the men had already died in prison, documents released in connection with an unrelated criminal prosecution revealed that FBI and other officials had procured false testimony and concealed exculpatory evidence during the investigation and prosecution.  *Id.* at 28.  The convictions of the two men still living were subsequently vacated.  *Id.*  They then filed, *inter alia*, FTCA claims against the FBI based on malicious prosecution under Massachusetts law.  *Id.* at 29.  On the government's motion to dismiss, the district court confronted the question whether the plaintiffs' claims for malicious prosecution "arose" before or after March 16, 1974.  *See id.* at 29-31.  Examining the plain language of the statute, the court observed that a "claim" is "an enforceable *legal right*," and that "arise" refers to "when legal rights may be enforced in court."  *Id.* at 31.  The court concluded that "plaintiffs did not have an enforceable *legal right* or claim until they received favorable

26

termination to their convictions—well after 1974—because they could not have brought an action for malicious prosecution until that point." *Id.* "Whatever 'arise' means in other settings, for other intentional torts," the court explained, "in the context of malicious prosecution, it has to include the occurrence of all elements comprising the tort." *Id.* at 30-31.[11]

None of the Government's cited authorities, *see* Gov't Mem. 17-18, examined the question presented here in significant detail, and they therefore do not persuade the Court to read the statute differently. In *Diminnie v. United States*, the Sixth Circuit affirmed the district court's dismissal of the plaintiff's claims for assault, battery, false imprisonment, false arrest, and malicious prosecution because they "all accrued at the time of the original arrest and indictment in 1973, and thus prior to the 1974 amendment to the FTCA." *Diminnie v. United States*, 728 F.2d 301, 303 (6th Cir. 1984). But the court considered all those claims together and conducted no independent analysis of the malicious prosecution claim, which, as discussed above, differs from other torts in important respects. *See id. Diminnie* is therefore not persuasive. In *Ames v. United States*, the Eighth Circuit affirmed the dismissal of abuse of process, false arrest, and false imprisonment claims because "plaintiff's arrest, confinement and indictment occurred prior to March 16, 1974." *Ames v. United States*, 600 F.2d 183, 185 (8th Cir. 1979). Importantly, however, the court disposed of the malicious prosecution claim on other grounds. *See id.* Accordingly, *Ames* does not support the Government's view. If anything, it undermines it

---

[11] On appeal, the First Circuit declined to reach the question of sovereign immunity, disposing of the malicious prosecution claim on other grounds. *Limone*, 579 F.3d at 88. Although it acknowledged that "the question of when a cause of action for malicious prosecution arises under the law enforcement proviso of the FTCA is jurisdictional in nature," *id.* at 88 n.3, it cautioned that "[c]ourts should take pains not to grapple needlessly with enigmatic questions" that are "unlikely to recur." *Id.* at 88. Here, however, this Court must address the question of sovereign immunity because it concludes, *infra*, that Plaintiffs have stated a claim for malicious prosecution. While the Court agrees that the fact-pattern is unusual and unlikely to recur, it respectfully disagrees with the characterization of the question as "enigmatic." *See id.* Rather, the Court finds that the question is answered by a straightforward reading of the proviso's text.

slightly, since the court could easily have disposed of the malicious prosecution claim on sovereign immunity grounds—which are jurisdictional—rather than on the merits if it believed itself to be without jurisdiction. And *Gaudet v. United States* contained very little analysis and did not concern a malicious prosecution claim—or, at least, did not discuss the tort of malicious prosecution in any detail. *See Gaudet v. United States*, 517 F.2d 1034, 1035 (5th Cir. 1975).

Finally, *Regan v. Sullivan* is entirely consistent with this Court's conclusion. There, the Second Circuit considered, hypothetically, whether a plaintiff's claims for several intentional torts, including malicious prosecution, could have been brought against the United States under the FTCA. *Regan v. Sullivan*, 557 F.2d 300, 303 (2d Cir. 1977). It reasoned that they could not have, because they "arose prior to the effective date of the [1974] amendment." *Id.* But, as Plaintiffs point out, the criminal proceedings in that case terminated in the plaintiff's favor in 1973, *also* prior to the amendment. *See Regan v. Sullivan*, 417 F. Supp. 399, 401 (E.D.N.Y. 1976). There is therefore no tension between the Second Circuit's decision in *Regan* and this Court's conclusion that a malicious prosecution claim does not "arise" until favorable termination.[12]

Accordingly, the Court holds that Congress has waived the sovereign immunity of the United States with respect to Plaintiffs' malicious prosecution claims, and the Court now proceeds to the merits.

### 2.  The Elements of Malicious Prosecution

As already discussed, malicious prosecution requires "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3)

---

[12] The Government's remaining cases—*Spock v. United States*, 464 F. Supp 510 (S.D.N.Y. 1978); *Pennington v. United States*, 406 F. Supp. 850 (E.D.N.Y. 1976); and *Dupree v. Village of Hempstead*, 401 F. Supp. 1398 (E.D.N.Y. 1975)—did not consider malicious prosecution claims and are therefore not instructive.

lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis*, 919 F.3d at 163-64.  The Government argues that Plaintiffs have failed to adequately allege the first and third of these elements.

The first element, initiation or continuation of a criminal proceeding, is satisfied where the "defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000).  "A jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010).  Courts in this Circuit have held that a "claim for malicious prosecution against a police officer 'requires some showing that the defendant distorted the process by which the plaintiff was brought to trial.'" *Buari v. City of New York*, 530 F. Supp. 3d 356, 383 (S.D.N.Y. 2021) (quoting *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015)).  For example, "[s]howing that the police 'failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the initiation element of malicious prosecution."  *Id.* (quoting *Manganiello*, 612 F.3d at 160)); *see also Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (noting that a police officer "initiate[s] a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor").

The Government asserts that Plaintiffs' factual allegations are insufficient to state the required level of initiation by FBI employees.  Gov't Mem. 18-22.  The Court disagrees.  As Plaintiffs note, they allege that the FBI concealed exculpatory information, fabricated evidence, and forwarded information to the District Attorney knowing that it would be used to prosecute them.  *See, e.g.*, Compl. ¶¶ 3, 7, 14, 47, 52, 72-74, 121, 129, 147, 154.  The District Attorney

even praised its partnership with the FBI as an example of "real effective cooperation."  *Id.* ¶ 59.  The level of FBI involvement alleged in the Complaints more than satisfies the requirement that the "defendant played an active role in the prosecution," *Rohman*, 215 F.3d at 217.

The Government responds by noting that Plaintiffs "do not allege that the FBI controlled the investigation or exerted control over" the state prosecution.  Gov't Mem. 20.  But that is not the standard under New York law, as discussed above.  And the Government's argument that Plaintiffs' claims are conclusory, *id.* n.5, is based on a decision at the summary judgment stage, not a motion to dismiss under Rule 12(b)(6).  *See Roberts v. City of New York*, 97 N.Y.S.3d 3, 7-8 (N.Y. App. Div. 2019), *aff'd*, 137 N.E.3d 497 (N.Y. 2019).  At this stage, all Plaintiffs need do is state a claim to relief that is plausible on its face, and they have done so.

The third element of malicious prosecution, lack of probable cause for commencing the proceeding, is also sufficiently alleged in the Complaints.  "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution."  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  Probable cause exists when officers "have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).  "A presumption of probable cause is created . . . by a grand jury's indictment," but that "presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts[, or] that they have misrepresented or falsified evidence or otherwise acted in bad faith.'"  *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250-51 (N.Y. 1983)).

Here, Plaintiffs' allegations that the FBI had intelligence about the actual assassins soon after Malcolm X's murder, *see* Compl. ¶¶ 42-51, and that the prosecution's case against

Plaintiffs rested in significant part on fabricated evidence, *see id.* ¶¶ 72-80, are sufficient to meet that burden and to rebut the presumption of probable cause that flows from a grand jury indictment.  The Government's argument to the contrary fails to grapple directly with Plaintiffs' allegations.  The Government argues that probable existed because multiple eyewitnesses identified Plaintiffs as the shooters, Gov't Mem. 24-25, but Plaintiffs allege that portions of the eyewitness testimony were fabricated and procured by FBI employees.  *See* Compl. ¶¶ 72-80. The Government, in insisting that Plaintiffs "allege what information was presented to the grand jury, what evidence supported the finding of probable cause as of March 10, 1965, and what evidence was presented against the Plaintiffs at trial," Gov't Mem. 24, demands a level of particularity not required at the pleading stage.  Plaintiffs have plausibly alleged the absence of probable cause.  Accordingly, the Court concludes that Plaintiffs have stated a claim for malicious prosecution.

### B.  Plaintiffs' IIED, Negligence, and NIED Claims

The Court next turns to Plaintiffs' claims for IIED, negligence, and NIED.  The Government seeks dismissal of all three claims as time-barred, *see* Gov't Mem. 8-14, and separately argues that Plaintiffs have failed to state claims for each under New York law, *see* Gov't Mem. 25-34.  For the reasons that follow, the Court holds that the IIED claims may proceed, but the negligence and NIED claims must be dismissed.

### 1.  Statute of Limitations

The FTCA provides for a two-year statute of limitations from the time that a claim accrues.  28 U.S.C. § 2401(b) (an FCTA claim "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues").  "[R]ead into every federal statute of limitations is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run

until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982).

Plaintiffs presented their FTCA claims to the relevant federal agency in March 2023. Compl. ¶ 17.  The Government contends that all of Plaintiffs' tort claims other than malicious prosecution "accrued decades ago" and are therefore barred by the FTCA's two-year statute of limitations.[13]  Gov't Mem. 8.  At the very least, the Government argues, Plaintiffs learned of the critical facts concerning their injury in February 2020, when a Netflix documentary concerning Malcolm X's assassination was released, or perhaps as far back as 2011, when a number of FBI files related to Malcolm X were released to the public.  *Id.* at 9-10.

Plaintiffs counter that they could not have brought their claims before their exoneration in 2021 because of the Supreme Court's decision in *Heck v. Humphrey*.  There, the Court held that, "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a plaintiff bringing a claim for damages under 42 U.S.C. § 1983 "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  *Heck*, 512 U.S. at 486-87.  The key question for a court considering such a claim is "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Id.* at 487.  In such cases, the statute of limitations does not begin to

---

[13] The Government acknowledges that "Plaintiffs' malicious prosecution claims accrued only when their convictions were vacated in November 2021, and thus has not argued that those claims are barred by the statute of limitations."  Gov't Reply 2 n.1.

run until "the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated." *McDonough v. Smith*, 588 U.S. 109, 119-20 (2019).

In *Wallace v. Kato*, the Supreme Court clarified that *Heck* "delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn." *Wallace v. Kato*, 549 U.S. 384, 393 (2007) (emphasis in original). Importantly, if no criminal conviction exists at the time a claim accrues, the statute of limitations runs normally and is not delayed by *Heck*. *See id.* Thus, in *Wallace*, the Court held that *Heck* did not delay the accrual of the plaintiff's false arrest claim because his claim became available "when he appeared before the examining magistrate and was bound over for trial." *Id.* at 391. At that time, "there was in existence no criminal conviction that the cause of action would impugn; indeed, there may not even have been an indictment." *Id.* at 393. Accordingly, *Heck* applies only to claims that (1) arose after the entry of a criminal conviction and (2) would necessarily impugn that conviction if successful.

The question before the Court is whether Plaintiffs' claims were *Heck*-barred before their convictions were vacated; if so, then their claims did not accrue until November 2021 and were timely filed in March 2023. To answer that question, the Court must consider three questions: whether *Heck* applies to FTCA actions; whether Plaintiffs' convictions were in existence at the time their claims accrued; and whether success on Plaintiffs' tort claims "would necessarily imply the invalidity of [their] conviction[s]," *Heck*, 514 U.S. at 487.

First, neither the Supreme Court nor the Second Circuit has addressed whether *Heck* applies to FTCA claims, but the parties do not dispute that it does. *See* Pls.' Mem. 4-5; Gov't Reply 2, ECF No. 63; Tr. 5. *Heck*'s holding that § 1983 claims for unlawful conviction or imprisonment are barred unless the conviction or sentence has been rendered invalid (or at least called into question) rested on the principle that "civil tort actions are not appropriate vehicles

33

for challenging the validity of outstanding criminal judgments." 512 U.S. at 486. Multiple

courts have therefore concluded that *Heck* is not limited to § 1983 claims, but also applies to

FTCA claims based on an invalid conviction or sentence. *See, e.g.*, *Erlin v. United States*, 364

F.3d 1127, 1132 (9th Cir. 2004) ("The interests the Supreme Court identified in *Heck* require us

to impose the same restriction on FTCA claims that *Heck* imposed on § 1983 actions."); *Parris v.*

*United States*, 45 F.3d 383, 385 (10th Cir. 1995) ("[T]he FTCA, like § 1983, is not an

appropriate vehicle for challenging the validity of outstanding criminal judgments."). As noted,

the Second Circuit has not addressed this question, but it has acknowledged that *Heck* is not

limited to the § 1983 context, holding that "*Heck* should apply to *Bivens* actions as well,"

*Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995) (referring to the implied cause of action against

the United States for constitutional violations established in *Bivens v. Six Unknown Named*

*Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)). Because the Supreme Court's

reasoning in *Heck* applies with as much force to FTCA claims as it does to § 1983 or *Bivens*

claims, the Court agrees with the parties that *Heck* applies in FTCA cases.

Second, the Government argues that Plaintiffs' negligence, IIED, and NIED claims could

have been brought before they were ever convicted, and therefore under *Wallace v. Kato*, their

claims were not *Heck*-barred. Gov't Reply 3. But there can be no serious argument that

Plaintiffs had a complete cause of action by the time of their convictions in March 1966.

Plaintiffs' claims are not based on false arrest—a cause of action that becomes available as soon

as a person is detained pursuant to legal process, *Wallace*, 549 U.S. at 389—but are, at bottom,

based on their wrongful convictions and decades-long thwarted efforts to clear their names. *See*

*Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010) (holding that the plaintiff's

"conviction was an essential piece of [the IIED] tort because it was the wrongful conviction that

led to the emotional strain and mental anguish that [he] faced"). Moreover, the critical facts

upon which Plaintiffs' claims rely were not known to Plaintiffs, to the public, or even to the

prosecutor until many decades after Malcolm X's assassination. *See* Compl. ¶¶ 117-151.

Indeed, the Government does not seriously argue that Plaintiffs could have sued in 1965-1966,

instead insisting that Plaintiffs should have discovered the basis for their claims by 2020, when

the Netflix documentary was released, if not by 2011, when the FBI released many Malcolm X

documents publicly. *See* Gov't Mem. 8-12; Gov't Reply 5, 7-8.  The Court holds that because

Plaintiffs have adequately alleged that they had not discovered, and could not by reasonable

diligence have discovered, the basis of their claims between February 1965 and March 1966,

accrual was postponed for that period, at a minimum. *See Barrett*, 689 F.2d at 327.

Accordingly, because Plaintiffs' claims did not accrue prior to their convictions, *Wallace v. Kato*

does not apply here.

Third, the Government argues that success on Plaintiffs' negligence, IIED, and NIED

claims would not *necessarily* imply the invalidity of their convictions, and therefore *Heck* did not

toll the statute of limitations.  Gov't Reply 2.  The inquiry into whether a judgment on a civil

claim would necessarily imply the invalidity of a criminal conviction "is inherently a factual

one." *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999).  A claim resting on false

arrest, for example, might not be *Heck*-barred "if there were independent evidence upon which a

conviction could be obtained that was not in any way tainted" by the alleged misconduct. *Id.* at

123.  Here, however, Plaintiffs' claims are not based on a false arrest that might nevertheless

have produced a valid conviction.  Rather, Plaintiffs allege that FBI agents manufactured a case

against them, and their basis for damages is that they were wrongfully convicted, incarcerated for

decades, and branded as the perpetrators of one of the most notorious acts of political violence of

the twentieth century in the United States. *See, e.g.*, Compl. ¶¶ 248, 270, 287.  Given the nature

of the allegations in this case, it appears—at least at this stage—that a finding of liability and an

award of damages in Plaintiffs' favor on any claim would necessarily require a conclusion that they were wrongfully convicted. *See Parish*, 614 F.3d at 684 (holding that plaintiff's IIED claim was *Heck*-barred because "at the heart of [his] complaint is a claim that the defendant officers fabricated an entire case against him that led to his wrongful conviction"). Given the precise nature of the factual allegations in this case, Plaintiffs were barred by *Heck* from bringing suit until November 2021. Accordingly, the Court concludes that Plaintiffs' claims, filed administratively in March 2023, are timely. *See* 28 U.S.C. § 2401(b).[14]

### 2. Intentional Infliction of Emotional Distress

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). The Government does not challenge Plaintiffs as to the second through fourth elements, but it argues that Plaintiffs' IIED claims must be dismissed for three reasons: first, they are foreclosed by New York's public policy bar on IIED claims against public entities, Gov't Mem. 30; second, the claims are duplicative of their malicious prosecution claim, *id.*; and third, the conduct alleged is not sufficiently extreme and outrageous, *id.* at 31-32. The Court rejects all three contentions.

The Government first argues that the IIED claims must be dismissed because "claims of intentional infliction of emotional distress against government bodies are barred as a matter of

---

[14] Because the Court concludes that Plaintiffs' claims are timely under *Heck*, it need not decide whether the statute of limitations should be equitably tolled until 2011, 2020, or 2021. *See* Gov't Mem. 8-10; Gov't Reply 5, 7-8; Pls.' Mem. 7-8. The Court also need not address the parties' argument over whether the continuing violation doctrine renders Plaintiffs' claims timely. *See* Gov't Mem. 12-14; Pls.' Mem. 8-10.

public policy" under New York law.  Gov't Mem. 30 (quoting *Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187, 219 (S.D.N.Y. 2024)).  But applying that principle to bar an FTCA claim would be paradoxical.  The FTCA expressly allows recovery "under circumstances where the United States, *if a private person*, would be liable" under state law—not where the United States, if a municipal entity, would be liable.  28 U.S.C. § 1346(b)(1); *see United States v. Olson*, 546 U.S. 43, 45-46 (2005); *Rayonier v. United States*, 352 U.S. 315, 319 (1957) ("We expressly decided . . . that the United States' liability is not restricted to the liability of a municipal corporation or other public body.").  It is therefore of no moment that New York law prohibits recovery for IIED against government entities, because FTCA liability depends only on what New York law permits as to *private* entities.[15]

Next, the Government argues that because IIED "is a theory of recovery that is to be invoked only as a last resort," it is "precluded where the offending conduct is embraced by a traditional tort remedy."  Gov't Mem. 30 (quoting *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999)).  The Government's theory is essentially that the IIED claims should be dismissed as duplicative of the other claims.  But as the Second Circuit has recognized, although the New York Court of Appeals has "questioned whether IIED should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability," it "did not hold that liability for IIED is *never* appropriate when the underlying conduct may overlap with other torts."  *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016).  Here, the alleged

---

[15] Courts in this Circuit have thus considered IIED claims against federal entities under the FTCA and New York law and dismissed them for failure to state a claim—notably, *not* based on the Government's theory that IIED claims against government entities are barred altogether. *See, e.g.*, *Stuto*, 164 F.3d at 827 (affirming dismissal of IIED claim where alleged conduct not sufficiently outrageous or extreme); *Li v. Aponte*, No. 05 Civ. 6237, 2008 WL 4308127, at *9 (S.D.N.Y. Sept. 16, 2008) (granting summary judgment on IIED claim where allegations fell entirely within the ambit of other torts and where conduct was not outrageous or extreme).

conduct underlying Plaintiff's malicious prosecution and IIED claims is certainly overlapping, but it is not *identical*.  The conduct comprising Plaintiffs' malicious prosecution claims is focused on acts that took place during the investigation, arrest, and prosecution, while Plaintiff's IIED claims also concern conduct that continued for decades after their conviction.  *Compare* Compl. ¶¶ 241-248, *with id.* at 249-262.  Accordingly, the IIED claims are not duplicative of a traditional tort remedy and may proceed.[16]

Finally, the Government denies that the conduct alleged is "extreme and outrageous" enough to meet the definition of IIED.  Gov't Mem. 31.  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Stuto*, 164 F.3d at 827.  If the facts alleged in the Complaint are true, then FBI officials fabricated evidence and withheld exculpatory information to ensure that two innocent men would spend the prime of their lives in prison for a notorious crime they did not commit—and then spend all or most of their golden years living under the shadow of that conviction.  Those allegations undeniably rise to the level of "extreme and outrageous" conduct.  The Government's argument to the contrary—implying that the alleged conduct in this case is "[]tolerable in a civilized society," *id.*—strains credulity.  The Court therefore denies the motion to dismiss as to Plaintiffs' IIED claim.

---

[16] Because IIED is not on the list of torts that were exempted from the FTCA's waiver of sovereign immunity before the law enforcement proviso of 1974—in other words, because IIED has always been included in the FTCA's waiver—the Government does not argue that Plaintiffs' IIED claims are barred by sovereign immunity.  *See* Gov't Mem. 14-18.

### 3.  Negligence

The FTCA allows recovery for torts committed "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  Under that provision, "a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred." *Watson v. United States*, 865 F.3d 123, 134 (2d Cir. 2017).  The Second Circuit has disallowed FTCA claims based on negligent investigation in New York: "under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Id.*  The Government argues that Plaintiffs' negligence claims must therefore be dismissed, and the Court agrees.

Plaintiffs counter that they are not seeking to recover under a theory of negligent investigation.  Pls.' Mem. 28.  But they do not satisfactorily explain how their claim is different from a negligent investigation claim.  Regardless of how they style their claims, the circumstances they describe and the behavior they allege fit the mold of negligent investigation as described in *Watson*.  *See, e.g.*, *King v. United States*, No. 16 Civ. 2565, 2020 WL 1234236, at *2-3 (E.D.N.Y. Mar. 13, 2020) (explaining that FTCA claims that FBI agents failed to, among other things, exercise due diligence in their investigation, present exculpatory information to the judge and prosecutor, and properly supervise the negligent behavior of their employees amounted to claims for negligent investigation, which were barred under *Watson*).

Plaintiffs also argue, in the alternative, that the Government should be liable for negligent supervision if the FBI employees acted outside the scope of their employment.  *See* Pls.' Mem. 35-36.  They allege that, "to the extent that certain of Defendant's agents and employees may have acted outside the scope of their employment, . . . [their] supervisors, if private persons,

would be liable under New York law for negligently supervising those agents or employees." Compl. ¶ 280. But they fail to identify any circumstances among the many factual allegations in the Complaint in which FBI employees might plausibly have been acting outside the scope of their employment. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. Plaintiffs' negligence and negligent supervision claims are therefore dismissed.

### 4. Negligent Infliction of Emotional Distress

Under New York law, a plaintiff may establish a claim for NIED "in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'" *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). Under the bystander theory, a plaintiff can recover for witnessing the death or serious bodily injury of a member of their immediate family. *Id.* Under the direct duty theory, a plaintiff has a cause of action "if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." *Id.* "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Id.* In addition, New York law "recognizes a cause of action in cases where there is 'an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious'" even in the absence of a direct duty. *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. State*, 334 N.E.2d 590, 592 (1975)). New York courts have found such special circumstances to exist in cases where hospital staff negligently misinformed a woman that her mother had died and where lab technicians negligently provided a false-positive result on an HIV test. *See id.*

Here, Plaintiffs do not allege either a bystander or a direct duty theory of NIED. *See* Tr. 55. Rather, they characterize their claims as invoking the special circumstances theory. *Id.* at 55-56. But Plaintiffs have not shown why the facts of this case are analogous to cases in which

New York courts have found special circumstances to be present.  Accordingly, the NIED claims are dismissed.

**CONCLUSION**

The Government's Motion to Dismiss is **GRANTED in part** and **DENIED in part**.  The Court **GRANTS** the motion with respect to Plaintiffs' negligence and negligent infliction of emotional distress claims; these claims are hereby dismissed.  The Court **DENIES** the motion with respect to the malicious prosecution and intentional infliction of emotional distress claims.

The Clerk of Court is respectfully requested to terminate ECF No. 34.

SO ORDERED.

Dated: December 11, 2024
       New York, New York

DALE E. HO
United States District Judge

41